1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  AMNON Z. SIEGEL (State Bar No. 234981)
   asiegel@millerbarondess.com
3  LAUREN R. WRIGHT (State Bar No. 280809)
   lwright@millerbarondess.com
4  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
5  Los Angeles, California 90067
   Telephone:  (310) 552-4400
6  Facsimile:  (310) 552-8400

7  HARRY F. COLE, *Pro Hac Vice application to be filed*
   cole@fhhlaw.com
8  FLETCHER, HEALD & HILDRETH, PLC
   1300 North 17th St., 11th Floor
9  Arlington, VA 22203
   Telephone:  (703) 812-0400
10
   Attorneys for Plaintiffs
11
                    **UNITED STATES DISTRICT COURT**
12
         **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
13

14
   NATIONAL ASSOCIATION OF            **CASE NO. 2:16-cv-00609**
15 AFRICAN AMERICAN-OWNED
   MEDIA, a California limited liability **COMPLAINT FOR CIVIL RIGHTS**
16 company; and ENTERTAINMENT         **VIOLATION; FOR DAMAGES;**
   STUDIOS NETWORKS, INC., a          **AND FOR INJUNCTIVE RELIEF**
17 California corporation,
18              Plaintiffs,
19         v.
20 CHARTER COMMUNICATIONS,            **DEMAND FOR JURY TRIAL**
   INC., a Delaware corporation;
21 FEDERAL COMMUNICATIONS
   COMMISSION, a federal agency; and
22 DOES 1 through 10, inclusive,
23              Defendants.
24
25
26
27
28

278989.10

                              COMPLAINT

Plaintiffs National Association of African American – Owned Media ("NAAAOM") and Entertainment Studios Networks, Inc. ("Entertainment Studios") allege claims against Defendants Charter Communications, Inc. ("Charter"), the Federal Communications Commission ("FCC") and DOES 1 through 10, inclusive, (collectively, "Defendants") as follows:

## INTRODUCTION

**A.   Background**

1.     This case is about racial discrimination in contracting for television channel carriage.  At the direction of its President and Chief Executive Officer, Tom Rutledge, Defendant Charter Communications has intentionally excluded African American–owned media companies, including Plaintiff Entertainment Studios, from contracting for carriage on its television distribution platform.  Rutledge did this himself and by and through his subordinates, including Allan Singer, Senior Vice President of Programming at Charter.

2.     Entertainment Studios—a 100% African American–owned media company with a portfolio of seven, 24-hour, high definition television networks currently carried by AT&T U-Verse, Verizon Fios and DirecTV, among others—has been attempting to enter into a carriage agreement with Charter for years, to no avail.[1]  Rutledge has refused to take, or return, any of Entertainment Studios' calls or to meet with Byron Allen, the African American founder, chairman and CEO of Entertainment Studios.  Even when Entertainment Studios implores Rutledge's underlings to approach Rutledge regarding the launch of Entertainment Studios' channels on Charter's television system, Rutledge refuses to consider a possible carriage deal with this African American–owned media company.

---

[1] A carriage agreement is a contract between a multichannel video programming distributor, such as Charter, and a channel vendor/programmer, such as Entertainment Studios, granting the distributor the right to "carry" (that is, distribute) the programmer's channels.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

3.     Rutledge's unwavering refusal to negotiate a carriage deal with Entertainment Studios effectively blocks Entertainment Studios' portfolio of television networks from reaching Charter's millions of subscribing television viewers.  Charter currently provides cable television services to more than four million subscribers and is poised to dramatically increase its television footprint with the acquisition of Time Warner Cable (currently the fourth-largest television distributor in the United States) and Bright House Networks (tenth-largest).

4.     If these acquisitions go through, Charter will become the third-largest television distributor, and the second-largest cable and broadband internet operator, in the United States with more than seventeen million subscribers.  This merged television distributor will be headed up by Rutledge—who is a blatant racist.

5.     Charter's merger application is currently pending before the Federal Communications Commission ("FCC"), one of the federal agencies tasked with reviewing the merger to ensure that it will serve the public interest.  This public interest evaluation considers a multitude of factors, including whether the proposed merger would promote a diversity of information sources to the public.  Needless to say, diversity requires the economic inclusion of African American–owned media companies.

6.     Diversity is a core concern for FCC merger approval.  Indeed, a driving purpose of the Federal Communications Act and the First Amendment is to ensure the widest possible dissemination of information from diverse sources.  Yet the FCC has done nothing to protect the voices of African American–owned media companies in the face of increased media consolidation.

7.     Instead, the FCC works hand-in-hand with these merging television distribution companies to enable and facilitate their Civil Rights violations.  The FCC's apparent standard operating procedure is to obtain and accept sham diversity commitments from merger applicants, in excess of its statutory duties.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

8.    Unlike a merger condition, these diversity "commitments" are shielded from judicial review under the dubious pretense that the merging parties "volunteered" to them.  But, in actual practice, the FCC routinely encourages, and then accepts as reliable, these empty diversity promises in order to ostensibly satisfy the law's diversity requirements.

9.    These commitments—whose genesis is, at best, questionable—do nothing to actually protect or promote diversity in the media industry.  They merely foster a public impression that the FCC is taking steps to enhance diversity.   In reality, these superficial commitments—entered into with non-media, non-channel-owner civil rights groups—harm African American–owned media companies.  The FCC's conduct actually facilitates the economic exclusion African American–owned media companies and supports white ownership using African American "fronts."

10.    In this regard, the FCC has violated—and continues to violate—Entertainment Studios' equal protection rights under the due process clause of the U.S. Constitution.  The FCC enables and facilitates Charter's racial discrimination in contracting, in violation of 42 U.S.C. § 1981.

11.    Given Charter's record of refusing to do business with African American–owned media companies, as detailed herein, Charter's proposed merger with Time Warner Cable and Bright House Networks will neither promote diversity nor be in the public interest.  Rutledge is now trying to cast Charter as a promoter of diversity, despite his and Charter's sordid record of refusing to do business with African American–owned media companies.

12.    Rutledge recently announced that Charter has entered into a memorandum of understanding ("MOU") with a dozen "multicultural leadership organizations," including Al Sharpton's National Action Network, among other non-media civil rights groups.  Through the MOU, Charter has made a number of symbolic commitments that it says it will implement upon approval of the merger, including appointing minority members to its presently all-male, all-white Board of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400      FAX: (310) 552-8400

1   Directors; appointing a so-called "Chief Diversity Officer"; and enhancing its

2   "involvement and investment" in organizations serving communities of color—*i.e.*,

3   making monetary "contributions"—pay offs—to non-media civil rights groups that

4   support the merger.

5          13.    In other words, rather than actually doing business with African

6   American–owned media companies, Rutledge and Charter have chosen to secure

7   merger support by embracing Al Sharpton and other non-media civil rights groups.

8   But Al Sharpton neither owns nor operates a television network.  Nor does Sharpton

9   speak for all Black people, and certainly not for all, or any, African American–

10  owned media companies.  He is a token, a shill being used by Rutledge, Charter and

11  the FCC.  Charter uses Al Sharpton as racial cover, which is far less expensive than

12  doing real business with African American–owned media companies, like

13  Entertainment Studios.

14         14.    Sharpton has a well-documented business model and track record of

15  obtaining payments from corporate entities in exchange for his support on "racial

16  issues."  Sharpton can be bought on the cheap.  Doing business with real African

17  American–owned media companies requires true economic inclusion for African

18  Americans—something that is unacceptable to Rutledge and Charter.

19         15.    Rutledge and Charter's motives are made evident by the "promises"

20  made in the MOU.  Indeed, the MOU's symbolic commitments do nothing to

21  promote diversity in the media industry.  Charter has made no commitment—

22  through the MOU or otherwise—to contract with and thereby ensure true economic

23  inclusion for African American–owned media companies.

24         16.    The MOU includes no pledge by Charter to launch African American–

25  owned and operated networks.  Rather, Charter states only that it will "expand

26  programming targeting diverse audiences."  But this vague "commitment" does

27  nothing to promote and protect programming from—and economic inclusion of—

28  diverse sources, which is the very heart of the public interest diversity inquiry.

17.     Charter's MOU is nothing more than a ploy to garner FCC support for and approval of its merger with Time Warner Cable and Bright House Networks.  In this regard, Charter has taken a page out of a familiar playbook—the same one another cable giant, Comcast, used to gain approval of its 2011 merger with NBC-Universal.

18.     In the time leading up to its merger, Comcast, too, was criticized for its poor track record in contracting for carriage with minority-owned media companies. To counter the opposition to its merger, Comcast entered into memoranda of understanding with some of the same non-media civil rights groups Charter has now partnered with.  Comcast, like Charter, made purely symbolic diversity commitments, without any true intentions of doing business with African American–owned media companies.  And, indeed, post-merger, Comcast has flouted its MOU commitments and steadfastly refused to do business with truly African American–owned media companies.

**B.     FCC Futility**

19.     Charter is playing the same game as Comcast.  And if the past is any predictor of the future, Charter's merger is on the path to approval.  Just as the FCC, in approving Comcast's merger, chose to rely on Comcast's sham diversity commitments in an MOU, so too is the FCC on track to approving Charter's merger based on the same sham diversity commitments.

20.     The FCC has established, repeatedly, that it is ready, willing and able to give merger applicants significant credit for making "voluntary" diversity commitments.  Through this practice, the FCC has encouraged merger applicants—including Charter—to take that route.  The result provides the agency and the merging parties with a "win-win" situation:  The FCC can claim that it has secured voluntary concessions (and, thus, can posture itself as a champion of diversity), while the applicants get what they want—*i.e.*, agency approval.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

21.     Because of the supposedly "voluntary" nature of the "diversity commitments," the FCC's actions in this regard are immune to judicial review. The only losers here are the *bona fide* African American–owned media companies who are left out in the cold. The FCC is exceeding its statutory duties; this practice violates the law.

22.     If the FCC approves Charter's merger and Charter becomes the third-largest television distributor in the United States, Entertainment Studios and other African American–owned media companies will be shut out from Charter's seventeen million subscribers due to Charter's racial discrimination in contracting.

23.     The FCC has done nothing to enforce or investigate Comcast's blatant violations of the commitments it made in its MOU, signaling to Charter that empty promises and symbolic gestures are all that is required to satisfy the FCC. There is no accountability in the FCC.

24.     Based on the FCC's established practice of encouraging merger applicants to enter into sham diversity agreements in order to secure merger approval, the FCC is engaging in extra-legal activity exceeding its statutory duties. It would therefore be futile for Plaintiffs to approach the FCC and seek relief therein.

25.     Absent court intervention, the FCC will approve Charter's merger based on its phony MOU, without consideration for Charter's racially discriminatory policies and practices in contracting for channel carriage, as detailed herein. The FCC is thereby encouraging the racist and discriminatory practices of Charter to continue unabated.

**C.     Racial Discrimination**

26.     Plaintiff Entertainment Studios is a 100% African American–owned media company involved in the production and distribution of television programming through broadcast television, its seven cable television channels and its subscription-based internet service. It is the only 100% African American–

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 Avenue of The Stars, Suite 1000   Los Angeles, California 90067
Tel: (310) 552-4400     Fax: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

owned video programming producer and multi-channel operator/owner in the United States.  It is a victim of Charter's racial discrimination in contracting and the FCC's practice of providing its governmental stamp-of-approval on racial discrimination in the media industry, in violation of law.

27.     Charter has come up with every excuse in the book to avoid doing business with Entertainment Studios.  For example, Charter claimed to have "bandwidth challenges," but in reality it was reserving all of its bandwidth for other, non-African American-owned networks.  It also claimed that it was not launching any new networks "for the foreseeable future," a statement which has been belied by Charter's launch of several new channels during the same time period, including (as just one example) white-owned RFD-TV.

28.     Entertainment Studios was also told by Charter personnel that Charter's President and CEO, Tom Rutledge, "doesn't meet with programmers," and thus they should not reach out to him to discuss a carriage deal.  The truth is, Rutledge does not meet with African American–owned programmers, like Entertainment Studios.  He has been witnessed meeting with other, white-owned programmers.  Rutledge is pulling the strings at Charter and is orchestrating its pretextual excuses for its discriminatory refusal to do business with Entertainment Studios.

29.     On information and belief, Charter currently spends upwards of $4 billion annually to license video programming via channel carriage agreements.  Of this, nothing is paid to 100% African American–owned multi-channel media companies.  This discrepancy is the result of—and evidences—racial discrimination in contracting, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

30.     Section 1981 was enacted to eradicate racial discrimination in contracting.  It was enacted after the adoption of the Thirteenth Amendment eradicating slavery, to outlaw racial discrimination in contracting.  Under Rutledge, Charter's business model is to engage in economic exclusion of African American–owned media companies by "buying" the support of an African American shill

(Sharpton) to mask Charter's racist business practices.  This business model completely undermines the purpose and intent of the Civil Rights Act and constitutes unlawful discrimination under § 1981.

31.     Through this lawsuit, Entertainment Studios and NAAAOM seek to vindicate their rights under 42 U.S.C. § 1981 and to enforce their due process rights under the Fifth Amendment to the U.S. Constitution.  To that end, Plaintiffs seek an order compelling the FCC to discontinue its facilitation of Charter's racial discrimination in contracting for channel carriage and end the practice of allowing sham MOUs to satisfy diversity requirements.

## PARTIES, JURISDICTION AND VENUE

### D.    Plaintiffs

32.     Plaintiff NAAAOM is a California limited liability company, with its principal place of business in Los Angeles, California.

33.     NAAAOM was created and is working to obtain for African American–Owned media companies the same contracting opportunities as their white counterparts for, among other things, distribution, channel carriage, channel positioning and advertising dollars.  Its mission is to secure the economic inclusion of African American–owned media companies in contracting, the same as white-owned media companies.  NAAAOM currently has six members.

34.     Historically, because of the lack of distribution/advertising support and economic exclusion, African American–owned media companies have been forced either to (i) give away significant equity in their enterprises; (ii) pay exorbitant sums for carriage, effectively bankrupting the business; or (iii) go out of business altogether, pushing African American–owned media to the edge of extinction.

35.     As alleged herein, Entertainment Studios—a member of NAAAOM—is being discriminated against on account of race in violation of 42 U.S.C. § 1981.  Entertainment Studios thus has standing to seek redress for such violations in its own right.  The interests at stake in this litigation—namely, the right of African

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

American–owned media companies to make and enforce contracts in the same manner as their white-owned counterparts—are consonant with NAAAOM's purpose. NAAAOM seeks only injunctive relief, so the individual participation of its members is not required.

36.     Plaintiff Entertainment Studios Networks, Inc. is a California corporation, with its principal place of business in Los Angeles, California. Entertainment Studios is a 100% African American–owned television production and distribution company. It is the only 100% African American–owned video programming producer and multi-channel operator/owner in the United States.

37.     Entertainment Studios is a bona fide Minority Business Enterprise as defined by the National Minority Supplier Development Council, Inc. and as adopted by the Southern California Minority Supplier Development Council.

38.     Entertainment Studios was founded in 1993 by Byron Allen, an African American actor / comedian / media entrepreneur. Allen is the sole owner of Entertainment Studios. Allen first made his mark in the television world in 1979, when he was the youngest comedian ever to appear on "The Tonight Show Starring Johnny Carson." He thereafter served as the co-host of NBC's "Real People," one of the first reality shows on television. Alongside his "on-screen" career, Allen developed a keen understanding of the "behind the scenes" television business. Over the past 22+ years, he has built Entertainment Studios as an independent media company.

39.     Entertainment Studios has carriage contracts with more than 40 television distributors nationwide, including AT&T/DirecTV, VerizonFIOS, Suddenlink, RCN and CenturyLink. These television distributors broadcast Entertainment Studios' networks to their millions of subscribers.

40.     Entertainment Studios owns and operates seven high definition television networks (channels), six of which were launched to the public in 2009 and one in 2012. Entertainment Studios produces, owns and distributes over 32

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  television series on broadcast television, with thousands of hours of video

2  programming in its library.  Entertainment Studios' shows have been nominated for,

3  and won, the Emmy award.  A copy of an Entertainment Studios promotional

4  presentation highlighting key aspects of the company and the programming it

5  produces is attached hereto as **Exhibit A**.

6      41.    In December 2012, Entertainment Studios launched "Justice Central," a

7  24-hour, high definition court/informational channel featuring several Emmy-

8  nominated and Emmy-award winning legal/court shows.  After just three years,

9  Justice Central has already proved itself a successful channel, boasting tremendous

10  ratings growth across key television viewing periods and demographics.

11  **E.**    **Defendants**

12      42.    Charter Communications, Inc. is a Delaware corporation with its

13  principal place of business in Stamford, Connecticut.  Charter also has an office, is

14  registered to do business and operates in California.  Charter is currently the

15  seventh-largest television distribution company in the United States, providing

16  subscription television services to more than four million subscribers.  If its merger

17  application goes through, it will become the third-largest television distribution

18  company in this country, with more than seventeen million subscribers.

19      43.    The Federal Communications Commission is the federal administrative

20  agency tasked with regulating interstate and international communications by radio,

21  television, wire, satellite and cable.

22      44.    Plaintiffs are informed and believe, and on that basis allege, that

23  Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to

24  Plaintiffs for the wrongs alleged herein.  The true names and capacities, whether

25  individual, corporate, associate or otherwise, of Defendants DOES 1 through 10,

26  inclusive, are unknown to Plaintiffs at this time.  Accordingly, Plaintiffs sue

27  Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this

28  Complaint to allege their true names and capacities after they are ascertained.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**F.**   **Jurisdiction & Venue**

45.   This case is brought under a federal statute, § 1981 of the Civil Rights Act, and under the Constitution of the United States; as such, there is federal question jurisdiction under 28 U.S.C. § 1331.  Venue of this action is proper in Los Angeles because Charter resides in this district, as defined in 28 U.S.C. § 1391; and the acts in dispute were committed in this district.

## FACTS

**A.**   **Racial Discrimination in the Media**

46.   Racial discrimination in contracting is an ongoing practice in the media industry, with far-reaching adverse consequences.  It effectively excludes African American–owned media companies and African American individuals—and their diverse viewpoints—from the vast majority of the television viewing audience.

47.   Major television channel distributors, like Charter, have unique power to limit the viewpoints available in the public media.  Channel owners, like Entertainment Studios, are reliant upon the services of television distributors, like Charter, to provide access to their distribution platforms not only to realize subscriber and advertising revenue, but also to reach television consumers themselves.

48.   Charter has control over television distribution on its distribution platform; its exclusion of African American–owned channels has contributed to the near-extinction of African American ownership in mainstream media, and this exclusion is self-perpetuating.

49.   There is a statistic that highlights the inequity here:  Charter's President and CEO, Tom Rutledge—the main perpetrator of the discrimination recounted herein—was paid $16.1 million in compensation in 2014 alone, while 100% African American–owned media companies received *nothing* by way of license fees from Charter.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

50.     White-owned media has worked hand-in-hand with governmental regulators to perpetuate the exclusion of truly African American–owned media companies from contracting for channel carriage.  This has been done through, among other things, the use of "voluntary" diversity commitments made by merging television distribution companies in order to secure merger approval from the FCC.

51.     To satisfy their diversity commitments, these merger applicants then use "token fronts" and "window dressing"—African American shills posing as "fronts" or "owners" of so-called "Black cable channels" that are actually majority owned and controlled by white-owned businesses.

**B.     The FCC's Prior Track Record – Comcast/NBC-Universal Merger**

52.     In connection with its 2010 bid to acquire NBC Universal, television distributor Comcast misled and circumvented the FCC and its diversity requirements by the use of, and through, a sham "diversity" MOU.

53.     In the time leading up to the merger, Comcast was criticized for its failure to do business with minority-owned media companies, including African American–owned media companies.

54.     As with Charter's merger with Time Warner Cable and Bright House Networks, Comcast's merger was subject to regulatory approval by the FCC. Entertainment Studios and other minority-owned media companies opposed Comcast's merger bid, publicly criticizing Comcast for its failure to do business with African American–owned media companies.  Entertainment Studios urged the FCC to impose merger conditions that would address Comcast's discriminatory practices in contracting for channel carriage.

55.     Realizing that its racist practices and policies jeopardized the approval of the NBC-Universal acquisition, Comcast entered into a MOU with non-media civil rights groups, including Al Sharpton's National Action Network.  These non-media civil rights groups are not television channel owners and do not operate in the television channel business.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

56.     Through the MOU, Comcast purported to address the widespread concerns regarding the lack of diversity in channel ownership on its systems by, among other things, committing to launch several new networks with minority ownership and establishing "external Diversity Advisory Councils" to advise Comcast as to its "diversity practices," including in contracting for carriage.

57.     In reality, the MOU was a ruse designed to secure merger approval without obligating Comcast to do business with truly African American–owned media companies.  And the ruse worked:  In 2011, the FCC approved Comcast's merger with NBC-Universal, emphasizing Comcast's adherence to the "commitments" it made in the MOUs.

58.     But the FCC conducted no actual inquiry into Comcast's discriminatory practices in contracting for channel carriage.  The FCC turned a blind eye to Comcast's racist practices and policies.  And the FCC never made any effort whatsoever to follow up as to whether Comcast actually fulfilled its "voluntary commitments," even in the face of substantial evidence demonstrating that Comcast had violated those commitments entirely.

59.     Post-merger, Comcast has flouted its MOU commitments.  It has not entered into carriage agreements with any truly African American–owned media companies.  Rather, the networks Comcast has launched pursuant to the MOU are owned, controlled and backed by white-owned media and money.  Comcast gave African American celebrities token ownership interests in those channels to serve as figureheads in order to cover up its racial discrimination in contracting.

60.     The "external Diversity Advisory Councils" Comcast established are also shams.  Not only do the Council members have limited understanding of the television industry and little-to-no experience operating television networks, but Comcast has not given the Council any real authority to "advise" Comcast as to its diversity initiatives in contracting for carriage.  Instead, Comcast gave the Council members a standard tour of its offices, and never even asked the members about

channel carriage.  The Diversity Advisory Councils were nothing more than an empty symbolic gesture to secure merger approval.

61.    Despite Comcast's failure to adhere to the diversity commitments it made in the MOUs, the FCC has done nothing to cure Comcast's violations or otherwise enforce Comcast's promises of diversity.  The FCC has thus signaled to Charter and any other media companies seeking approval of major mergers and acquisitions that empty promises and symbolic gestures are all that is required to satisfy the FCC that a proposed merger will promote diversity and thereby be in the "public interest."

62.    There is no accountability imposed by the FCC.  "Window dressing" by way of sham "diversity" MOUs is how the FCC operates, and it is happening again here in connection with the proposed Charter merger with Time Warner Cable and Bright House Networks.

**C.    Taking A Play Out of Comcast's Playbook, Charter Enters Into An MOU With Non-Media Civil Rights Groups**

63.    Recently, Charter's President and CEO, Tom Rutledge, announced that Charter had entered into a memorandum of understanding with twelve "multicultural leadership organizations"—*i.e.*, non-media civil rights groups— including the National Urban League and Al Sharpton's National Action Network.

64.    Implementation of Charter's MOU is *contingent upon* the approval of Charter's merger application by the FCC.  Rutledge's motive in entering into the MOU is thus transparent:  The pledges made by Charter are designed to facilitate approval of the merger; Charter otherwise has no true intention of increasing diversity or inclusion in its business practices, including with respect to contracting for channel carriage.  If the merger falls through, it is business as usual at Charter— *i.e.*, diversity is not on the agenda.

65.    Charter's press release regarding the MOU states that the MOU includes "specific steps" that Charter will take, post-merger, including the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

following:

- Appointing one African American, one Asian American / Pacific Islander and one Latino American to its board of directors within two years of the close of the transaction;
- Appointing a so-called "Chief Diversity Officer"; and
- Expanding "programming targeting diverse audiences."

66.    These first two commitments—to add minority members to its board of directors and appoint a "Chief Diversity Officer"—are symbolic, empty promises. They do nothing to enhance diversity of information sources available to Charter's subscribers, nor to advance diverse ownership or economic inclusion of African American–owned media companies.  The fact that, in 2016, Charter does not already have a Diversity Officer indicates that Charter has no interest in diversity. And as a matter of fact, Charter does not even have a woman on its Board of Directors.

67.    Nor does Charter's vague commitment to "expand programming targeting diverse audiences" promote diversity in ownership, or economic inclusion of African American–owned media companies, in any real way.  Through this pledge, Charter committed only to distributing more programming "targeting" diverse audiences.  Charter has made no commitment to actually do business with minority-owned media companies.

68.    Without a commitment to doing business with minority-owned media companies, there can be no true economic inclusion for such companies in the media industry.  Charter's symbolic commitments to add minority members to its board and appoint a "Chief Diversity Officer" do nothing to protect African American– owned media companies, like Entertainment Studios, from continued economic exclusion by Charter.  Post-merger and post-implementation of the MOU, the television content available to Charter's seventeen million subscribers will continue to be limited by Charter's racial discrimination in contracting.

15

COMPLAINT

**D.** **Charter's Discriminatory Refusal To Contract With Entertainment Studios**

69.     For over five years, Entertainment Studios has attempted to contract with Charter for carriage of its television channels, to no avail.  In fact, Charter's top programming official, Allan Singer, Senior Vice President, time and again refused to meet with this African American–owned media company to discuss a possible carriage deal, sometimes pushing Entertainment Studios' meeting requests back by a year or more.

70.     At Rutledge's direction, Singer and other Charter executives have given Entertainment Studios multiple, pretextual excuses for why "now" was never the right time to seek carriage.

71.     For example, in 2011, Entertainment Studios reached out to Charter to discuss a possible carriage deal.  Singer told Entertainment Studios they needed to "be a bit patient."  He insisted that they try again "next year" instead.

72.     When "next year" rolled around, Singer still would not give Entertainment Studios the time of day.  In 2012, Singer explained that, again, "now" was not the right time.  Speaking on behalf of Charter, Singer stated "we aren't launching."  As additional excuses, Singer also told Entertainment Studios that Charter's "bandwidth and operational demands have increased," such that it did "not have any opportunities for the foreseeable future."  Just as he did in 2011, Singer told Entertainment Studios that a "meeting in 2012 doesn't make sense."

73.     Charter's pretextual claims that, in 2012, it was not launching any new networks on its system and that it had bandwidth problems are provably false.  During this same period, Charter was in negotiations to launch several new white-owned networks on its system.  Indeed, in late 2012, Charter publicly announced that it had entered into carriage agreements with, among others, Walt Disney Company (for the Longhorn Network, among others) and Time Warner Cable Sports.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

74.     Charter's pretextual excuses and refusals to discuss a carriage deal with Entertainment Studios continued into 2013.  In 2013, Charter again told Entertainment Studios that it would not launch its networks "for the foreseeable future," further stating that it would not even allow Entertainment Studios to make "another pitch."

75.     According to Singer, Charter did not believe in Entertainment Studios' "tracking model" because Entertainment Studios' content not only appears on Entertainment Studios' channels, but is also sold to other broadcast stations and cable networks.  This is yet another made up excuse.  Indeed, several white-owned media companies with which Charter has carriage agreements have the same business model—*i.e.*, their content not only appears on their channels but is also sold to other networks.  If this business model is satisfactory for these white-owned networks, so too should it be satisfactory for this African American–owned media company.

76.     Also in 2013, Singer advised Entertainment Studios that Charter would be willing to keep one of Entertainment Studios' channels, Justice Central, in consideration only for "the next e basic launches"—*i.e.*, the "expanded basic" or second-highest penetrated tier in the industry.  After several years of making no progress with Charter, Entertainment Studios was surprised and excited by this potential launch opportunity.

77.     Entertainment Studios thanked Charter for its consideration of Justice Central as part of its next e basic launches.  But this potential launch opportunity was too good to be true.  Charter had no true intention of ever doing business with Entertainment Studios.  Shockingly, Singer told Entertainment Studios:  "I was being facetious.  We are never doing e basic launches . . . ."  In other words, the only consideration Charter was willing to give to Entertainment Studios was for a service that it *never intended* to launch or utilize.  Singer also stated, "Even if you get support from management in the field, I will not approve the launch of your

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1   networks."

2       78.    Sensing that it could make no progress through Singer, Entertainment

3   Studios requested a meeting with Charter's President and CEO, Tom Rutledge.  But,

4   again, this avenue for negotiating carriage was thwarted.  Singer told ESN that

5   Rutledge "does not meet with programmers."  To the contrary, however,

6   Entertainment Studios witnessed Rutledge meeting with Phillipe Daumann, CEO of

7   Viacom—*i.e.*, a programmer (who is white).

8       79.    Thus, on its own initiative, ESN reached out to Rutledge in March

9   2013.  Rutledge never even responded.

10      80.    Charter's excuses in 2013 for why Entertainment Studios would not be

11  eligible for a carriage deal "in the foreseeable future" are pretextual.  In 2013, it was

12  publicly announced that Charter had entered into a channel carriage agreement with

13  white-owned/controlled RFD-TV, which provides programming focused on rural

14  and western lifestyle issues.

15      81.    Despite Charter's repeated refusals to negotiate for carriage with

16  Entertainment Studios, Entertainment Studios persisted.  They reached out again in

17  June 2015.  Despite several years of knocking on Charter's door and countless

18  attempts to set in-person meetings and phone calls to discuss a carriage deal, Singer

19  feigned ignorance in response to Entertainment Studios' renewed carriage request.

20      82.    Singer lied.  He claimed that he believed Entertainment Studios was

21  "no longer interested" in obtaining carriage on Charter's system.  Singer further

22  stated that "practice in the industry" dictated that Entertainment Studios "provide a

23  presentation about [its] channels as the first step to considering carriage," and that

24  he "looked forward to learning more about them."  But Entertainment Studios had

25  already provided information about its channels to Singer on multiple occasions

26  throughout their years-long efforts to obtain carriage with Charter.

27      83.    Singer's comments in this regard were disingenuous.  Entertainment

28  Studios at no time stopped seeking carriage on Charter's system, and Singer had no

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   legitimate basis to believe they were "no longer interested" in a carriage deal.

2   Indeed, Singer often balked at Entertainment Studios' persistence, telling them that

3   he did not need "another pitch" from the company and that it did not make sense to

4   "meet again" regarding Entertainment Studios' request carriage.  Singer was, once

5   again, just making up excuses to avoid doing business with this African American–

6   owned media company.

7        84.    Entertainment Studios called Singer out on his lies and phony excuses.

8   And in doing so, Entertainment Studios copied several FCC commissioners,

9   including Chairman Wheeler, to notify them of Charter's discriminatory practices in

10  contracting for carriage.  In other words, the FCC has already been apprised of

11  Charter's unfair and discriminatory business practices; hence Charter's eagerness to

12  "prove" it is now a proponent of diversity in the media industry to get its merger

13  approved.

14       85.    Despite Entertainment Studios' many attempts to reach out to

15  Chairman Wheeler and the FCC to address the rampant racism in the media

16  industry, Chairman Wheeler would not set a meeting with Entertainment Studios

17  founder, chairman and CEO, Byron Allen, or even return his numerous phone calls.

18       86.    After Entertainment Studios called Singer out on his lies and excuses,

19  Singer finally agreed to set a meeting with Entertainment Studios in July 2015.

20       87.    Entertainment Studios' team traveled from their office in Los Angeles

21  to Charter's headquarters in Connecticut, with the understanding that the purpose of

22  the meeting was to negotiate the terms of a carriage deal.  But when they arrived,

23  they soon learned that was not the case.  Singer dragged Entertainment Studios to

24  Connecticut just so he could say that he met with them and gave them consideration

25  for a carriage deal.  But at the meeting, he made clear that Charter would never

26  consider doing business with Byron Allen's company.

27       88.    Once more, Singer gave Entertainment Studios all the excuses in the

28  book.  For example, Singer told Entertainment Studios that Rutledge wanted to wait

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

to "see what AT&T does."  But AT&T already carried one of Entertainment Studios' networks (Justice Central) at the time, and AT&T has since launched Entertainment Studios' entire portfolio of channels on its television distribution system.  Despite this—and despite Charter's indication that it just wanted to wait to "see what AT&T does"—Charter still refuses to carry *any* of Entertainment Studios' channels.

89.    Charter also told Entertainment Studios that it would have to wait until after the merger was approved to be considered for a carriage deal.  According to Charter, until the merger is approved, there are "too many unknowns" to enter into a carriage deal with Entertainment Studios.  Singer told Entertainment Studios:  "You go back to the line"—*i.e.*, "Get to the back of the bus behind white-owned channels who have carriage."

90.    Charter just wanted to postpone the negotiations and lead Entertainment Studios to believe that it had a chance to obtain carriage on its system so that Entertainment Studios would not publicly oppose the merger on the basis of Charter's racist refusal to do business with African American–owned media companies.

91.    Charter also continued its mantra regarding limited bandwidth as a pretextual excuse to avoid doing business with Entertainment Studios in 2015.  But despite its purported bandwidth limitations, Charter expanded the reach of its distribution of white-owned RFD-TV in 2015, when it began distributing RFD-TV across its entire television footprint—including in major urban cities such as Los Angeles and Atlanta where, presumably, the demand for rural networking is not nearly as high as the demand for the general audience, lifestyle networks offered by Entertainment Studios.  More pretext.

92.    Meanwhile, Singer has ceased returning Entertainment Studios' calls altogether.

93.     Charter is discriminating against Entertainment Studios on account of race in connection with contracting for carriage in violation of the Civil Rights Act, 42 U.S.C. § 1981.  Without access to viewers and without licensing fees and advertising revenues from one of the largest video programming distributors in the country, this African American–owned media company is being shut out and severely damaged.

## FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS
## (42 U.S.C. § 1981)

### NAAAOM and Entertainment Studios Against Defendant Charter

**A.      Section 1981**

94.     Plaintiffs refer to and incorporate by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

95.     Charter has engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting, which is illegal under § 1981.  Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

96.     African Americans are a protected class under § 1981.  Entertainment Studios is a 100% African American–owned media company.

97.     As alleged herein, Entertainment Studios attempted many times over many years to contract with Charter to carry its channels, but Charter has refused, providing a series of phony, pretextual excuses.  Yet Charter has continued to contract with—and make itself available to contract with—similarly situated white-owned television channels.

98.     Charter has refused to contract with Entertainment Studios for channel carriage.  Charter has a pattern and practice of refusing to do business, or offering unequal contracting terms, to African American–owned media companies.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**B.   Damages**

99.   But for Charter's refusal to contract with Entertainment Studios, Entertainment Studios would receive millions of dollars in annual license fees and advertising revenue.  Moreover, with distribution on one of the largest television platforms in the nation, the demand for Entertainment Studios' channels both domestically and internationally would increase, leading to additional growth and revenue for Entertainment Studios' channels.

100.   Based on the revenue Entertainment Studios would generate if Charter contracted with them in good faith, Entertainment Studios would be valued at approximately $10 billion.

101.   Similarly situated lifestyle and entertainment media companies are valued at higher amounts.  But for Charter's refusal to contract with Entertainment Studios, Entertainment Studios would have a higher valuation.

102.   Accordingly, Charter's unlawful discrimination has caused Entertainment Studios in excess of $10 billion in damages, according to proof at trial; plus punitive damages for intentional, oppressive and malicious racial discrimination.

## SECOND CAUSE OF ACTION: VIOLATION OF DUE PROCESS
## UNDER THE FIFTH AMENDMENT
### NAAAOM and Entertainment Studios Against Defendant FCC

103.   Plaintiffs refer to and incorporate by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

104.   Defendant FCC is violating the due process rights of NAAAOM and Entertainment Studios by engaging in a pattern or practice of facilitating economic exclusion of African Americans by encouraging merger applicants to execute sham diversity MOUs in order to secure merger approval.

105.   The FCC's pattern of accepting sham commitments to diversity permits television distributors, including Charter, to discriminate as described herein.  This

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    amounts to a racially discriminatory practice and procedure.

2          106.   The U.S. Supreme Court has held that the Fifth Amendment to the U.S.

3    Constitution contains an equal protection component prohibiting the federal

4    government from invidiously discriminating between individuals or groups,

5    including on the basis of race.  This constitutional protection applies to actions by

6    governmental agencies such as the FCC, which are required to provide Americans

7    with equal protection of the laws without regard to race, based on the guarantee of

8    liberty in the due process clause of the Fifth Amendment.

9          107.   Discrimination based on race by a federal agency such as the FCC is so

10   unjustifiable as to violate constitutional due process.  The U.S. Supreme Court has

11   repeatedly invalidated federal actions fostering discrimination in violation of due

12   process clause.

13         108.   In this case, the FCC's pattern and practice of facilitating Charter's

14   racial discrimination by encouraging and accepting sham "diversity" MOUs, while

15   in fact excluding African Americans from real economic inclusion, provides a

16   federal government stamp of approval on these discriminatory practices.  The result

17   is that the FCC is complicit in Charter's racial discrimination in contracting for

18   channel carriage, in violation of the U.S. Constitution.

19         109.   Through the FCC's policy of leading Charter and other television

20   distributors to eschew their commitments to diversity and true economic inclusion

21   of African American–owned media companies by creating a false pretense of racial

22   equality, the FCC denies Entertainment Studios and other African American–owned

23   media companies of the constitutionally required due process guarantee to be free of

24   government sanctioned invidious discrimination.

25         110.   The FCC's encouragement and acceptance of sham MOUs and its "lip

26   service" to African American–owned media companies fosters the false impression

27   that the FCC has taken diversity considerations into account when determining

28   whether a proposed merger is in the "public interest."  This constitutes a pattern or

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1  practice of invidious discrimination in violation of the Fifth Amendment to the U.S.

2  Constitution.

3       111.   The FCC's established pattern and practice of facilitating

4  discrimination by television distributors, including Charter, happens behind closed

5  doors.  There is no formal rule promulgated by the FCC governing this policy and

6  practice, nor is there any recount or record of this policy and practice when the FCC

7  approves a merger.

8       112.   As a result, this discriminatory policy and practice by the FCC evades

9  judicial review through traditional channels such as the Administrative Procedure

10  Act.  Indeed, nothing further could be gained by waiting for a final agency action, as

11  the FCC's actions to facilitate discrimination have not and will not appear in any

12  administrative record.

13       113.   Exhaustion of administrative remedies is not required for a U.S.

14  constitutional claim against a governmental agency.  And based on the FCC's

15  established practice of pretending to care about racial equality and claiming

16  diversity as an important value, while actually encouraging the economic exclusion

17  of African American–owned media companies, it would be futile for Plaintiffs to

18  approach the FCC to exhaust their administrative remedies.

19       114.   Defendant FCC's violations of the constitutional rights of NAAAOM

20  and Entertainment Studios causes serious, irreparable, and lasting harm to Plaintiffs.

21  Absent relief, the FCC will approve this merger under the façade of diversity and

22  racial equality while being complicit in Charter's racially discriminatory policies

23  and practices in contracting for channel carriage, thus encouraging the racist and

24  discriminatory practices of Charter and other television distributors to continue

25  unabated.

26       115.   Accordingly, Plaintiffs hereby seek injunctive relief precluding the

27  FCC from utilizing the sham diversity agreements offered by Charter in its

28  regulatory review of the Charter / Time Warner Cable / Bright House merger.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

24

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment, as follows:

1.  Plaintiff Entertainment Studios prays for compensatory, general and special damages from Charter in excess of $10 billion according to proof at trial;

2.  Plaintiffs NAAAOM and Entertainment Studios pray for injunctive relief prohibiting Charter from discriminating against African American–owned media companies, including Entertainment Studios, based on race in connection with contracting for channel carriage;

3.  Plaintiff Entertainment Studios prays for punitive damages, based on oppression and malice, according to Charter's net worth;

4.  Plaintiffs NAAAOM and Entertainment Studios pray for injunctive relief that the FCC discontinue its practice of facilitating sham "diversity" agreements/MOUs, including the Charter MOU described herein, and not rely on these agreements in considering whether to approve proposed mergers, including Charter's proposed acquisition of Time Warner Cable and Bright House Networks;

5.  Plaintiff Entertainment Studios prays for attorneys' fees, costs and interest; and

6.  Plaintiffs NAAAOM and Entertainment Studios pray for such other and further relief as the court deems just and proper.

DATED:  January 27, 2016            MILLER BARONDESS, LLP


By:  _____/s/ Louis R. Miller_____
      LOUIS R. MILLER
      Attorneys for Plaintiffs

278989.10

## 25
COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

3      Plaintiff Entertainment Studios hereby demands trial by jury pursuant to the

4 Seventh Amendment of the United States Constitution on the 42 U.S.C. § 1981

5 claim for damages.

6

7 DATED:  January 27, 2016         MILLER BARONDESS, LLP

8

9

10                   By: _____/s/ Louis R. Miller_____

11                       LOUIS R. MILLER
                         Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

278989.10

26

COMPLAINT