LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
BRIAN A. PROCEL (State Bar No. 218657)
bprocel@millerbarondess.com
DAVID W. SCHECTER (State Bar No. 296251)
dschecter@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:  (310) 552-8400

HARRY F. COLE, *Admitted Pro Hac Vice*
cole@fhhlaw.com
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th St., 11th Floor
Arlington, VA 22203
Telephone:  (703) 812-0400

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF AFRICAN AMERICAN-OWNED MEDIA, a California limited liability company; and ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation,<br><br>   Plaintiffs,<br><br>  v.<br><br>CHARTER COMMUNICATIONS, INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>   Defendants. | Case No.: 2:16-cv-00609-GW-FFM<br><br>**FIRST AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

306209.5

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................... 1

PARTIES, JURISDICTION AND VENUE............................................... 3

    A.   Plaintiffs ....................................................................................... 3

    B.   Defendants................................................................................... 6

    C.   Jurisdiction And Venue............................................................... 6

FACTS ....................................................................................................... 7

    A.   Racial Discrimination In The Media........................................... 7

    B.   Charter's Racial Discrimination ................................................. 7

    C.   Charter Makes Sham Commitments To Diversity..................... 14

    D.   The Comcast/NBC-Universal Merger ...................................... 15

    E.   Taking a Play out of Comcast's Playbook, Charter Enters into a Similar MOU......................................................................... 17

FIRST CAUSE OF ACTION:
VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1981) .......................... 19

    A.   Section 1981 .............................................................................. 19

    B.   Damages .................................................................................... 20

PRAYER FOR RELIEF ........................................................................... 20

DEMAND FOR JURY TRIAL ................................................................ 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

i

FIRST AMENDED COMPLAINT

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

## <u>STATUTES</u>

4

28 U.S.C. § 1331.................................................................................................6

5

28 U.S.C. § 1391.................................................................................................7

6

Civil Rights Act of 1866, 42 U.S.C. § 1981 ......................................................3

7

Federal Communications Act, 47 U.S.C. § 151 ...............................................14

8

9

## <u>OTHER AUTHORITIES</u>

10

U.S. Const. amend. 1 ......................................................................................14

11

U.S. Const. amend. 5 ......................................................................................21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ii

FIRST AMENDED COMPLAINT

1        Plaintiffs National Association of African American–Owned Media

2  ("NAAAOM") and Entertainment Studios Networks, Inc. ("Entertainment Studios")

3  (together "Plaintiffs") allege claims against Defendants Charter Communications,

4  Inc. ("Charter") and DOES 1 through 10, inclusive, (together "Defendants") as

5  follows:

6                      **<u>INTRODUCTION</u>**

7        1.     This case is about racial discrimination in contracting for television

8  channel carriage.[1]  Plaintiff Entertainment Studios is an African American-owned

9  media company.  For years, Entertainment Studios has been attempting to enter into

10  a carriage agreement with Defendant Charter—now the third-largest television

11  distributor in the United States—but Charter has refused to carry Entertainment

12  Studios' channels because Entertainment Studios is owned by an African American.

13        2.     Racial discrimination is the only explanation for Charter's refusal

14  because Entertainment Studios has offered to license six of its networks for free and

15  the seventh network for just ten cents per subscriber—which is the lowest offer

16  Entertainment Studios can make, given the most favored nations clause in its other

17  agreements.  Entertainment Studios' offer of ten cents per subscriber for a total of

18  seven networks is far below the millions of dollars Charter pays to white-owned

19  programmers to license their networks.

20        3.     Racial discrimination is an ongoing practice in the media industry with

21  far-reaching adverse consequences.  The practice is so extensive that a top legal

22  advisor to the Chairman of the Federal Communications Commission (the "FCC")

23  told a representative of Entertainment Studios that the "cable system in America is

24  inherently racist."

25  _____

26  [1] A carriage agreement is a contract between a multi-channel video programming
distributor, such as Charter, and a channel vendor/programmer, such as

27  Entertainment Studios, granting the distributor the right to "carry" (that is,

28  distribute) the programmer's channels.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

4.      Plaintiffs have powerful evidence of Charter's racial bias against Entertainment Studios.  Four African Americans who were protesting outside of Charter's headquarters in Stamford, Connecticut have come forward and will testify that Charter's Senior Vice President of Programming, Allan Singer, approached them and made derogatory racist comments about African Americans.

5.      Singer yelled at these African Americans and told them to get off welfare and that they were typical African Americans looking for "handouts." Singer stereotyped one of the people as an African American who was out of work, saying he spent his money on frivolous things.  In his anger, Singer specifically mentioned race.  These comments show Singer's racism—that African Americans are financially irresponsible and can succeed only through government assistance or "handouts."  Two days after Plaintiffs showed Charter their allegations about Singer's racist statements to this African American group, Charter announced that Singer is leaving the company.

6.      Singer's racism has roots in the racism that existed in this Country in the mid-19th Century when African Americans were thought to be genetically inferior to and lacking the intellectual capacity of whites.

7.      A person with such racial bias carries these prejudices into all aspects of his life, including his work.  At Charter, Singer was the executive in charge of dealing with Entertainment Studios and its African American owner.

8.      Plaintiffs also have evidence of racial animus harbored by Charter's Chairman and CEO, Tom Rutledge.  Rutledge and the owner, founder and CEO of Entertainment Studios, Byron Allen, both attended the Cable Hall of Fame Dinner on May 16, 2016.  At the dinner, Allen tried to talk with Rutledge, but Rutledge refused.  Rutledge made a dismissive hand gesture and called Allen a "Boy," a derogatory name for an African American man.  Rutledge told Allen that he needed to change his behavior.

9.      Rutledge's use of the derogatory, insulting term "Boy" was no

accident.  Rutledge was expressing his belief that Allen was different from the white executives Rutledge is used to dealing with, echoing the days of Jim Crow when whites routinely called African American men "Boys" to demean them as inferior to whites.

10.    The racism expressed by Rutledge and Singer accounts for why Charter has refused to carry Entertainment Studios' channels (and any other 100% African American-owned channels).  It also explains why Charter, until the approval of its merger with Time Warner Cable, had an all-white male board of directors, even though women and racial minorities subscribe to Charter's services and are responsible for a significant portion of Charter's revenue.  Rutledge and Singer will not do business with Entertainment Studios because of their racial animosity and because, per their statements, it would just be another "handout" for African Americans.

11.    In addition to the derogatory racist statements by Charter CEO, Tom Rutledge, and Charter Senior Vice President of Programming, Allan Singer, as set forth above, there is abundant evidence pleaded herein showing Charter's racism including deceitful conduct, phony excuses for not contracting with Entertainment Studios, and paying-off non-media civil rights groups such as Al Sharpton's organization to supposedly fulfill diversity requirements.

12.    Charter's discrimination is contrary to the law.  Racial discrimination in contracting is prohibited by 42 U.S.C. § 1981, which ensures that all people have the same right to make and enforce contracts "as is enjoyed by white citizens."  Section 1981 was enacted to eradicate racial discrimination in contracting and is derived from the Civil Rights Act of 1866, and applies with full force today.

13.    Through this lawsuit, Plaintiffs seek to vindicate their rights under 42 U.S.C. § 1981.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## PARTIES, JURISDICTION AND VENUE

### A.    Plaintiffs

14.    Plaintiff NAAAOM is a California limited liability company, with its principal place of business in Los Angeles, California.

15.    NAAAOM was created for the purpose of and is working toward obtaining the same contracting opportunities for African American–owned media companies as their white counterparts for—among other things—distribution, channel carriage, channel positioning and advertising dollars.  At the heart of its mission is obtaining the economic inclusion of African American-owned media companies in the same manner as white-owned media companies.

16.    Historically, because of economic exclusion, African American–owned media companies have been forced either to: (i) give away significant equity in their enterprises; (ii) pay exorbitant sums for carriage, effectively bankrupting the business; or (iii) go out of business altogether, pushing African American–owned media to the edge of extinction.

17.    Entertainment Studios—a member of NAAAOM—is being discriminated against on account of race in violation of 42 U.S.C. § 1981.  NAAAOM thus has standing to seek redress for such violations in its own right.  The interests at stake in this litigation—namely, the right of African American–owned media companies to make and enforce contracts in the same manner as their white-owned counterparts—are consonant with NAAAOM's purpose.  NAAAOM does not seek money damages, so the individual participation of its members is not required.

18.    Plaintiff Entertainment Studios is a corporation, with its principal place of business in Los Angeles, California.  Entertainment Studios is a 100% African American–owned television production and distribution company, involved in all facets of the entertainment industry including television, film, digital publishing, advertising and multiple networks/channels featuring original content.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

19.     Entertainment Studios is a bona fide Minority Business Enterprise as defined by the National Minority Supplier Development Council, Inc. and as adopted by the Southern California Minority Supplier Development Council.

20.     Entertainment Studios was founded in 1993 by Byron Allen, an African American actor, comedian and media entrepreneur.  Allen is the sole owner of Entertainment Studios.  Allen first made his mark in the television world in 1979 as the youngest comedian ever to appear on "The Tonight Show Starring Johnny Carson."  He thereafter served as the co-host of NBC's "Real People," one of the first reality shows on television.  Alongside his "on-screen" career, Allen developed a keen understanding of the "behind the scenes" television business.  For more than 22 years, Allen has built Entertainment Studios into an independent, global media company competing with the likes of The Walt Disney Company, Warner Bros., Lionsgate, Sony, and Paramount (among others).

21.     Entertainment Studios has channel carriage contracts with more than 40 television distributors nationwide, including AT&T U-Verse, DirecTV, VerizonFIOS, Suddenlink, RCN and CenturyLink.  These television distributors broadcast Entertainment Studios' networks to nearly 80 million cumulative subscribers throughout the United States.

22.     In 2009 Entertainment Studios' launched six high definition television networks (channels) to the public, eventually launching a seventh in 2012. Entertainment Studios produces, owns and distributes over 35 television series on broadcast television, with thousands of hours of video programming in its library. Entertainment Studios' shows have been nominated for, and have won, highly coveted and internationally recognized awards such as the Emmy Award. Entertainment Studios also acquires, produces and distributes motion pictures to movie theatres, home video distributors, television networks, and other licenses through its affiliate companies.  A copy of an Entertainment Studios promotional

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  presentation highlighting certain key aspects of the company and the programming

2  it produces is attached hereto as **Exhibit A**.

3      23.    In December 2012, Entertainment Studios launched

4  "JusticeCentral.TV," a 24-hour-per-day, high definition court, news and

5  entertainment channel featuring several Emmy-Award nominated and Emmy-Award

6  winning television judges and legal/court shows.  After just three years,

7  JusticeCentral.TV has already proved itself a successful channel, being now

8  available to approximately 25 million pay television subscribers in the United

9  States.

10     **B.     Defendants**

11     24.    Charter Communications, Inc. is a Delaware corporation with its

12  principal place of business in Stamford, Connecticut.  Charter also has an office, is

13  registered to do business and operates in California.  Charter is now the third-largest

14  television distribution company in this country, with more than 17 million

15  subscribers.

16     25.    Charter became the third-largest television distribution company after

17  the FCC—the federal administrative agency tasked with regulating interstate and

18  international communications by radio, television, wire, satellite and cable—

19  approved the merger with Time Warner Cable.

20     26.    Plaintiffs are informed and believe, and on that basis allege, that

21  Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to

22  Plaintiffs for the wrongs alleged herein.  The true names and capacities, whether

23  individual, corporate, associate or otherwise, of Defendants DOES 1 through 10,

24  inclusive, are unknown to Plaintiffs at this time.  Accordingly, Plaintiffs sue

25  Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this

26  Complaint to allege their true names and capacities after they are ascertained.

27     **C.     Jurisdiction And Venue**

28     27.    This case is brought under a federal statute, 42 U.S.C. § 1981; as such,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  there is federal question jurisdiction under 28 U.S.C. § 1331.  Venue of this action is

2  proper in Los Angeles because the parties reside in this district, as defined in 28

3  U.S.C. § 1391; and the acts in dispute were committed in this district.

**FACTS**

**A.   Racial Discrimination In The Media**

6      28.    Racial discrimination in this industry is so extensive that a top legal

7  advisor to the Chairman of the FCC, Gigi Sohn, candidly told an Entertainment

8  Studios representative that the "cable system in America is inherently racist."  Such

9  inherent racism prevents television audiences from viewing programming from

10  African American–owned media companies.

11      29.    Major television channel distributors such as Charter have unique

12  power to limit economic opportunity for channel owners.  To reach the television

13  audience, channel owners like Entertainment Studios are reliant upon the services of

14  television distributors, like Charter, to provide access to their distribution platforms.

15  Channel owners need distribution to realize subscriber and advertising revenue.

16      30.    Charter has refused to carry African American–owned channels on its

17  distribution platform, contributing to the near-extinction of African American

18  ownership in mainstream media.  There is a statistic that highlights the inequity

19  here:  Charter's President and CEO, Tom Rutledge—the main perpetrator of the

20  discrimination recounted herein and a blatant racist—was paid $16.1 million in

21  compensation in 2014 alone, while 100% African American–owned media

22  companies received *nothing* by way of license fees from Charter.

**B.   Charter's Racial Discrimination**

24      31.    Charter's racial bias is evident even in its own moving papers.  In its

25  motion to dismiss filed on June 16, 2016, Charter refers to Plaintiffs as extortionists

26  and calls the lawsuit a "scam" brought with "cynical" motives—these are criminal

27  accusations.  When white-owned businesses file suit against Charter, they are called

28  litigants.  But when an African American-owned business files suit, Charter calls it

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  extortion.

2      32.    Entertainment Studios is an African American-owned global media

3  company with 80 million cumulative television subscribers, seven television

4  networks, a film studio and a robust production and distribution business.  Charter's

5  competitors—including AT&T U-Verse, DirecTV, VerizonFIOS, Suddenlink, RCN

6  and CenturyLink—carry Entertainment Studios' channels.  In fact, VerizonFIOS has

7  carried Entertainment Studios' networks since 2009 and has repeatedly extended

8  carriage agreements with Entertainment Studios, and added JusticeCentral.TV in

9  2012.  Charter's competitors would not carry, let alone extend, carriage agreements

10 with Entertainment Studios unless Entertainment Studios' channels had market

11 demand and working with Entertainment Studios made sound business sense.

12      33.    Despite the fact that Charter's competitors carry Entertainment Studios'

13 channels, Charter has never dealt in good faith with, nor provided a competitive

14 proposal, offer or counter-offer to, Entertainment Studios.  Charter's top

15 programming official, Senior Vice President Allan Singer, has refused, rescheduled

16 and postponed meetings with Entertainment Studios, which prevented Charter and

17 Entertainment Studios from engaging in meaningful discussions about a carriage

18 deal.

19      34.    By virtue of his position, Singer has decision-making authority over

20 which channels Charter carries.  Motivated by racial animus, Singer blocked

21 Entertainment Studios' attempts to obtain a carriage contract with Charter.

22      35.    To hide their racial animus, Singer and other Charter executives, all at

23 the direction of CEO Tom Rutledge, gave Entertainment Studios multiple phony

24 excuses for why "now" was never the right time.

25      36.    In 2011, Entertainment Studios reached out to Charter to discuss a

26 possible carriage deal.  Singer told Entertainment Studios they needed to "be a bit

27 patient."  Singer insisted that Entertainment Studios try again "next year."

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

37.     When the next year rolled around, Singer explained that, again, "now" was not the right time.  Speaking on behalf of Charter, Singer stated "we aren't launching" despite the fact that Charter was indeed launching new, white-owned channels throughout the entire time period in question.  As additional excuses, Singer told Entertainment Studios that Charter's "bandwidth and operational demands have increased," such that it did "not have any opportunities for the foreseeable future."  Just as he did in 2011, Singer told Entertainment Studios that a "meeting in 2012 doesn't make sense."

38.     Charter's made-up excuse that it was not launching any new networks on its system in 2012 and that it had bandwidth problems are provably false.  During this same period, Charter was in negotiations to launch several new white-owned networks on its system.  Indeed, in late 2012, Charter publicly announced that it had entered into carriage agreements with, among others, the Walt Disney Company (for the Longhorn Network, among others) and Time Warner Cable Sports.

39.     Charter's phony excuses and refusals to discuss a carriage deal with Entertainment Studios continued into 2013.  Charter again told Entertainment Studios that it would not launch its networks "for the foreseeable future," further stating that it would not even allow Entertainment Studios to make "another pitch."

40.     Charter's excuses for why Entertainment Studios would not be eligible for a carriage deal "in the foreseeable future" are patently false.  Charter publicly announced in 2013 that it had entered into a channel carriage agreement with white-owned/controlled RFD-TV, which provides programming focused on rural and Western lifestyle issues.

41.     Another phony excuse was that, according to Singer, Charter did not believe in Entertainment Studios' "tracking model" because Entertainment Studios' content appears on both Entertainment Studios' channels and on other broadcast stations and cable networks.  This is yet another made-up excuse because several white-owned media companies with carriage agreements with Charter have the same

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  business model—*i.e.*, their content not only appears on their channels but is also

2  sold to other networks.  Indeed, the vast majority of cable networks Charter carries

3  have programming that simultaneously runs on broadcast networks, local broadcast

4  television stations, other cable networks, and on digital platforms such as Netflix,

5  Hulu and Amazon.

6       42.    In 2013, Singer advised Entertainment Studios that Charter would be

7  willing to keep one of Entertainment Studios' channels, JusticeCentral.TV, in

8  consideration for "the next e basic launches"—*i.e.*, the "expanded basic" or second-

9  highest penetrated tier in the industry.  After several years of making no progress

10  with Charter, Entertainment Studios was surprised and excited by this potential

11  launch opportunity.

12       43.    Entertainment Studios thanked Charter for its consideration of

13  JusticeCentral.TV as part of its next e basic launches.  But this potential launch

14  opportunity was a Singer/Rutledge ruse.  Charter had no intention of ever doing

15  business with Entertainment Studios.  Shockingly, Singer told Entertainment

16  Studios:  "I was being facetious.  We are never doing e basic launches . . . ."

17       44.    In other words, Charter was only willing to consider Entertainment

18  Studios for a service that it never intended to launch or utilize.  Singer made it clear

19  that he would block any future efforts to obtain carriage, telling Entertainment

20  Studios:  "Even if you get support from management in the field, I will not approve

21  the launch of your networks."

22       45.    Sensing that Singer was discriminating against Entertainment Studios,

23  Entertainment Studios requested a meeting with Charter's President and CEO, Tom

24  Rutledge.  Singer tried to block this effort, telling Entertainment Studios that

25  Rutledge "does not meet with programmers."  This was a lie because Rutledge

26  regularly meets with white CEOs of white-owned programmers.  In fact,

27  Entertainment Studios witnessed Rutledge meet with Phillipe Daumann, CEO of

28  Viacom—*i.e.*, a programmer (who is white).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

46.     Seeking the same treatment Charter offers to white-owned programmers, Entertainment Studios reached out to Charter's CEO, Tom Rutledge, in March 2013 to pitch its channels.  Rutledge never responded.  In fact, Rutledge has refused to take or return any of Entertainment Studios' calls or to meet with Byron Allen, the African American founder, chairman and CEO of Entertainment Studios.

47.     Despite Charter and Rutledge's repeated refusals to negotiate for carriage with Entertainment Studios, Entertainment Studios persisted. Entertainment Studios reached out again in June 2015.  Despite several years of knocking on Charter's door and countless attempts to set in-person meetings and phone calls to discuss a carriage deal, Singer told Entertainment Studios that he thought Entertainment Studios was "no longer interested" in a Charter carriage deal—a wholly illogical, disingenuous statement.

48.     Condescendingly, Singer stated that the "practice in the industry" dictated that Entertainment Studios "provide a presentation about [its] channels as the first step to considering carriage."  Singer even said that he "looked forward to learning more about them."  But as Entertainment Studios had already provided information about its channels directly to Singer on multiple occasions over the past four years, Singer's comments were bizarre and fake.

49.     As Singer knew, at no time did Entertainment Studios stop seeking carriage on Charter's system.  Indeed, the suggestion that Entertainment Studios would not be interested is ludicrous; why would any television programmer decide to stop seeking carriage to reach Charter's 17 million subscribers and all of the potential advertising and licensing revenue associated with a carriage deal?  Singer always balked at Entertainment Studios' persistence, telling them that he did not need "another pitch" from the company and that it did not make sense to "meet again" regarding Entertainment Studios' request for carriage.  In reality, Singer was creating a record to cover up his past dealings with Entertainment Studios.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

50.    After Entertainment Studios called Singer out on his lies and excuses, Singer finally agreed to set a meeting with Entertainment Studios in July 2015.

51.    Entertainment Studios' team traveled from Los Angeles to Charter's headquarters in Stamford, Connecticut, with the understanding that the purpose of the meeting was to negotiate the terms of a carriage deal.  But when they arrived, they soon learned that was not the case.  Singer lured Entertainment Studios to Connecticut just so he could say "on the record" that he met with Entertainment Studios' team and considered offering a carriage deal.  Singer made clear that Charter would never do business with Byron Allen's company.

52.    Once more, Singer gave Entertainment Studios all the excuses in the book.  Singer told Entertainment Studios that Rutledge wanted to wait to "see what AT&T does."  But AT&T already carried one of Entertainment Studios' networks (JusticeCentral.TV) at the time, and AT&T has since launched Entertainment Studios' entire portfolio of channels on its television distribution system.  Despite this—and despite Charter's indication that it just wanted to wait to "see what AT&T does"—Charter still refuses to carry any of Entertainment Studios' channels.

53.    Charter also told Entertainment Studios that it would have to wait until after the Time Warner Cable merger was approved to be considered for a carriage deal.  According to Charter, until the merger is approved, there are "too many unknowns" to enter into a carriage deal with Entertainment Studios.  Singer told Entertainment Studios:  "You go back to the line"—*i.e.*, "Get to the back of the bus behind white-owned channels who have carriage."

54.    Using this ploy, Charter wanted to postpone the negotiations and deceive Entertainment Studios into believing that it had a chance to obtain carriage on its system so that Entertainment Studios would not publicly oppose the merger on the basis of Charter's racist refusal to do business with the African American-owned Entertainment Studios.

55.     Charter restated its phony excuse about limited bandwidth.  Charter had ample bandwidth available to carry Entertainment Studios' channels.  In fact, in 2015, Charter expanded the reach of its distribution of the white-owned, lesser-known channel RFD-TV across its entire television footprint—including in major urban cities such as Los Angeles and Atlanta where, presumably, the demand for rural networking is not nearly as high as the demand for the general audience, lifestyle networks offered by Entertainment Studios.  Also in 2015, Charter expanded the reach of the white-owned, lesser-known channel CHILLER to all of its 17 million subscribers.

56.     Meanwhile, Singer has ceased returning Entertainment Studios' calls altogether; and Rutledge has continued to refuse to meet.

57.     There is no sound business justification for Charter's unwavering refusal to meet in good faith with Entertainment Studios and negotiate a carriage deal.  There is also no sound business justification for Charter's refusal to provide a competitive proposal, offer or counter-offer to Entertainment Studios, especially since Charter's competitors carry Entertainment Studios' channels.  Rather than engage in good faith discussions, Singer and his boss Rutledge simply do not want to do business with Entertainment Studios' owner Byron Allen because he is African American.

58.     Entertainment Studios has powerful direct evidence confirming Singer and Rutledge's racial bias.  In mid-March 2016, as summarized above, Singer approached an African American group in front of Charter headquarters and made derogatory racist comments to them.  Singer racially profiled these people, telling them to get off of welfare and that they were typical African Americans looking for a "handout."

59.     These people were peacefully and lawfully protesting the merger that made Charter the third-largest television distributor in the United States, giving it even more power to discriminate against African American-owned media.  Given

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  Singer and Rutledge's racial bias, it is not surprising that Charter has refused to treat

2  Entertainment Studios as a legitimate media company.

3    60. And more, the Chairman and CEO of Charter, Tom Rutledge,

4  condescendingly dismissed Allen at the Cable Hall of Fame dinner, calling him a

5  "Boy" and telling him to change his behavior.  This is powerful, direct evidence of

6  racial bias.

7    61. And there is still more evidence of Charter's racism.  In or about late

8  July or early August, Charter subscribers received a horrific, racist message through

9  their cable box.  The message read "F*** Black Lives Matter!  1488 Brought to you

10  by Phreak of Nature Baby J and King Benji!  All N****** Must Die!"  The term

11  1488 is a combination of two white supremacist symbols.  14 refers to 14 words:

12  "We must secure the existence of our people and a future for white children."  88

13  refers to HH or "Heil Hitler" (H is the eighth letter of the alphabet).  Charter has not

14  identified the source of this message.  On information and belief, this message came

15  from within Charter.

16    62. Entertainment Studios is merely the most recent victim of Charter's

17  racism towards African Americans.  For years, prominent African American media

18  executives and entrepreneurs have tried and failed to launch a cable television

19  network on Charter's platform.  Charter's refusals have led to the near extinction of

20  100% African American-owned media.

21    **C.**  **<u>Charter Makes Sham Commitments To Diversity</u>**

22    63. Charter's racially discriminatory conduct is evidenced by its song-and-

23  dance routine with the FCC, where Charter makes diversity commitments that

24  appear genuine so that both Charter and the FCC can present themselves as

25  champions of diversity—but in reality, these commitments are a sham that Charter

26  knows the FCC will not enforce.

27    64. Diversity is a core concern for FCC merger approval.  Indeed, a driving

28  purpose of the Federal Communications Act and the First Amendment is to ensure

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

the widest possible dissemination of information from diverse sources.  Yet the FCC has done nothing to protect the voices of African American–owned media companies in the face of increased media consolidation.  The FCC routinely encourages, and then accepts as reliable, empty diversity promises in order to ostensibly satisfy the law's diversity requirements.

65.    It has become an all too common practice for merger applicants to satisfy diversity commitments by using "token fronts"—African American shills posing as "fronts" or "owners" of so-called "Black cable channels" that are actually majority owned and controlled by white-owned businesses.  The FCC gives merger applicants significant credit for making "voluntary" diversity commitments that are truly empty and illusory.  The result provides the merging parties with a "win-win" situation:  The FCC can claim that it has secured voluntary diversity concessions (and, thus, can posture itself as a champion of diversity), while the applicants get what they want—*i.e.*, agency approval.

66.    That is exactly what Comcast and the FCC did years ago during the FCC's review of the Comcast/NBC-Universal Merger, and has done again in more brazen fashion with the Charter/Time Warner Cable merger.

**D.    The Comcast/NBC-Universal Merger**

67.    In connection with its 2010 bid to acquire NBC-Universal, television distributor Comcast was required to show to the FCC that it was committed to diversity.

68.    In the time leading up to the merger, Comcast was criticized for its failure to do business with minority-owned media companies, including African American–owned media companies.

69.    Entertainment Studios and other minority-owned media companies opposed Comcast's merger bid, publicly criticizing Comcast for its failure to do business with African American–owned media companies.  Entertainment Studios urged the FCC to impose merger conditions that would address Comcast's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  discriminatory practices in contracting for channel carriage.

2       70.    Realizing that its racist practices and policies jeopardized the approval

3  of the NBC-Universal acquisition, Comcast entered into a memorandum of

4  understanding ("MOU") with non-media civil rights groups, including Al

5  Sharpton's National Action Network.  These non-media civil rights groups are not

6  television channel owners and do not operate in the television channel business.

7       71.    Through the MOU, Comcast purported to address the widespread

8  concerns regarding the lack of diversity in channel ownership on its systems by,

9  among other things, committing to launch several new networks with minority

10 ownership and establishing "external Diversity Advisory Councils" to advise

11 Comcast as to its "diversity practices," including contracting for carriage.

12      72.    In reality, the MOU was a ruse designed to secure merger approval

13 without obligating Comcast to do business with truly African American–owned

14 media companies.  And the ruse worked:  In 2011, the FCC approved Comcast's

15 merger with NBC-Universal, emphasizing Comcast's adherence to the

16 "commitments" it made in the MOUs.

17      73.    But the FCC conducted no actual inquiry into Comcast's

18 discriminatory practices in contracting for channel carriage, turning a blind eye to

19 Comcast's institutionalized racist practices and policies.  And the FCC never made

20 any effort whatsoever to follow up as to whether Comcast actually fulfilled its

21 "voluntary commitments," even in the face of substantial evidence demonstrating

22 that Comcast had violated those commitments entirely.

23      74.    Post-merger, the FCC has allowed Comcast to flout its MOU

24 commitments and the FCC's authority to enforce such commitments.  Meanwhile,

25 Comcast has not entered into carriage agreements with any truly African American–

26 owned media companies.  Rather, the networks Comcast has launched pursuant to

27 the MOU are owned, controlled and backed by white-owned media and money.

28 Comcast gave African American celebrities token ownership interests in those

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

306209.5

1  channels to serve as figureheads in order to cover up its racial discrimination in

2  contracting.  The FCC has taken no action.

3       75.    Consistent with its failure to monitor and ensure Comcast's adherence

4  to its diversity commitments made in the MOUs, the FCC has agreed to allow

5  Charter and Time Warner to merge in reliance upon sham diversity commitments

6  made in MOUs.  The FCC thus signaled to Charter, and now any other media

7  companies seeking approval of major mergers and acquisitions, that empty promises

8  and symbolic gestures are all that is required to satisfy the FCC that a proposed

9  merger will promote diversity and thereby be in the "public interest."  There is no

10  accountability imposed by the FCC.

11     **E.     Taking a Play out of Comcast's Playbook, Charter Enters into a**

12          **Similar MOU**

13      76.    To receive regulatory approval from the FCC for its merger with Time

14  Warner Cable, Charter entered into a memorandum of understanding ("MOU") with

15  a dozen "multicultural leadership organizations," including Al Sharpton's National

16  Action Network, among other non-media civil rights groups.  Through the MOU,

17  Charter, like Comcast before it, made symbolic commitments, including appointing

18  minority members to its all-male, all-white Board of Directors, appointing a so-

19  called "Chief Diversity Officer," and enhancing its "involvement and investment" in

20  organizations serving communities of color—*i.e.*, making monetary

21  "contributions"—pay offs—to non-media civil rights groups that support the

22  merger.

23      77.    Charter and the FCC apparently think that Al Sharpton speaks for all

24  African Americans, and thus if Charter enters into an MOU with Sharpton, Charter

25  must be making a *bona fide* commitment to African American-owned media.  But

26  Sharpton does not speak for all African Americans, and certainly not for African

27  American–owned media companies.  Sharpton acts merely as racial cover, and it is

28  far less expensive for Charter to pay him than to do business with African

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   American–owned media companies like Entertainment Studios.

2      78.   In fact, Sharpton has a well-documented business model and track

3   record of obtaining payments from corporate entities in exchange for his support on

4   "racial issues."   Sharpton can be bought on the cheap, and allows businesses to

5   avoid doing business with real African American–owned companies that would lead

6   to true economic inclusion for African Americans—something that is unacceptable

7   to Rutledge and Charter

8      79.   Even worse, the implementation of Charter's illusory MOU was

9   contingent upon the approval of Charter's merger application by the FCC.

10   Rutledge's motive in entering into the MOU is thus transparent:  The pledges made

11   by Charter are designed to facilitate approval of the merger; Charter otherwise has

12   no intention of increasing diversity or inclusion in its business practices, including

13   with respect to contracting for channel carriage.  If the merger were to have fallen

14   through, it would have been business as usual at Charter—*i.e.*, diversity is not on the

15   agenda.

16      80.   Charter's press release regarding the MOU states that the MOU

17   includes "specific steps" that Charter will take post-merger, including the following:

18      ▪   Appointing one African American, one Asian American/Pacific Islander

19          and one Latino American to its board of directors within two years of the

20          close of the transaction;

21      ▪   Appointing a so-called "Chief Diversity Officer"; and

22      ▪   Expanding "programming targeting diverse audiences."

23      81.   These first two commitments—to add minority members to its board of

24   directors and appoint a "Chief Diversity Officer"—are only symbolic.  They do

25   nothing to enhance diversity of the entities contracting with Charter or advance

26   economic inclusion of African American–owned media companies.  The fact that, in

27   2016, Charter does not already have a Diversity Officer indicates that Charter has no

28   interest in diversity.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

82. Nor does Charter's vague commitment to expanding "programming targeting diverse audiences" promote diversity in ownership or economic inclusion of African American–owned media companies in any real way. Through this pledge, Charter committed only to distributing more programming "targeting" diverse audiences. Charter has made no commitment to actually do business with minority-owned media companies.

83. Without a commitment to do business with minority-owned media companies, there can be no true economic inclusion for such companies in the media industry. Charter's symbolic commitments to add minority members to its board and appoint a "Chief Diversity Officer" do nothing to protect African American–owned media companies like Entertainment Studios from continued economic exclusion by Charter. Post-merger and post-implementation of the MOU, the television content available to Charter's 17 million subscribers will continue to be limited by Charter's racial discrimination in contracting.

## FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1981)

### NAAAOM and Entertainment Studios Against Defendant Charter

**A.    Section 1981**

84. Plaintiffs refer to and incorporate by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

85. Charter has engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting, which is illegal under § 1981. Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

86. African Americans are a protected class under § 1981. Entertainment Studios is a member of that class because it is a 100% African American–owned media company.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

87.     As alleged herein, Entertainment Studios attempted many times over many years to contract with Charter to carry its channels, but Charter has refused, providing a series of phony excuses.  Yet, Charter has continued to contract with—and make itself available to contract with—similarly situated white-owned television channels.

88.     Charter has refused to contract with Entertainment Studios for channel carriage.  Charter has a pattern and practice of refusing to do business, or offering unequal contracting terms to, African American–owned media companies.

**B.     Damages**

89.     But for Charter's refusal to contract with Entertainment Studios, Entertainment Studios would receive millions of dollars in annual license fees and advertising revenue.  Moreover, with distribution on one of the largest television platforms in the nation, the demand for Entertainment Studios' channels both domestically and internationally would increase, leading to additional growth and revenue for Entertainment Studios' channels.

90.     Based on the revenue Entertainment Studios would generate if Charter contracted with them in good faith, Entertainment Studios would be valued at approximately $10 billion.

91.     Similarly situated lifestyle and entertainment media companies are valued at higher amounts.  But for Charter's refusal to contract with Entertainment Studios, Entertainment Studios would have a higher valuation.

92.     Accordingly, Charter's unlawful discrimination has caused Entertainment Studios in excess of $10 billion in damages, according to proof at trial; plus punitive damages for intentional, oppressive and malicious racial discrimination.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

# **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment, as follows:

1.      Plaintiff Entertainment Studios prays for compensatory, general and special damages from Charter in excess of $10 billion according to proof at trial;

2.      Plaintiffs NAAAOM and Entertainment Studios pray for injunctive relief prohibiting Charter from discriminating against African American–owned media companies, including Entertainment Studios, based on race in connection with contracting for channel carriage;

3.      Plaintiff Entertainment Studios prays for punitive damages, based on oppression and malice, according to Charter's net worth;

4.      Plaintiffs NAAAOM and Entertainment Studios pray for declaratory relief that the FCC's practice of facilitating sham "diversity" agreements/MOUs, including the Charter MOU described herein, violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution;

5.      Plaintiff Entertainment Studios prays for attorneys' fees, costs and interest; and

6.      Plaintiffs NAAAOM and Entertainment Studios pray for such other and further relief as the court deems just and proper.

DATED:  August 31, 2016           MILLER BARONDESS, LLP

By:   */s/ Louis R. Miller*
LOUIS R. MILLER
Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiff Entertainment Studios hereby demands trial by jury pursuant to the Seventh Amendment of the United States Constitution on the 42 U.S.C. § 1981 claim for damages.

DATED:  August 31, 2016                    MILLER BARONDESS, LLP


By:   _/s/ Louis R. Miller_
          LOUIS R. MILLER
          Attorneys for Plaintiffs

22
FIRST AMENDED COMPLAINT