Jeffrey S. Powell (*Admitted Pro Hac Vice*)
 jeff.powell@kirkland.com
Patrick F. Philbin (*Admitted Pro Hac Vice*)
 patrick.philbin@kirkland.com
Erin C. Johnston (*Admitted Pro Hac Vice*)
 erin.johnston@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Mark C. Holscher, SBN 139582
 mark.holscher@kirkland.com
KIRKLAND & ELLIS LLP
333 S. Hope St.
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Attorneys for Defendant,
CHARTER COMMUNICATIONS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF AFRICAN AMERICAN-OWNED MEDIA, a California limited liability company; and ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC., a Delaware corporation; FEDERAL COMMUNICATIONS COMMISSION, a federal agency; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. 2:16-cv-00609-GW-FFM<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Judge:        Hon. George H. Wu<br>Hearing Date: October 24, 2016<br>Time:         8:30 A.M.<br>Courtroom:  312 N Spring St.<br>                    Courtroom 10<br>                    Los Angeles, CA 90012 |

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on October 24, 2016, at 8:30 AM, in courtroom 10 of the United States District Court for the Central District of California, located at 312 North Spring Street in Los Angeles, California, defendant Charter Communications, Inc. will and hereby does move for an order dismissing Plaintiffs' First Amended Complaint.

The claims against Charter should be dismissed under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 8(a) for failure to state facts sufficient to show an entitlement to relief, as plaintiffs fail to plead sufficient facts constituting essential elements of each purported cause of action. In addition, the First Amendment to the U.S. Constitution bars the claims, and Plaintiff NAAAOM lacks standing. This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, Charter's Request for Judicial Notice and the declaration of Patrick F. Philbin enclosed therewith, the pleadings and papers on file in this action, the arguments of counsel, and any other matter that the Court may properly consider.

This motion is made following the conference of counsel pursuant to Local Rule 7-3. Plaintiffs oppose this motion.

DATED: September 23, 2016

Respectfully submitted,
KIRKLAND & ELLIS LLP

By:  */s/ Patrick F. Philbin*

Jeffrey S. Powell (*Admitted Pro Hac Vice*)
Patrick F. Philbin (*Admitted Pro Hac Vice*)
Erin C. Johnston (*Admitted Pro Hac Vice*)
655 Fifteenth St., N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Attorneys for Defendant,*
*CHARTER COMMUNICATIONS, INC.*

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................................... 1

Factual Allegations ........................................................................................... 3

Legal Standard .................................................................................................. 8

Argument ........................................................................................................... 9

I.   The FAC Fails to Allege Facts Plausibly Stating a Claim for Intentional Racial Discrimination. ......................................................................... 9

    A.   Charter's Decision Not To Carry ESN's Channels Does Not Raise a Plausible Inference of Purposeful Racial Discrimination. ...................... 10

    B.   Plaintiffs Have Not Stated a Plausible Claim by Identifying Other Networks with Which Charter Has Contracted. ...................................... 13

    C.   Plaintiffs Have Not Stated a Plausible Claim by Dismissing Charter's Stated Reasons for Declining Coverage as "Pretext." ............................ 15

    D.   Disparaging the MOU as a "Sham" Does Not State a Claim. ................ 16

    E.   New Allegations About Unrelated Events Long After Charter's Decision Not To Carry ESN Cannot Create A Plausible Claim. ............. 16

II.  Plaintiffs' Claims Are Barred By the First Amendment .................................... 18

    A.   Plaintiffs' Claims Under Section 1981 Are Barred Because They Are Based on Charter's Constitutionally Protected Speech. .......................... 18

    B.   *Turner Broadcasting* Does Not Support Plaintiffs' Claims..................... 23

III. NAAAOM Lacks Associational Standing. ....................................................... 24

Conclusion ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aquino v. Honda of Am., Inc.*,
  158 F. App'x 667 (6th Cir. 2005) ................................................................. 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................*passim*

*Bachman v. St. Monica's Congregation*,
  902 F.2d 1259 (7th Cir. 1990) ................................................................. 10

*Benton v. Moreno-Benton*,
  No. 5:15-CV-00588-CAS ......................................................................... 10

*Cahill v. Liberty Mut. Ins. Co.*,
  80 F.3d 336 (9th Cir. 1996) ....................................................................... 9

*Carper v. Media*,
  No. CV 15-4259-VAP (SSX), 2016 WL 4062047 (C.D. Cal. July 25,
  2016) ......................................................................................................... 17

*Claybrooks v. Am. Broad. Cos.*,
  898 F. Supp. 2d 986 (M.D. Tenn. 2012) ..........................................*passim*

*Comcast Cable Commc'ns, LLC v. FCC*,
  717 F.3d 982 (D.C. Cir. 2013) ............................................................ 19, 21

*Cone v. Longmont United Hosp. Ass'n*,
  14 F.3d 526 (10th Cir. 1994) ................................................................... 17

*Contreras v. Johnson & Johnson Consumer Cos., Inc.*,
  No. CV 12-7099-GW SHX, 2012 WL 12096581 (C.D. Cal. Nov. 29,
  2012) ........................................................................................................... 9

*Dallas & Lashmi, Inc. v. 7-Eleven, Inc.*,
  112 F. Supp. 3d 1048, 1063 (C.D. Cal. 2015) ........................................ 10

*Davis v. HSBC Bank Nev., N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ................................................................... 4

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*,
  470 F.3d 827 (9th Cir. 2006) ..................................................................... 9

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ................................................................... 10

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
  458 U.S. 375 (1982) .................................................................................. 9

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) .................................................................................. 22

*Heno v. Sprint/United Mgmt. Co.*,
  208 F.3d 847 (10th Cir. 2000) ................................................................ 17

*Herring Broad., Inc. v. F.C.C.*,
  515 F. App'x 655 (9th Cir. 2013) ............................................................ 14

*Hudson v. J.P. Morgan Chase Bank*,
  No. CV 14-04528 DDP SHX, 2014 WL 4854583 (C.D. Cal. Sept. 29,
  2014) ........................................................................................................ 10

*Hunt v. Washington State Apple Adverising Commission*,
  432 U.S. 333 (1977) ................................................................................ 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) .......................................................................*passim*

*Jean v. Nelson*,
  472 U.S. 846 (1985) ........................................................................... 3, 22

*Jian Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................. 20, 22

*Kneivel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .................................................................. 4

*Lefevre v Design Profs. Ins. Cos.*,
  No. C 93-20720 RPA, 1994 WL 514020 (N.D. Cal. Sept. 15, 1994) .................... 17

*Lewis v. Univ. of Pittsburgh*,
  725 F.2d 910 (3d Cir. 1983) .................................................................... 10

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Lomax v. Sellenthin*,
 No. C 98-2588 TEH, 1999 WL 281120 (N.D. Cal. Apr. 26, 1999)........................ 18

*Los Angeles v. Preferred Commcn's, Inc.*,
 476 U.S. 488 (1986)............................................................................ 18, 19

*Mabra v. United Food & Commercial Workers Local Union No. 1996*,
 176 F.3d 1357 (11th Cir. 1999) ................................................................. 9

*Melvin v. USA Today*,
 No. 3:14-CV-00439, 2015 WL 251590 (E.D. Va. Jan. 20, 2015) .......................... 21

*Merrick v. Farmers Ins. Grp.*,
 892 F.2d 1434 (9th Cir. 1990) ................................................................. 18

*MGM Studios, Inc. v. Grokster, Ltd.*,
 518 F. Supp. 2d 1197 (C.D. Cal. 2007).................................................... 25

*Molski v. Kahn Winery*,
 381 F. Supp. 2d 1209 (C.D. Cal. 2005)............................................. 24, 25

*Molski v. Mandarin Touch Rest.*,
 359 F. Supp. 2d 924 (C.D. Cal. 2005)........................................ 3, 24, 25

*Moore v. Avon Prod. Inc.*,
 No. C 06-03425 SBA, 2007 WL 2900204 (N.D. Cal. Oct. 4, 2007) ..................... 17

*Mora v. US Bank*,
 No. CV 15-02436 DDP, 2015 WL 4537218 (C.D. Cal. July 27, 2015) ................ 10

*Mulcahy v. Cheetah Learning LLC*,
 386 F.3d 849 (8th Cir. 2004) ................................................................. 25

*N.L.R.B. v. Express Pub. Co.*,
 312 U.S. 426 (1941)............................................................................. 25

*NAAAOM v. Comcast Corp.*,
 No. 2:15-CV-01239 (C.D. Cal. May 10, 2016) (RJN Ex. A).........................*passim*

*Pac. Shores Props., LLC v. City of Newport Beach*,
 730 F.3d 1142 (9th Cir. 2013) ................................................................ 13

*Paske v. Fitzgerald*,
 785 F.3d 977 (5th Cir. 2015) ............................................................ 13, 15

*Payne v. Travenol Labs., Inc.*,
    565 F.2d 895 (5th Cir. 1978) ................................................................. 25

*Rea v. Martin Marietta Corp.*,
    29 F.3d 1450 (10th Cir. 1994) .............................................................. 18

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)............................................................................. 19

*Stevenson v. Lewis*,
    384 F.3d 1069 (9th Cir. 2004) .............................................................. 23

*Summit Media LLC v. City of Los Angeles, CA*,
    530 F. Supp. 2d 1084 (C.D. Cal. 2008) ................................................ 13

*TCR Sports Broad. Hldg. LLP v. FCC*,
    679 F.3d 269 (4th Cir. 2012) ................................................................ 11

*Thomas v. Berry Plastics Corp.*,
    803 F.3d 510 (10th Cir. 2015) ................................................................ 9

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)......................................................................*passim*

*Van Buskirk v. Cable News Network, Inc.*,
    284 F.3d 977 (9th Cir. 2002) .................................................................. 8

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir.2003) ................................................................. 9

*Yagman v. Galipo*,
    No. CV 12-7908 GW SHX, 2012 WL 5458072 (C.D. Cal. Nov. 5,
    2012) ........................................................................................................ 8

**Statutory & Constitutional Authority**

42 U.S.C. § 1981............................................................................*passim*

U.S. CONST., amend. I..............................................................*passim*

**Regulatory Authority**

*In re Herring Broad., Inc.*,
    26 F.C.C. Rcd. 8971 (2011)................................................................. 11

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................................ 9

Fed. R. Civ. P. 65(d) ................................................................................................ 25

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

1

## <u>INTRODUCTION</u>

2      Nothing in the First Amended Complaint ("FAC") changes the fact that this lawsuit

3    is part of a scam.  Plaintiffs are serial litigants who target distributors of television

4    programming (like cable companies) that have transactions pending before the FCC and

5    DOJ and sue them with sensational charges of discrimination.  Their cynical objective is

6    to force the distributors to carry the channels of plaintiff Entertainment Studios Networks,

7    Inc. (ESN).  Plaintiffs' scheme has now generated ***seven*** complaints in the last three years

8    against AT&T, DirecTV, Comcast, and now Charter—as well as against the FCC, the

9    NAACP, the Reverend Al Sharpton, and other respected civil rights groups and leaders.

10   Not one of those complaints has ever been held to state a valid claim for relief.  Of the six

11   prior complaints, Plaintiffs immediately amended three (including the complaint here) in

12   response to motions to dismiss, thus acknowledging that they failed to state a claim as

13   originally filed.  Two complaints against Comcast have been *dismissed* for failure to state

14   a claim.[1]  Finally, an amended complaint against AT&T became moot when Plaintiffs

15   entered into a confidential settlement after Magistrate Judge Walsh had issued a tentative

16   opinion holding that Plaintiffs' claims were all barred by the First Amendment.  *See* RJN

17   Ex. C (AT&T 2d Tentative Op.) at 10.

18      Like all the others, the FAC here fails to state a claim and should be dismissed.

19   Charter declined to enter into a programming agreement with ESN for legitimate business

20   reasons, including bandwidth limitations, and this lawsuit is simply an effort to extract a

21   contract from Charter that ESN could not secure on the merits in the marketplace.  As

22   Charter has pointed out, *see* Mot. to Dimiss, ECF No. 31, at 1, ESN made its objectives

23   clear when it asked the FCC to impose a condition on the then-pending transaction

24   between Charter and Time Warner Cable establishing a competition-free set-aside of

25   "10% of all [Charter's] activated channel capacity"—50 or more channels in many

26

27   [1]   *See NAAAOM v. Comcast Corp.*, No. 2:15-CV-01239 (C.D. Cal. May 10, 2016)
      (attached as Ex. A to Charter's Request for Judicial Notice ("RJN")); *NAAAOM v.*

28   *Comcast Corp.*, No. 2:15-CV-01239 (C.D. Cal. Aug. 5, 2015) (RJN Ex. B).

markets—for "100% African-American owned channels"—*i.e.*, for ESN.

On its face, the FAC does not come close to stating a claim for discrimination under 42 U.S.C. § 1981.

***First***, the FAC still fails to allege facts raising an inference that Charter decided not to carry ESN's channels as a result of intentional racial discrimination. To state a claim under section 1981, the complaint must allege *facts* showing discriminatory *intent* and tending to exclude obvious alternative grounds for Charter's decision. Here, the FAC on its face continues to point out multiple legitimate business reasons for Charter's decision not to contract with ESN, including that Charter was facing "bandwidth limitations" and was not planning to launch new general entertainment channels on its expanded basic tier. FAC ¶¶ 35, 43, 55. The FAC thus remains devoid of facts negating the obvious explanation that Charter's decision was based on precisely such legitimate business considerations. The only new allegations in the FAC relate to three alleged events in 2016, long *after* the decision not to carry ESN's channels had been made in July 2015. Continuing their tactic of making false and defamatory allegations, Plaintiffs assert that two Charter executives made racist comments in two unrelated contexts. Those allegations are false and, more importantly, are legally irrelevant. Isolated comments unrelated to the particular decision at issue in a discrimination suit are insufficient as a matter of law to raise an inference of discrimination in a decision made months earlier. And Plaintiffs' absurd suggestion, made solely "[o]n information and belief," that a hacking incident in late summer 2016 in which a racist message appeared on subscribers' screens "came from within Charter," FAC ¶ 61, need not be accepted as true and is also utterly irrelevant to Charter's decision about carrying ESN's channels.

Another judge on this Court has *twice* held that Plaintiffs' similar suit charging racism against Comcast failed to state a claim. *See supra* n.1. There, Judge Hatter held that Plaintiffs failed to allege *facts* showing discriminatory intent and, in particular, failed to exclude the equally plausible explanation that Comcast had decided not to carry ESN's channels for valid business reasons, including specifically "the bandwidth costs

associated with carrying ESN's channels"—one of the precise reasons that ESN *admits* Charter invoked in declining to carry ESN. *Comcast II*, slip op. at 3 (RJN Ex. A). Here, as in *Comcast*, the FAC still fails to allege facts that would exclude the inference that Charter has declined to carry ESN's channels for legitimate business reasons.

*Second*, even if the FAC otherwise alleged facts stating a claim, dismissal would still be required because the First Amendment independently bars a claim based on a cable operator's decisions about the content it will carry. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994). Plaintiffs' claim would impermissibly require the Court to second-guess Charter's constitutionally protected editorial decisions in selecting programming. *See Claybrooks v. Am. Broad. Cos.*, 898 F. Supp. 2d 986, 995-96 (M.D. Tenn. 2012). The mere fact that Plaintiffs' prior complaints have not been dismissed on First Amendment grounds does not remotely suggest that the application of the First Amendment is unclear here. *Cf.* 08/29/16 Order (ECF No. 46), at 3. Instead, decisions like those in *Comcast* dismissing Plaintiffs' complaints for failure to state a claim without mentioning the First Amendment simply reflect the settled rule that "[p]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Jean v. Nelson*, 472 U.S. 846, 854 (1985).

*Finally*, given that Plaintiffs have dropped the FCC as a defendant, NAAAOM no longer has any claim to standing. NAAAOM is simply attempting to pursue the same claim against Charter that its member, ESN, is pursuing individually. Where the only actual claim in the case is an individual's claim against the defendant, however, an association like NAAAOM lacks standing and cannot remain in the case simply to "lend an aura of legitimacy to . . . predatory litigation as part of a strategy to encourage settlement." *Molski v. Mandarin Touch Rest.*, 359 F. Supp. 2d 924, 935 (C.D. Cal. 2005).

## FACTUAL ALLEGATIONS

The FAC rests on the same core allegations as before, updated to reflect the fact that Charter's transaction with Time Warner Cable and Brighthouse Networks—which Plaintiffs sought to hold up for ransom—has now closed. FAC ¶ 24.

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Plaintiffs allege that ESN is "a 100% African American-owned television production and distribution company" wholly owned by Byron Allen.  FAC ¶¶ 18, 20. Plaintiff NAAAOM is an LLC created by Allen and ESN. NAAAOM's address is the same as ESN's address, and NAAAOM's registered agent is the general counsel of ESN. *See* RJN Exs. D & E.  NAAAOM essentially exists to give a false veneer of public-interest respectability to ESN's trumped up lawsuits.

ESN produces seven networks (channels) that are "general audience, lifestyle networks."  FAC ¶¶ 22, 55.  They include Comedy.TV, Recipe.TV, Cars.TV, Pets.TV, MyDestination.TV, and ES.TV, *see* FAC, Ex. A, at 9–35, which target roughly the same audiences as the better-known channels Comedy Central, Food Network, Velocity, Animal Planet, The Travel Channel, and E!—channels that Charter already carries, *see, e.g.*, https://www.charter.com/browse/content/new-channel-lineup.  ESN also produces Justice Central, which targets "court programming and justice fans."  FAC, Ex. A, at 7.

Plaintiffs allege that ESN tried for several years to obtain a carriage deal from Charter.  *See* FAC ¶¶ 36–57.  They claim that, in 2011, ESN sought "to discuss a possible carriage deal," but Charter's senior vice president of programming ("SVP of Programming") said they should "try again 'next year.'"  *Id.* ¶ 36.

The FAC then selectively quotes snippets of e-mails from August 2012.  The full exchange shows that Charter declined a meeting with ESN, explaining that "[o]ur business has not changed, in fact the bandwidth and operational demands have increased."  RJN Ex. F, at 1;[2] *see also* FAC ¶ 37.  "Bandwidth" refers to the finite

---

[2] On a motion to dismiss, this Court may consider documents "'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (quoting *Kneivel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)).  When Charter attached the same e-mails to its original motion, Plaintiffs asserted that the Court could not consider them unless Charter had "authenticate[d]" them as if they were being introduced into evidence.  *See* ECF No. 41-1 ("1st MTD Opp."), at 12 n.3.  That is not the law.  Unless Plaintiffs actually dispute the *authenticity* of the e-mails—which they have not done—the Court may consider the copies Charter has provided.  *See Davis*, 691 F.3d at 1160.  In any event, the attached declaration of Patrick Philbin describes the procedures through which the e-mails were collected and sufficiently establishes their authenticity here.

capacity of Charter's network.  Given that bandwidth (like shelf space) is ultimately limited, each decision to carry a channel turns on multiple factors, including whether the channel will provide a better return than alternatives.  Charter's SVP of Programming explained that Charter was not interested in ESN's offer, which involved launching Justice Central as an "e basic" channel, because "[w]e are never doing e basic launches as I told you before."  RJN Ex. G, at 1.  An "e basic launch" refers to adding a channel to the "expanded basic" tier of service.  He was explaining that Charter was generally not adding channels to that tier because it is more profitable to add channels to attract subscribers to premium tiers.  Charter's SVP of Programming concluded: "Glad you are having success and best of luck but we do not have any opportunities for the foreseeable future.  A meeting in 2012 doesn't make sense."  RJN Ex. F at 1; FAC ¶ 37.  ESN's representative responded that she "underst[ood] [Charter's] bandwidth limitations" and acknowledged that "e basic is out of the question."  RJN Ex. F at 1.

Six months later, in February 2013, ESN sought another meeting.  Again, the e-mails quoted in the FAC show that Charter's SVP of Programming declined a meeting and reiterated the same points he had made previously: "[A]s I said Janice, we are not launching these Services for the foreseeable future.  It is not happening, and I do not need another pitch."  RJN Ex. G, at 1; FAC ¶ 39.  ESN responded by repeating yet again the same offer on Justice Central that Charter had repeatedly declined.  RJN Ex. G, at 1.

Charter's exasperated SVP of Programming then gave a sarcastic reply, alluding to his previous explanations that Charter was not doing e basic launches: "Yes if on e basic.  Really in my consideration set for the next e basic launches we do."  *Id.*; FAC ¶ 42.  When it appeared that ESN's sales rep failed to understand the sarcasm (although she had acknowledged that "e basic is out of the question," RJN Ex. F at 1), Charter's SVP of Programming promptly clarified that he "was being facetious," and explained that, "[o]utside of sports services that we have to carry," Charter was "never doing e basic launches *as I told you before*" because "that is bad for our business," RJN Ex. G at 1 (emphasis added); *see also* FAC ¶ 43 (selectively quoting e-mail).  He explained that "I

1  listen to you, [but] you don't to me," and repeated again that "we aren't launching general

2  entertainment e basic services."  RJN Ex. G at 1.

3       Less than a month later, on March 5, 2013, despite having been told that Charter

4  was not launching general entertainment channels and that Charter's CEO "'does not

5  meet with programmers,'" FAC ¶ 45, ESN sought to go around Charter's SVP of

6  Programming by contacting Charter's CEO directly—simply to repeat the offer Charter

7  had already declined.  *See* RJN Ex. H.  Charter's CEO did not respond.  *See* FAC ¶ 46.

8       Two years later, ESN contacted Charter in June 2015,  FAC ¶ 47, mere days after

9  Charter announced transactions with Time Warner Cable and Bright House Networks.

10  The emails Plaintiffs quote, *see id.* ¶¶ 47–48, show that Charter offered to meet with

11  Byron Allen to hear about ESN's channels.  *See* RJN Ex. I, at 2.  A week later, Allen sent

12  a lengthy response copying "members of the FCC, DOJ, Congress, the National Black

13  Caucus, [NAAAOM], one of Charter's investment bankers, and key Charter executives,"

14  *id.* at 1, and making clear that he wanted a special set-aside for his company.  He declared

15  that it was "COMPLETELY UNACCEPTABLE" that "Charter spends billions of dollars

16  on programming license fees annually and zero of this budget is *allocated* to 100%

17  African American-owned media"—*i.e.*, to ESN.  *Id.* (emphasis added).  Making a not-so-

18  veiled threat, Allen noted that he "ha[d] filed a $20 billion lawsuit against Comcast and

19  Time Warner for this exact behavior" and implied that a lawsuit would follow if ESN did

20  not receive what Allen viewed as his "allocated" share of Charter's budget.  *Id.*

21       Notwithstanding Allen's histrionics, Charter met with ESN in July 2015 to hear

22  ESN's programming presentation, *see* FAC ¶¶ 50–51, after which Charter chose not to

23  carry ESN's channels.  Among other things, Charter told Allen that it still has "limited

24  bandwidth," *id.* ¶ 55; that ESN "would have to wait until after the . . . merger was

25  approved to be considered for a carriage deal" given the "'many unknowns,'" *id.* ¶ 53;

26  and that Charter "wanted to wait to 'see what AT&T does,'" *id.* ¶ 52.

27       Plaintiffs also allege that from 2012 to 2015 Charter added or expanded the

28  geographic coverage of channels in its lineup.  In 2012, they point to carriage agreements

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

with "the Walt Disney Company (for the Longhorn Network, among others) and Time Warner Cable Sports." FAC ¶ 38. Charter's public press releases describe those agreements. In October 2012, Charter announced an agreement to distribute in Southern California Time Warner Cable's local sports networks, which offered "the local TV homes for Los Angeles Lakers, LA Galaxy and Los Angeles Sparks games, as well as in-depth, dedicated, team-focused programming."[3] On December 31, 2012, Charter and Disney "announced a comprehensive long-term distribution agreement" for a package that included the Longhorn Network, which focuses on University of Texas sports.[4] Plaintiffs also allege that, in 2013, Charter "entered into a channel carriage agreement with . . . RFD-TV, which provides programming focused on rural and Western lifestyle issues," *id.* ¶ 40, and that, in 2015, Charter expanded the scope of carriage for both RFD-TV and the horror network CHILLER, *see id.* ¶ 55. The FAC provides no information comparing these sports, rural/western, and horror channels to ESN's offerings.

The FAC also attacks "a memorandum of understanding ('MOU')" between Charter and "a dozen 'multicultural leadership organizations,' including Al Sharpton's National Action Network" and others such as the Urban League. FAC ¶ 76. A copy of this MOU is attached as Exhibit J. Plaintiffs complain that, under the MOU, Charter committed to "appointing minority members to its all-male, all-white Board of Directors, appointing a . . . 'Chief Diversity Officer,' and enhancing its 'involvement and investment' in organizations serving communities of color," *id.* ¶ 76, all of which Plaintiffs characterize as "pay offs" to "shills" who "can be bought on the cheap" to provide "racial cover," *id.* ¶¶ 65, 76–78.

Finally, Plaintiffs have added three new allegations purportedly to establish "evidence of Charter's racial bias." FAC ¶ 4. First, they allege that, in mid-March 2016,

---

[3] http://www.nba.com/lakers/releases/121026_twcs_charter (visited Sept. 23, 2016).

[4] http://ir.charter.com/phoenix.zhtml?c=112298&p=irol-newsArticle&ID=1771792 (visited Sept. 23, 2016); http://espn.go.com/longhornnetwork/ (visited Sept. 23, 2016).

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

months after the decision not to carry ESN's channels had been made and after this lawsuit had been filed, Charter's SVP of Programming made remarks to paid protestors hired by ESN, characterizing them as "African Americans looking for 'handouts,'" "out of work," and people who "spent money on frivolous things." *Id.* ¶¶ 5, 58. Second, they allege that, on May 16, 2016, while Charter's CEO and ESN's CEO, Byron Allen, were attending an industry dinner, Charter's CEO used the term "Boy" in reference to Allen and "made a dismissive hand gesture." *Id.* ¶¶ 8, 60. Finally, Plaintiffs note that Charter experienced a hacking incident in late summer 2016 that caused a racist message to be displayed on subscribers' screens in North Texas,[5] and they conclusorily assert "[o]n information and belief"—without any facts whatsoever to substantiate that belief—that the message "came from within Charter." *Id.* ¶ 65.

Plaintiffs assert a single count under 42 U.S.C. § 1981, charging "intentional racial discrimination in contracting," FAC ¶ 85, and seek "in excess of $10 billion in damages." *Id.* ¶ 90–92. The FAC drops any claims against the FCC.

## **LEGAL STANDARD**

"A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face." *Yagman v. Galipo*, No. CV 12-7908 GW SHx, 2012 WL 5458072, at *1 (C.D. Cal. Nov. 5, 2012) (Wu, J.). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and that requires dismissal. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The court "must construe the complaint in the light most favorable to the plaintiff and must accept all factual allegations as true. . . . Conclusory statements, unlike proper factual allegations, are not entitled to a presumption of truth." *Id.* at *1 (citation omitted). The Court may also consider documents incorporated by reference in the Complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.

---

[5]   *See* http://www.wfaa.com/news/local/racist-rant-delivered-to-charter-cable-customers/286462534 (visited Sept. 23, 2016).

2002).  Dismissal should be with prejudice where further amendment would be futile. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 339 (9th Cir. 1996).

A claim may also be dismissed under Rule 12(b)(1) based on "challenges to a court's subject matter jurisdiction, including standing-based challenges." *Contreras v. Johnson & Johnson Consumer Cos., Inc.*, No. CV 12-7099-GW SHx, 2012 WL 12096581, at *1 (C.D. Cal. Nov. 29, 2012) (Wu, J.).  The plaintiff bears the "burden to allege Article III standing," *id.*; *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003)), and "[i]t is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record," *Contreras*, 2012 WL 12096581, at *1 (quotation & citations omitted).

## **ARGUMENT**

## I.   **THE FAC FAILS TO ALLEGE FACTS PLAUSIBLY STATING A CLAIM FOR INTENTIONAL RACIAL DISCRIMINATION.**

The FAC should be dismissed because it fails to state a plausible claim of intentional racial discrimination under *Iqbal*, 556 U.S. at 679.

Plaintiffs cannot state a claim under section 1981 without pleading facts plausibly showing that Charter denied carriage to ESN based on race.  It is well settled that Section 1981 requires proof of discriminatory intent.  *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 837 (9th Cir. 2006) ("[Section] 1981 . . . cover[s] only acts involving intentional discrimination, excluding from the statute's reach actions that merely have a disparate effect.").  As a result, Plaintiffs must plead *facts* "sufficient to plausibly suggest [the defendant's] discriminatory *state of mind*." *Iqbal*, 556 U.S. at 683 (emphasis added).  Plaintiffs must also allege facts showing that discrimination was the "but for" cause of Charter's decision not to carry ESN's channels—in other words, that Charter *would have* carried ESN's channels *but for* racial discrimination.[6]

---

[6]   *See, e.g.*, *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516–17 (10th Cir. 2015); *Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 676 (6th Cir. 2005); *Mabra v. United*

9

For multiple reasons detailed below, the FAC fails to meet these standards.

### A. Charter's Decision Not To Carry ESN's Channels Does Not Raise a Plausible Inference of Purposeful Racial Discrimination.

Plaintiffs' primary theory is that the mere fact that Charter "refused to contract with [ESN] for channel carriage," FAC ¶ 88, is somehow sufficient to raise an inference of racial animus.  That is flatly incorrect.  If that were sufficient, *every* plaintiff under section 1981 could state a claim simply by virtue of the fact that the defendant refused to contract with him.  That is exactly the approach foreclosed in *Iqbal*.  *See* 556 U.S. at 677–79.  Under *Iqbal*, where there are "two possible explanations" for conduct "only one of which results in liability," the plaintiff must allege "facts tending to *exclude* the possibility that the alternative explanation is true." *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014) (emphasis added).  Here, just as in *Comcast*, there is an obvious alternative explanation for Charter's decision—namely, that Charter had "legitimate business reasons for denying [ESN] carriage"—and, as in *Comcast*, Plaintiffs fail to "plead facts tending to exclude the possibility that the [lawful] alternative explanation is true." *Comcast II*, slip op. at 2, 3 (RJN Ex. A).  Section 1981 claims are routinely dismissed under *Iqbal* where a plaintiff supplies no facts to support the inference that discrimination was the real reason for the defendant's conduct.[7]

There are myriad legitimate reasons for a distributor to decide not to carry a particular channel.  As the FCC has explained in rejecting a claim of discrimination raised by WealthTV, such "non-discriminatory business reasons" include:

(1) "their evaluation of WealthTV's programming;" (2) "their perception

---

*Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357, 1358 (11th Cir. 1999); *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1262–63 (7th Cir. 1990); *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 914 (3d Cir. 1983).

[7]  *See, e.g.*, *Mora v. US Bank*, No. CV 15-02436 DDP (AJWx), 2015 WL 4537218, at *8 (C.D. Cal. July 27, 2015); *Dallas & Lashmi, Inc. v. 7-Eleven, Inc.*, 112 F. Supp. 3d 1048, 1063 (C.D. Cal. 2015); *Benton v. Moreno-Benton*, No. 5:15-CV-00588-CAS Ex, 2015 WL 2380745, at *6 (C.D. Cal. May 18, 2015); *Hudson v. J.P. Morgan Chase Bank*, No. CV 14-04528 DDP SHx, 2014 WL 4854583, at *2-3 (C.D. Cal. Sept. 29, 2014).

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

that WealthTV lacked an established brand with a proven record of appeal to their subscribers;" (3) that "WealthTV had not obtained carriage with a number of competing MVPDs;" (4) that "WealthTV's owners were inexperienced in launching networks;" (5) that "bandwidth necessary to carry WealthTV could be used for better purposes;" (6) that "WealthTV lacked outside financing;" and (7) that "WealthTV's proposed terms and conditions of carriage were unfavorable" to the defendants.

*In re Herring Broad., Inc.*, 26 F.C.C. Rcd. 8971, 8976 (2011); *see also TCR Sports Broad. Hldg. LLP v. FCC*, 679 F.3d 269, 274-75 & n.6 (4th Cir. 2012). Plaintiffs have not pleaded facts that would tend to *exclude* legitimate explanations like these for why Charter declined to carry ESN's channels. They have not alleged any facts showing a pattern of discriminatory decisions. And despite recounting more than *three years* of interactions in which Charter told ESN why it did not make sense for Charter to take on ESN's channels, they have not provided a *single* factual allegation identifying any statement or conduct of any sort directly suggesting racial bias in those interactions. When Plaintiffs filed a complaint against Comcast similarly devoid of facts showing discriminatory intent, the district court dismissed the complaint, *see Comcast I*, slip op. at 3 (RJN Ex. B), even after Plaintiffs were granted a second bite at the apple with an amended complaint, *see Comcast II*, slip op. at 3 (RJN Ex. A).

Here, moreover, the FAC discloses on its face multiple legitimate reasons for declining to carry ESN's channels. For instance, the FAC acknowledges that Charter has limited bandwidth for carrying channels, *see* FAC ¶¶ 37, 55; that ESN was seeking carriage at the wrong time, *id.* ¶¶ 36–37, 52–53; that Charter "did not believe in [ESN's] 'tracking model' because [its] content appears on both [ESN's] channels and on other broadcast stations and cable networks," *id.* ¶ 41; and that Charter did not want to make a decision while its transaction with Time Warner Cable was pending, *see id.* ¶ 53.

The e-mails cited in the FAC further confirm that Charter had legitimate reasons for rejecting ESN's channels. Charter explained that its "bandwidth and operational demands ha[d] increased," RJN Ex. F; that Charter was not "launching general entertainment e basic services," RJN Ex. G at 1; and that Charter simply was not interested in "launching these Services for the foreseeable future," *id.* Nothing in the

statements Plaintiffs allege—or in the emails they cite—shows even a hint of racial bias. Instead, they show rational business reasons for declining to carry ESN's channels. It was only *ESN* that injected race into the discussions with Byron Allen's vitriolic e-mail. *See supra* p. 6.

Plaintiffs come no closer to stating a claim with their theory that racial animus is the "only explanation" for Charter's decision given that ESN was offering its channels at fire-sale prices—free for six channels and ten cents per subscriber for the seventh. FAC ¶ 2. That rationale ignores the fact that taking up bandwidth is not costless. Any decision to commit limited bandwidth must take into account the *return* a carrier can expect from the channel it adds. If anything, ESN's assertion that it was giving away its channels essentially for free (and that it gave the same terms to others because a "most favored nations clause" precluded an even *lower* price, *id.*) confirms Charter's assessment that the channels were sub-par and not worth carrying. If the channels generated ordinary returns, ESN would not be forced to offer such cut rates to get anyone to carry its channels.

As the *Comcast* Court explained, Plaintiffs cannot state a viable section 1981 claim where their allegations fail to rule out "legitimate business reasons for denying [ESN] carriage," such as "*the bandwidth costs associated with carrying ESN's channels*." *Comcast II*, slip op. at 3 (RJN Ex. A) (emphasis added). Bandwidth, of course, was one of the precise rationales that Charter cited in turning down ESN's repeated sales pitches.

Plaintiffs fare no better with their passing and wholly conclusory assertion that "Charter has a pattern and practice of refusing to do business" with African-American owned media companies. FAC ¶ 88; *see also id.* ¶ 62 (asserting, without any factual allegations, that ESN is "merely the most recent victim of Charter's racism towards African Americans"). To make a claim of a pattern or practice of discrimination, Plaintiffs must allege *facts* plausibly showing specific prior incidents of conduct based on race, which Plaintiffs utterly fail to do. *See Summit Media LLC v. City of Los Angeles, CA*, 530 F. Supp. 2d 1084, 1091 (C.D. Cal. 2008).

The Complaint also alleges further facts that *undermine* Plaintiffs' baseless

assertions of racial animus.  Plaintiffs note that Charter entered into an MOU "with a dozen 'multicultural leadership organizations,'" including the Urban League and Al Sharpton's National Action Network, through which Charter committed to "appointing minority members to its all-male, all-white Board of Directors, appointing a . . . 'Chief Diversity Officer,' and enhancing its 'involvement and investment' in organizations serving communities of color."  FAC ¶ 76; *see also* RJN Ex. J (MOU).  Charter also committed under the MOU to "strive to increase the diversity of its workforce at all levels," and to "partner with [its] External Diversity Council to create and/or enhance existing mentoring, outreach, recruiting, development, and training programs that provide meaningful opportunities for advancement."  RJN Ex. J at 5.

Stripped of bald accusations of racism, the *factual* allegations in the FAC come nowhere near raising a "plausible" inference that "invidious discrimination" underpinned Charter's decision not to carry ESN's channels.  *Iqbal*, 556 U.S. at 680.

### B. Plaintiffs Have Not Stated a Plausible Claim by Identifying Other Networks with Which Charter Has Contracted.

Plaintiffs have also failed to plead facts showing that Charter treated any similarly-situated content providers differently.  The FAC identifies four channels Charter decided to carry or for which it expanded carriage between 2011 and present—Longhorn Network, Time Warner Cable Sports (otherwise known as the Lakers Channel), RFD TV, and CHILLER, *see* FAC ¶¶ 38, 40, 55.  Although "[p]roving the existence of a similarly situated entity [who was treated differently] is . . . *one* way to [make out] a disparate treatment claim," *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013), Plaintiffs' allegations are insufficient even under that approach.[8]

The FAC fails to allege any facts whatsoever showing that ESN's channels are remotely "similarly situated" to the channels Plaintiffs point out as comparators, two of

---

[8] As other courts hold, identifying similarly-situated comparators is an independent *requirement* for stating a discrimination claim. *See Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015).  Plaintiffs' inability to identify one should be fatal.

which are sports channels.  Plaintiffs do not allege any facts showing that the channels are similar in important respects such as content, quality, popularity, or any objective metric relevant to a carriage decision.  To the contrary, the FAC shows the opposite.  Plaintiffs allege that RFD, unlike ESN's channels, "provides programming focused on rural and Western lifestyle issues."  FAC ¶ 40.  Plaintiffs also offer no allegations to show that ESN was similarly situated to the Longhorn Network (a channel narrowly focused on University of Texas sports), to Time Warner Cable SportsNet or Time Warner Cable Deportes (channels focused on local Los Angeles sports teams), or to CHILLER (a horror channel).  *See id.* ¶ 38.  Indeed, this is a classic instance in which the Court may rely on "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, to know that they are not.  After all, channels showing local sports or horror films are quite unlike Pets.TV, Recipe.TV or any of ESN's "general audience, lifestyle networks."  FAC ¶ 55.  Without *factual* allegations showing that the channels were similarly situated, the mere fact that Charter decided to carry *some* channels, but not ESN's channels, cannot bring Plaintiffs any closer to raising an inference that racial bias was the reason for Charter's decision.

In addition, any assertion that these channels are similarly situated is even less plausible given that the critical factors in carriage decisions turn largely on subjective assessments that defy attempts to categorize two networks as "similarly situated."  As the Ninth Circuit has recognized, carriage decisions can turn on an intensely subjective determination "that . . . two networks ha[ve] a different 'look and feel.'"  *Herring Broad., Inc. v. F.C.C.*, 515 F. App'x 655, 657 (9th Cir. 2013).  Given the subjective nature of the judgments involved, Plaintiffs do not and cannot allege *facts* demonstrating that their channels are so "similarly situated" to others as to tend to exclude other "'obvious alternative explanation[s],'" for a carriage decision.  *Iqbal*, 556 U.S. at 682.  Thus, they cannot use a mere allegation that Charter decided to carry other channels to raise a plausible inference that racial bias prompted the decision.

### C.   Plaintiffs Have Not Stated a Plausible Claim by Dismissing Charter's Stated Reasons for Declining Coverage as "Pretext."

Plaintiffs' assertion that the reasons Charter gave for turning down ESN were just "phony excuses," FAC ¶ 87—*i.e.*, pretext—is both legally irrelevant and factually inadequate.  Plaintiffs' claim of pretext is legally irrelevant because allegations about pretext are insufficient as a matter of law to state a claim of intentional discrimination. *See Paske v. Fitzgerald*, 785 F.3d 977, 985 n.8 (5th Cir. 2015).  Pretext becomes relevant only if a plaintiff has adequately alleged a prima facie case of disparate treatment from others similarly situated (which ESN has not).  *See id*.  Absent an antecedent showing that plaintiff was treated differently from those similarly situated, however, attempts to allege pretext do not advance the ball.

The claim is also factually inadequate because Plaintiffs rely on distorting the reasons that Charter gave by seizing on each point in isolation and trying to show that, in other cases, the same factor did not, by itself, bar carriage of a channel.  Plaintiffs claim, for instance, that Charter's concerns for "limited bandwidth" and "operational demands" were false because Charter nevertheless agreed to localized carriage deals for the Longhorn Network and both Time Warner Cable SportsNet and Time Warner Cable Deportes, *see* FAC ¶¶ 37–38, and challenge Charter's statement that it "did not believe in [ESN]'s 'tracking model,'" *id.* ¶ 41.  But telling ESN that limited bandwidth and concerns about the tracking model were among the reasons for not carrying its channels did not mean that it was *impossible* to add channels or that Charter would *never* carry channels from a network with a similar tracking model.  It simply meant that Charter did not view ESN's offer as good enough to justify the use of limited resources and to overcome concerns about the tracking model.  Every decision to use limited bandwidth requires balancing competing factors.  By pointing to bandwidth constraints, Charter was indicating that ESN's offerings were not a good enough prospect to use up limited resources.  The mere fact that Charter decided other channels *were* good enough to carry does not suggest that the reasons given to ESN were pretextual.  Charter's actions,

moreover, were also consistent with its explanation that "*[o]utside of sports services that we have to carry*" (like the Longhorn Network as part of a Disney package and Time Warner Cable's local sports channels, which were deemed must-haves in southern California) "[w]e are never doing ebasic launches." RJN Ex. G at 1 (emphasis added).

### D. Disparaging the MOU as a "Sham" Does Not State a Claim.

Plaintiffs stray even farther from stating a plausible claim with their intemperate attacks disparaging as a "sham," FAC ¶ 63, the MOU that Charter entered into with civil rights groups such as the National Urban League. If anything, that MOU tends to *disprove* any claim of intentional discrimination. *See supra* pp. 12–13. Plaintiffs' real complaint is that the MOU—which advances broad diversity objectives in areas such as expanding "programming targeting diverse audiences" and employment, FAC ¶ 80; *see also* RJN Ex. J—does not advance Plaintiffs' parochial objectives, which are concerned solely with securing what Plaintiffs characterize as a "payoff" directly to ESN in the form of a carriage contract. But the fact that Charter committed to promote diversity through programming content, employment initiatives, and altering its board—while declining to carry ESN's channels—does not in any way support a claim of discrimination.

### E. New Allegations About Unrelated Events Long After Charter's Decision Not To Carry ESN Cannot Create A Plausible Claim.

Finally, Plaintiffs have not nudged their deficient complaint across the line to stating a claim simply by adding three allegations about comments or incidents in 2016—*after* this suit had been file and long *after* Charter had declined ESN's channels in July 2015. *See* FAC ¶¶ 4–11, 58-61. Plaintiffs allege that in March 2016 Charter's SVP of Programming directed derogatory remarks at African-American protestors hired by ESN, *id.* at ¶¶ 5, 58, and that at an industry event in May 2016 Charter's CEO used the term "Boy" in reference to Byron Allen, *id.* at ¶¶ 8, 60. These assertions—which conveniently materialized only *after* Charter's motion to dismiss had already shown the fatal defects in Plaintiffs' claims—are categorically false. But even taking them as true, they do not support an inference of discrimination in Charter's decisions—dating back to 2011, and

16

reaffirmed in July 2015—not to carry ESN's channels.  The alleged comments have no connection to the carriage decision and occurred eight and ten months *after* that decision had been made.  But, as a matter of law, "[a]llegedly discriminatory comments that are . . . unrelated to an employment decision or separated in time form a contested employment decision do not support an inference of discriminatory intent."  *Moore v. Avon Prod. Inc.*, No. C 06-03425 SBA, 2007 WL 2900204, at *6 (N.D. Cal. Oct. 4, 2007); *see also Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000) ("Discriminatory incidents which occurred . . . anytime *after* [the contested action] are not sufficiently connected to the employment action . . . to demonstrate pretext.") (quotation omitted).[9]  Indeed, "remarks . . . unrelated to the decisional process are insufficient to demonstrate that the [decisionmaker] relied on illegitimate criteria, even when such statements are made by the decisionmaker in issue."  *Carper v. Media*, No. CV 15-4259-VAP (SSx), 2016 WL 4062047, at *9 (C.D. Cal. July 25, 2016) (quotation omitted).  The alleged comment by Charter's SVP of Programming not only occurred eight months *after* the decision concerning ESN (thus showing it was unrelated to the decision), but also in a wholly unrelated context (a comment to phony paid protestors).

The alleged comment from Charter's CEO is even more irrelevant because it is more remote in time and equally unrelated to the decision about carrying ESN's channels, and because the FAC does not even raise an inference that Charter's CEO was involved in that decision.  To the contrary, from the allegations in the FAC, it appears that the CEO took no part in the decision, and a comment from a non-decisionmaker cannot suggest racial animus in a decision.  *See, e.g.*, *Lomax v. Sellenthin*, No. C 98-2588 TEH, 1999 WL 281120, at *5 n.4 (N.D. Cal. Apr. 26, 1999) ("[S]tray remarks, particularly when made by non-decisionmakers or when unrelated to the decisional process, are insufficient

---

[9]  *See also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus."); *Lefevre v Design Prof'ls Ins. Cos.*, No. C 93-20720 RPA, 1994 WL 514020, at *4 (N.D. Cal. Sept. 15, 1994) (same).

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

to prove discrimination.") (citing *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990)).  Plaintiffs thus have not alleged and cannot allege any "nexus" between their claims about a post hoc comment from the CEO and the decision not to carry ESN's channels.  *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994).

Plaintiffs' third new allegation is even less relevant.  Plaintiffs point to a hacking incident in July 2016 in which a racist message appeared on subscribers' screens in North Texas and simply assert, without any factual allegations in support, that on "information and belief" the hacking "came from within Charter."  FAC ¶ 61.  Unlike a *factual* allegation, the Court is not required to accept such an absurd and unsupported assertion as true, and in any event, as a matter of law, the hacking incident bears no connection to any decisionmaker and is utterly irrelevant to carriage decisions made a year earlier.

## II.    PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT

### A.    Plaintiffs' Claims Under Section 1981 Are Barred Because They Are Based on Charter's Constitutionally Protected Speech.

The Complaint must also be dismissed because the First Amendment protects a television programming distributor's decisions concerning which networks to carry and Plaintiffs' claims would impermissibly require the Court to sit in judgment on Charter's constitututionally protected programming decisions.

It is beyond dispute that "[c]able programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994).  Moreoveor, a cable operator may engage in protected speech both "[t]hrough 'original programming,'" and "'by exercising editorial discretion over which stations or programs to include in its repertoire.'"  *Id.* (quoting *Los Angeles v. Preferred Commcn's, Inc.*, 476 U.S. 488, 494 (1986)).  In reviewing and selecting which content produced by others to transmit, "cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.'"  *Id.* (quoting *Preferred Commcn's*, 476 U.S. at 494); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011)

(explaining that both "the creation and dissemination of information are speech within the meaning of the First Amendment").

The Supreme Court has thus made it clear that "[c]able operators . . . are engaged in protected speech activities even when they only select programming originally produced by others." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995); *see also Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 993 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[T]he Supreme Court has squarely held that a video programming distributor such as Comcast both engages in and transmits speech, and is therefore protected by the First Amendment.").

Given the constitutional protection afforded Charter's programming decisions, Plaintiffs' claims must be dismissed because they would directly interfere with that First Amendment activity. *See Claybrooks v. Am. Broad. Cos.*, 898 F. Supp. 2d 986, 995-96 (M.D. Tenn. 2012) (dismissing section 1981 claim that addressed constitutionally protected decisions about television content).

It is settled law that a plaintiff cannot invoke laws of general applicability to coerce a defendant to exercise its First Amendment rights in a particular way. The Supreme Court has made this clear in the specific context of anti-discrimination laws. *See Hurley*, 515 U.S. at 570. In *Hurley*, the Court held that the First Amendment barred claims brought by an LGBT group against parade organizers under a state anti-discrimination law because providing relief under that statute would constitute "an order essentially requiring petitioners to alter the expressive content of their parade." *Id.* at 572-73. Plaintiffs have suggested that their claim does not implicate the First Amendment because section 1981 is a law of general applicability, but *Hurley* forecloses that argument. It is well settled that, "under appropriate circumstances, anti-discrimination statutes of general applicability must yield to the First Amendment," and "this principle applies equally to § 1981 discrimination claims." *Claybrooks*, 898 F. Supp. 2d at 996. Nor does the context of a private lawsuit render the First Amendment inapplicable. *See id.*; *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 442 (S.D.N.Y. 2014).

19

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Plaintiffs have previously tried to distinguish *Hurley* by arguing that they "do not seek to alter any speech on any television channel" but instead attack Charter's "decision of which channels to *add*."   1st MTD Opp. 16 (emphasis in original).   That supposed distinction ignores the core holding in *Hurley*.   In *Hurley*, the Supreme Court explained that applying an anti-discrimination statute to parade organizers' decisions about which "participating unit[s]" to accept into the parade would violate the First Amendment because "every participating unit affects the message conveyed by the private organizers." 515 U.S. at 572.   The exact same analysis applies to television programming distributors' carriage decisions.   A distributor's choices in "select[ing] programming originally produced by others" constitutes "protected speech activit[y]," and changing the mix of channels selected necessarily alters the mix of messages conveyed by the distributor's programming and interferes with editorial discretion.   *Id.* at 570.

Two recent decisions highlight the fatal constitutional problems inherent in a suit such as this.   In *Claybrooks*, two would-be contestants on the shows *The Bachelor* and *The Bachelorette* sued under section 1981, claiming that ABC refused to bring them onto the shows based on their race.   *See* 898 F. Supp. 2d at 989-90.   The court dismissed the suit on First Amendment grounds because "whatever messages *The Bachelor* and *The Bachelorette* communicate or are intended to communicate—whether explicitly, implicitly, intentionally, or otherwise—the First Amendment protects the right of the producers of these Shows to craft and control those messages, based on whatever considerations the producers wish to take into account."   *Id.* at 1000.   *Jian Zhang* involved a Chinese search engine that allegedly blocked pro-democracy websites in search results.   *See* 10 F. Supp. 3d at 435.   The court there granted a motion to dismiss the plaintiffs' section 1981 claims because they "call upon the Court to impose a penalty on Baidu precisely because of what it does and does not choose to say," *id.* at 441, and "the First Amendment . . . does not countenance governmental control over the content of messages expressed by private individuals," *id.* (quoting *Turner*, 512 U.S. at 641).

Plaintiffs' claims pose the very same problems.   Plaintiffs cannot ask the Court, or

20

a jury, to sit in judgment of Charter's constitutionally protected programming decisions. Yet that is precisely what the Court would need to do to adjudicate Plaintiffs' claims—for instance, to evaluate Plaintiffs' allegation that Charter's stated reasons for declining carriage were mere pretext.  Neither Plaintiffs nor the Court can tell a cable company "how to exercise its editorial discretion about what networks to carry any more than" they could "tell the *Wall Street Journal* or *Politico* or the *Drudge Report* what columns to carry; or tell the MLB Network or ESPN or CBS what games to show." *Comcast*, 717 F.3d at 994 (Kavanaugh, J., concurring).  The Complaint must therefore be dismissed because "the conduct alleged by [Plaintiffs] lies at the heart of editorial discretion protected by the First Amendment, which leaves to private citizens, not the government or litigants, the power to decide whether to speak on any particular subject." *Melvin v. USA Today*, No. 3:14-CV-00439, 2015 WL 251590, at *9 (E.D. Va. Jan. 20, 2015), *appeal dismissed*, No. 15-2055, 2016 WL 212561 (4th Cir. Jan. 19, 2016).

Plaintiffs have also argued that "[t]he key distinction between *Claybrooks* and this case is that Plaintiffs are not challenging any decision of Charter regarding *the content* of television shows," and that "there is a constitutionally-relevant difference between cable programmers (those who produce content, like ESN) and cable operators (those who distribute the speech of others, like Charter)."  1st MTD Opp. 16–17.  That assertion ignores the law.  *Hurley* specifically warned that "First Amendment protection [does not] require a speaker to *generate* . . . each item featured in the communication."  515 U.S. at 570 (emphasis added).  One does not need to be the original creator of speech to have protected First Amendment rights when deciding what speech created by others to further promote or distribute.  Indeed, *Hurley* gave the specific example that "[c]able operators . . . are engaged in protected speech activities even when they only select programming originally produced by others."  *Id*.  And by attempting to dictate the channels that Charter must carry, this suit necessarily challenges decisions about content.  Altering the channel line-up alters content.

Plaintiffs' purported distinction that "*Jian Zhang* . . . is an internet search-engine

21

case, not a cable distribution case," 1st MTD Opp. 17, carries no weight.  Plaintiffs do not even attempt to explain why the relevant First Amendment principles would apply any differently here from the search-engine context.  Both scenarios involve editorial choices about what content (produced by others) to distribute.  Plaintiffs also assert that they "do not challenge any content-based decision of Charter," *id.*, but as discussed below, *see infra* pp. 23–24, *Turner Broadcasting* made clear that a restriction imposed on a cable operator is content-based where, as here, it depends on the "stations the cable operator has selected or will select."  512 U.S. at 644.

As *Hurley*, *Claybrooks*, and *Jian Zhang* illustrate, Plaintiffs cannot ask the Court, or a jury, to sit in judgment on Charter's constitutionally protected programming decisions.  But that is what the Court would have to do to adjudicate Plaintiffs' claims.  No amount of re-pleading can save Plaintiffs' lawsuit from this constitutional defect, and the Court should therefore dismiss the case with prejudice.

The mere fact that Plaintiffs' prior complaints have not been dismissed on First Amendment grounds does not suggest any ambiguity in the application of the First Amendment here.  *Cf.* 08/29/16 Order (ECF No. 46), at 3.  As noted above, Plaintiffs amended three complaints before any court ruled on a motion to dismiss, and in one of those instances the case later settled.  The *Comcast* court dismissed the complaint *twice* on the antecedent ground that it failed to allege discrimination, and there was thus no need to reach the constitutional issue.  The absence of any decision on the First Amendment simply reflects the rule that "[p]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Jean v. Nelson*, 472 U.S. 846, 854 (1985) (quoting *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99 (1981)); *see also Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) (describing the courts' "obligation to avoid deciding constitutional issues needlessly").  In fact, the only court that has addressed the issue tentatively ruled that the First Amendment wholly bars all Plaintiffs' claims.  *See* RJN Ex. C (AT&T 2d Tentative Op.) at 10.

DEFENDANT CHARTER'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

### B.     *Turner Broadcasting* Does Not Support Plaintiffs' Claims.

Plaintiffs' assertion that their claims "trigger, at most, intermediate scrutiny" under the Supreme Court's holding in *Turner Broadcasting*, 1st MTD Opp. 14 (capitalization and emphasis omitted), is wholly misplaced.

Plaintiffs' claims would impose a burden on First Amendment rights that is materially different from the must-carry provisions that were at issue in *Turner Broadcasting*. In *Turner Broadcasting*, the Supreme Court held that the must-carry provisions (which required *all* cable operators to carry local broadcast stations) were a content-neutral restriction on cable operators' speech subject to intermediate scrutiny. *See Turner Broad.*, 512 U.S. at 643–52. As relevant here, in explaining why the must-carry provisions were content-netural (and thus did not trigger strict scrutiny), the Supreme Court emphasized that "[n]othing in the Act imposes a restriction, penalty, or burden by reason of the views, programs, or *stations the cable operator has selected or will select.*" *Id.* at 644 (emphasis added). Here, by contrast, Plaintiffs' claims turn entirely on the theory that Charter should be subjected to liability based on decisions about the particular stations that Charter has, and has not, chosen to carry.

As the Supreme Court later explained in *Hurley*, the decision to apply intermediate scrutiny in *Turner Broadcasting* hinged in part on the particular history surrounding cable companies carrying local broadcast stations. The Court reasoned that, because the cable industry had a "'long history of serving as a conduit for broadcast signals'" there was "'little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator.'" *Hurley*, 515 U.S. at 576 (quoting *Turner Broadcasting*, 512 U.S. at 655). That rationale cannot apply to Plaintiffs' claims here because the decision whether to carry ESN's channels is plainly a discretionary matter with each programming distributor. Indeed, *most* distributors have decided *not* to carry ESN's channels. Unlike *Turner Broadcasting*, where the unique history meant that subscribers would not understand the forced carriage of broadcast networks to convey any message from the cable provider, there can be no dispute here

23

that subscribers would view Charter's carriage of ESN's networks "as having resulted from [Charter's] customary determination about [those channels], that [their] message was worthy of presentation and quite possibly of support as well." *Hurley*, 515 U.S. at 575. As a result, regulating Charter's lineup of cable channels—including through private claims under section 1981 based on the ownership of the channels—would necessarily be a content-based restriction that cannot survive under the First Amendment.

## III.   NAAAOM LACKS ASSOCIATIONAL STANDING.

Entirely apart from the defects detailed above, NAAAOM's claim suffers from the independent defect that NAAAOM lacks standing. *See, e.g.*, *Molski v. Kahn Winery*, 381 F. Supp. 2d 1209, 1210–11 (C.D. Cal. 2005). Given that Plaintiffs dropped their claims against the FCC, the only remaining claim in the case is a single count against Charter based on its dealings with ESN. *See* FAC ¶¶ 84–92. NAAAOM lacks standing to assert such a claim, however, because it cannot satisfy the three requirements for an association to bring claims "as the representative of its members"—namely, "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). Here, NAAAOM cannot argue that ESN's participation is not required because ESN already *is* a party and the complaint seeks money damages on its behalf.

In addition, where an individual member of an association (like ESN) is already a party to the lawsuit, "prudential standing doctrines suggest that the individual plaintiff is in the best position to litigate his own claims." *Molski*, 381 F. Supp. 2d at 1210. In *Molski*, a disabled individual sued a winery under the Americans with Disabilities Act, but the suit also named a public interest group as plaintiff. *Id*. The court held that the public interest group "lack[ed] standing to pursue the federal ADA claim" because the individual plaintiff was "in the best position to assert his own claims." *Id*. at 1211. The court also observed that—like NAAAOM here—the public interest group had served as

an add-on plaintiff in several other lawsuits in an effort "'to lend an aura of legitimacy to . . . predatory litigation as part of the strategy to encourage settlement.'" *Id.* at 1210 (quoting *Molski v. Mandarin Touch Rest.*, 359 F. Supp. 2d 924, 935 (C.D. Cal. 2005)).

Plaintiffs' request for "injunctive relief prohibiting Charter from discriminating against African American-owned media companies," FAC at 21, also does not create standing for NAAAOM.[10]  As a threshold matter, the FAC lacks any allegations about other members of NAAAOM to suggest that this relief would benefit anyone other than ESN.  More important, it is black-letter law that a party cannot secure an injunction directing a defendant simply to "obey the law."  Plaintiffs' request for relief is framed in precisely that impermissible manner.  It does not contain any "reasonable detail . . . [regarding] the act or acts [to be] restrained," Fed. R. Civ. P. 65(d), and instead simply tracks Plaintiffs' claims under section 1981.  It thus runs afoul of the principle that "'blanket injunctions to obey the law are disfavored.'" *MGM Studios, Inc. v. Grokster, Ltd.,* 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (quoting *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 n.1 (8th Cir. 2004)); *see also Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897 (5th Cir. 1978) (rejecting an injunction prohibiting defendant from "[d]iscriminating on the basis of color, race, or sex in employment practices or conditions of employment"); *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435–36 (1941) ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute . . . .").

Because, at bottom, NAAAOM's claim simply replicates ESN's claim for damages, NAAAOM lacks standing and its claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[10]  Plaintiffs' request for declaratory relief *against the FCC*, *see* FAC at 21, is plainly an error held over from the original complaint and cannot create standing for NAAAOM given that the FCC is no longer even a party to the case.

1    DATED: September 23, 2016      Respectfully submitted,

2                             KIRKLAND & ELLIS LLP

3                             */s/ Patrick F. Philbin*

4                             Jeffrey S. Powell (*Admitted Pro Hac Vice*)
                                    jeff.powell@kirkland.com

5                             Patrick F. Philbin (*Admitted Pro Hac Vice*)
                                    patrick.philbin@kirkland.com

6                             Erin C. Johnston (*Admitted Pro Hac Vice*)
                                    erin.johnston@kirkland.com

7                             655 Fifteenth St., N.W.
                                    Washington, DC 20005

8                             Telephone: (202) 879-5000
                                    Facsimile: (202) 879-5200

9

10                           -and-

11                          Mark C. Holscher, SBN 139582
                                mark.holscher@kirkland.com

12                         KIRKLAND & ELLIS LLP
                                333 S. Hope St.

13                         Los Angeles, CA 90071
                                Telephone: (213) 680-8400

14                         Facsimile: (213) 680-8500

15                         *Attorneys for Defendant,*

16                         *CHARTER COMMUNICATIONS, INC.*

17

18

19

20

21

22

23

24

25

26

27

28

---