UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 16-609-GW(FFMx) | Date | October 24, 2016 |
|---|---|---|---|
| Title | *National Association of African-American Owned Media, et al. v. Charter Communications, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Louis R. Miller | Mark C. Holscher |
| David W. Schecter | Patrick F. Philbin |

**PROCEEDINGS:** DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT [48]

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. Defendants' Motion is GRANTED IN PART and DENIED IN PART. The Court will grant Defendant's motion with leave to amend, as to NAAAOM's standing. Otherwise, it will deny Defendant's motion.

A briefing schedule as to Defendant's Motion for Interlocutory Appeal is set as follows:

    Deadline to file motion      November 4, 2016
    Opposition      November 18, 2016
    Reply      November 25, 2016
    Hearing on motion      December 8, 2016 at 8:30 a.m.

     :    35

Initials of Preparer    JG

*Nat'l Ass'n of African Am.-Owned Media, et al. v. Charter Commcn's, Inc., et al.*, Case No. 2:16-cv-00609-GW-FFM, Tentative Ruling on Motion to Dismiss Plaintiffs' First Amended Complaint

I. **BACKGROUND**

On August 31, 2016, with leave of the Court, the National Association of African American-Owned Media ("NAAAOM") and Entertainment Studios Networks, Inc. ("ESN" and, together with NAAAOM, "Plaintiffs") filed a First Amended Complaint ("FAC") in this action which they first initiated against Charter Communications, Inc. ("Defendant" or "Charter") on January 27, 2016. *See* Docket No. 47. The FAC contains a single claim for relief, for violation of 42 U.S.C. § 1981 (generally, equal rights to make and enforce contracts).

Byron Allen, an African American actor, comedian and media entrepreneur, is the owner, founder and CEO of ESN. *See* FAC ¶ 8, 20. ESN is a 100% African-American owned television production and distribution company. *See id.* ¶¶ 18, 86. ESN has channel carriage contracts with more than 40 television distributors nationwide, including AT&T U-Verse, DirecTV, VerizonFIOS, Suddenlink, RCN and CenturyLink, broadcasting ESN's networks to nearly 80 million cumulative subscribers throughout the United States. *See id.* ¶¶ 21, 32. It has launched seven television networks/channels since 2009, and its shows have been nominated for, and have won, highly coveted and internationally recognized awards such as the Emmy Award. *See id.* ¶ 22.

NAAAOM is a limited liability company that works to obtain equal contracting opportunities for African American-owned media companies. *See id.* ¶¶ 14-15. ESN is a member of NAAAOM. *See id.* ¶ 17.

Defendant is currently the third-largest television distribution company in the country, with more than 17 million subscribers, and it refuses to carry African American-owned channels on its distribution platform. *See id.* ¶¶ 24, 30. Allan Singer was Defendant's Senior Vice President of Programming, the executive in charge of dealing with ESN and Allen. *See id.* ¶¶ 4, 7, 34. Tom Rutledge was Defendant's Chairman and CEO. *See id.* ¶ 8.

Plaintiffs allege that Defendant refuses to carry ESN's content because ESN is owned by an African American, thereby constituting a violation of 42 U.S.C. § 1981. To substantiate this claim (which Plaintiffs summarily assert is consistent with how Defendant has treated prominent

1

African American media executives and entrepreneurs "[f]or years," *see id.* ¶¶ 62, 88), Plaintiffs allege that:

- Defendant pays no licensing fees to 100% African-American owned multi-channel media companies.  *See id.* ¶ 30.
- ESN offered Defendant a deal of seven networks for ten cents per subscriber, a deal that is "far below the millions of dollars Charter pays to white-owned programmers to license their networks."  *Id.* ¶ 2.  But Defendant has never dealt in good faith with, nor provided a competitive proposal, offer or counter-offer to, ESN.  *See id.* ¶ 33.
- Singer refused, rescheduled and postponed meetings with ESN, preventing meaningful discussions about a carriage deal.  *See id.*  In 2011, Singer told ESN that it needed to "be a bit patient," insisting that ESN try again "next year."  *Id.* ¶ 36.  The next year, Singer again communicated that it was not the right time and that a "meeting in 2012 doesn't make sense," informing ESN that its "bandwidth and operational demands [had] increased" and that it was not launching any new networks, but then announced in late 2012 the launch of two new networks and announced in 2013 that it had entered into a channel-carriage agreement with RFD-TV, a white-owned/controlled network focusing on rural and Western lifestyle issues.  *See id.* ¶¶ 37-38, 40, 87.  In 2013, Defendant told ESN that it would not launch ESN's networks "for the foreseeable future," and indicated that it would not even allow ESN to make another pitch.  *See id.* ¶ 39.  However, that same year, Singer told ESN that it would keep one of ESN's channels, JusticeCentral.TV, in consideration for "the next e basic launches" – i.e., the "expanded basic" or "second-highest penetrated tier in the industry."  *Id.* ¶ 42.  But ESN learned that this was a ruse, with Singer telling ESN "I was being facetious.  We are never doing e basic launches…."  *Id.* ¶ 43.  He then told ESN that "Even if you get support from management in the field, I will not approve the launch of your networks."  *Id.* ¶ 44.
- Singer also informed ESN that Charter did not believe in ESN's "tracking model" because ESN's content appears on both ESN's channels and on other broadcast stations and cable networks.  *See id.* ¶ 41.  But the same is true of the vast

2

majority of cable networks Charter carries, including several white-owned media companies with carriage agreements with Charter. *See id.*

- When ESN attempted to get around what it perceived was Singer's discriminatory behavior and requested a meeting with Rutledge, Singer told ESN that Rutledge "does not meet with programmers." *Id.* ¶ 45. But Rutledge actually regularly meets with CEOs of white-owned programmers, such as Phillipe Daumann, CEO of Viacom. *See id.* When ESN reached out to Rutledge in March 2013, he never responded, and has refused to take or return any of ESN's calls or to meet with Allen. *See id.* ¶ 46.

- When ESN contacted Singer again in June 2015, Singer pretended to be surprised that ESN was still interested in doing a deal and required that ESN "provide a presentation about [its] channels as the first step to considering carriage," despite the fact that ESN had already provided such information directly to Singer on multiple occasions over the previous four years. *See id.* ¶¶ 47-48. When ESN "called Singer out on his lies and excuses," Singer agreed to set a meeting with ESN in July 2015. *See id.* ¶ 50. But, when ESN's team traveled from Los Angeles to Defendant's headquarters in Connecticut, they learned that Singer had just agreed to the meeting so that he could say "on the record" that he had met with ESN and considered offering a carriage deal, while Singer made clear that he would never do business with ESN. *See id.* ¶ 51. Singer also told ESN that Rutledge wanted to wait to "see what AT&T does," though AT&T already carried one of ESN's networks, and since that time has launched ESN's entire portfolio of channels. *See id.* ¶ 52. He also told ESN that any deal would have to wait until after Defendant's merger with Time Warner Cable because there were "too many unknowns," such that ESN would have to "go back to the line." *Id.* ¶ 53. ESN believes that Defendant was attempting to ensure that ESN would not publicly oppose the merger based on Defendant's refusal to do business with ESN. *See id.* ¶ 54. Defendant again also cited limited bandwidth as a reason there could be no deal, but in that same year Defendant expanded the reach of two white-owned, lesser-known channels, RFD-TV and CHILLER. *See id.* ¶¶ 55, 87. After that July 2015 meeting, Singer ceased returning ESN's calls and Rutledge continued

- to refuse to meet. *See id.* ¶ 56.
- Until the recent approval of its merger with Time Warner Cable, Defendant had an all-white male board of directors. *See id.* ¶ 10. While Plaintiff acknowledges that Defendant made diversity commitments in connection with pursuing approval of its merger, it alleges that these commitments are a sham that Defendant knows the Federal Communications Commission will not enforce. *See id.* ¶¶ 63-66, 73-83.
- In mid-March 2016, Singer approached protestors outside Charter's headquarters and "made derogatory racist comments about African Americans." *See id.* ¶ 4. Among other things, he specifically told them to "get off welfare and that they were typical African Americans looking for 'handouts.'" *Id.* ¶¶ 5, 58. Two days after Plaintiffs showed Defendant their allegations about Singer's statements, Defendant announced that Singer was leaving the company. *See id.* ¶ 5.
- Rutledge attended the Cable Hall of Fame Dinner on May 16, 2016, and Allen was also in attendance. *See id.* ¶ 8. At the dinner, Allen tried to speak with Rutledge, but Rutledge refused, making a dismissive hand gesture and calling Allen a "Boy," a term with racial connotations. *See id.* ¶¶ 8-9, 60.
- Plaintiffs also allege, on information and belief, that a message originating from within Charter was sent to Charter subscribers through their cable box in late July or early August (presumably of 2016). *See id.* ¶ 61. The message read "F*** Black Lives Matter! 1488 Brought to you by Phreak of Nature Baby J and King Benji! All N****** Must Die!" *Id.*

Defendant now moves to dismiss the FAC in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) and, to the extent it fails in that regard, to dismiss NAAAOM for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1). Thus, the ultimate question on this motion is whether Plaintiffs' – or one of the Plaintiffs' – action deserves to proceed beyond the pleadings.

## II. ANALYSIS

### A. <u>Procedural Standard</u>

Under Rule 12(b)(6), a court must (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all

reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable[1] and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruling on other grounds recognized in Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007) (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "'Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what…the claim is and the grounds upon which it rests.'" *Johnson*, 534 F.3d at 1122 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). However, a plaintiff must also "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (confirming that *Twombly* pleading requirements "apply in all civil cases"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "'[I]t may appear on the face of the

---

[1] Both parties have submitted requests for judicial notice. *See* Docket No. 48-1, 52-1, 55. While there have been arguments over the meaning or weight that can be attributed to the materials that are the subject of those requests, there has been no objection to the requests. As such, the Court grants the requests (though, in truth, some of the materials in question are not proper matters of judicial notice, but are nevertheless able to be considered in connection with a Rule 12(b)(6) motion).

pleadings that recovery is very remote and unlikely but that is not the test.'" *Johnson*, 534 F.3d at 1123 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002)).

A motion to dismiss for lack of standing may consist of a "facial" attack under Rule 12(b)(1), where a court accepts plausible factual allegations as true. *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003); Schwarzer, Tashima, et al., California Practice Guide: Federal Civil Procedure Before Trial (2016) ("Schwarzer & Tashima") §§ 9:76.2, 9:84-84.2, at 9-23, 9-29-30.

### B. Pleading a Claim Under Section 1981

Section 1981 of Title 42 of the United States Code provides, in part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts…and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens…." 42 U.S.C. § 1981(a); *see also id.* § 1981(b) ("For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."); *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 977 (9th Cir. 2004) ("Had Cholla a viable claim, Cholla would have standing to sue for racial discrimination, even though it is a corporation, if it 'either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity.'") (quoting *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004)).

"In order to withstand a motion to dismiss for failure to state a claim, a § 1981 cause of action need only allege 'that plaintiff suffered discrimination…on the basis of race.'" *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487 (9th Cir. 1995) (quoting *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 625 (9th Cir. 1988)).[2] Under Section 1981, "[p]roof of intent to discriminate is necessary to establish a violation," meaning that a plaintiff "must at least allege facts that would support an inference that defendants intentionally and purposefully discriminated against them." *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1313 (9th

---

[2] For instance, in *Parks School of Business*, the Ninth Circuit found sufficient to state a Section 1981 claim allegations that the defendants "took the disputed actions 'based on the fact that plaintiff is a proprietary postsecondary institution catering to minority and inner-city students, which students traditionally have a higher default rate than nonminority students'" and that one of the defendants "acted 'because [plaintiff] primarily teaches minority and inner-city students.'" *Parks Sch. of Bus.*, 51 F.3d at 1487. Curiously, the parties' briefs on this motion do not so much as mention that Ninth Circuit decision.

Cir. 1992), *abrogated in other respects as recognized by Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008); *see also Evans v. McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989) ("What is required in a section 1981 action…is that the plaintiffs must show intentional discrimination on account of race."). Causation is of course also a necessary element of a Section 1981 claim. *See Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 926-27 (9th Cir. 1991).

Here, Plaintiffs plainly have pled that ESN suffered discrimination on the basis of race, and that such racial discrimination caused Defendant's repeated refusal to contract with ESN. Apart from a general *Twombly*/*Iqbal* challenge, Defendant presents a two-pronged argument for why Plaintiff's claim should nonetheless be dismissed. First, it argues that Plaintiffs have not eliminated – indeed, the FAC reveals – the possibility that the reasons for Defendant's refusal to contract were not race-based at all, but were due to legitimate business considerations. Second, somewhat linked to that first argument, Defendant asserts that Plaintiff is required to demonstrate not just that racial animus was *one* contributing factor in Defendant's decisions, but that it must have been the "but for" cause of those decisions.

1. Exclusion of Innocent Explanations

With respect to the first argument, Defendant asserts that Plaintiffs are required to allege facts tending to exclude obvious alternative grounds for Defendant's decision not to carry ESN's channels. As the Court has recounted above, the FAC acknowledges that Defendant proffered business-based decisions not to carry the channels: limited bandwidth; a decision not to do "e basic" launches; problems with ESN's "tracking model"; and timing issues. Defendant relies upon *Iqbal* and, in particular, *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014), for the proposition that Plaintiffs must allege facts tending to exclude the possibility that the alternative, non-liability-producing, explanation is true.

*Eclectic Properties* does indeed repeat the Supreme Court's direction that "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief" and comments that "[w]hen considering plausibility, courts must also consider an 'obvious alternative explanation' for defendant's behavior." *Eclectic Props.*, 751 F.3d at 996 (quoting *Iqbal*, 556 U.S. at 678, 682). In addition, the Ninth Circuit noted that when a plaintiff simply offers allegations that are consistent with their favored explanation, but also with an alternative explanation, "[s]omething

7

more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *Id.* at 996-97 (quoting *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (omitting quotation marks).

However, the Ninth Circuit's explanation of the applicable standard set forth in *Eclectic Properties* did not stop there. The court also added, quoting from another of its recent decisions, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), that – when "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible" – a complaint may "be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." *Eclectic Props.*, 751 F.3d at 996 (quoting *Starr*, 652 F.3d at 1216).

The FAC survives the approach outlined in *Eclectic Properties*. Plaintiffs have proffered reasons why Defendant's reasons appear incredible, *i.e.* "facts tending to exclude the possibility that the alternative explanation[s are] true." *See* FAC ¶¶ 37-38, 40-42, 45, 52, 55, 87. The same can be said with respect to the merger-related actions Defendant emphasizes as demonstrating that discrimination could not have been the basis for the decision not to carry ESN's content: Plaintiffs have pled that the governmental oversight and approval of Defendant's merger necessitated the seemingly diversity-promoting commitments Defendant undertook. *See id.* ¶¶ 63-66, 73-83.

Presumably in an attempt to preclude a determination that Plaintiffs have done exactly what Defendant asserts that *Iqbal* and *Eclectic Properties* require that they do, Defendant argues that Plaintiffs have not identified any "similarly situated" content-providers (defined, according to Defendant's emphasis, by content, quality, popularity, or any objective metric relevant to a carriage decision) who were treated differently than ESN. But, even if the Court were to agree with Defendant in that regard (and the Court does not believe that issue is quite so clearly in Defendant's favor as Defendant asserts that it is, *see* FAC ¶¶ 21-22, 32, 41, 45, 55, 87), comparisons with a similarly-situated entity is only one way that Plaintiff could demonstrate discrimination, as Defendant concedes. *See* Docket No. 48, at 13:20-22; Docket No. 52, at 13:12-19. Direct evidence of racial animus suffices as well, *see Evans*, 869 F.2d at 1344-45, and – viewed in Plaintiffs' favor – Singer's and Rutledge's statements could qualify.[3] Moreover,

---

[3] Plaintiffs believe this view is bolstered by Singer's departure from Defendant's employ almost immediately after Plaintiffs' presented Defendant with Singer's alleged comments. Defendant proffers a different reason for Singer's

8

alleging the existence of a similarly situated entity is *not* one of the *pleading* requirements for Plaintiffs' claim *in the Ninth Circuit*. *See Maduka v. Sunrise Hosp.*, 375 F.3d 909, 912-13 (9th Cir. 2004). Defendant's citation – for the opposite proposition – to the Fifth Circuit's decision in *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015), is therefore pointless.

      Defendant also rejects Plaintiffs' attempt to demonstrate "pretext" as irrelevant, as part of an effort to explain away the ways in which Plaintiffs have poked holes in the reasons Defendant gave for not carrying ESN's content. In doing so, Defendant seeks to combine the collection of individual, arguably-refuted, reasons for declining carriage into a package deal that allowed Defendant to simply conclude that ESN's offerings simply were not "good enough" to carry. But, as explained above, Plaintiffs have offered reasons that tend to exclude the possibility that the non-nefarious explanation was true. To go much beyond that extends *Iqbal*'s and *Eclectic Properties*' reach further than the Court believes is warranted.

      Defendant also attempts to minimize, if not entirely eliminate, the Court's consideration of the alleged statements made by programming executive Singer and CEO Rutledge by noting that those comments were not made directly in connection with any carriage discussion and were uttered months after the last negotiations between ESN and Defendant, citing (insofar as Ninth Circuit case law is concerned) *Merrick v. Farmers Insurance Group*, 892 F.2d 1434, 1438 (9th Cir. 1990), an Age Discrimination in Employment Act ("ADEA") decision on an appeal from a summary judgment ruling and jury verdict. First, the Court rejects the assertion that such later-in-time comments simply cannot be considered for purposes of assessing whether Plaintiffs have sufficiently alleged a Section 1981 claim. *See Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007) ("We have held that bigoted remarks by a member of senior management may tend to show discrimination, even if directed at someone other than the plaintiff."). Second, simply because formal negotiations between ESN and Defendant had ceased does not mean that the Court could not view later evidence of discriminatory intent as related to a continued refusal to enter into a contract with ESN, especially where there are substantial allegations of Defendant simply ignoring, putting off, or stringing-along ESN over the course of several years. Even under Defendant's characterization of the "stray remarks" doctrine (which is what *Merrick* – without any detailed guidance on the operation of the "doctrine" – involved, in the context of

---

departure, *see* Docket No. 52, at 6 n.2, but that allegation is not found on the face of the FAC, and therefore may not be considered on this motion.

assessing the "pretext" step of the *McDonnell Douglas* framework used at the summary judgment stage in such cases[4]), only two of the factors favor their position – "whether the comment is related in time and subject matter to the decisional process" and "whether there are multiple comments or only a single statement" – whereas two others favor Plaintiffs – "whether the comment is ambiguous as an indicator of discriminatory animus" and "whether the comment is uttered by a decisionmaker." Docket No. 52, at 6:3-9 (quoting *Marques v. Bank of Am.*, 59 F.Supp.2d 1005, 1019 (N.D. Cal. 1999)).

If Singer's and Rutledge's alleged arguably-racist statements were all that Plaintiffs could muster, the Court would likely agree with Defendant that they were insufficient to satisfy even a "motivating factor" standard at the pleading stage. But when they are viewed in combination with the several-year effort made by ESN and the – viewed most-favorably to Plaintiffs – continued stonewalling and provision of excuses that do not match up with Defendant's practices with non-African American-owned media companies, the Court believes Plaintiffs have validly stated a claim under Section 1981. Plaintiffs are entitled to proceed to discovery on their claim.[5]

    2. <u>But-For Causation Requirement</u>

As for the second argument, Defendant relies on numerous out-of-circuit decisions for the proposition that Plaintiffs must demonstrate discrimination was the "but for" cause of Defendant's decision not to contract with ESN. *See Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516-17 (10th Cir. 2015); *Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357, 1358 (11th Cir. 1999); *Bachman v. St. Monica's Congregation*, 902 F.2d

---

[4] Decisions rendered on summary judgment motions about the meaning (or lack thereof) attributed to particular remarks, such as in *Carper v. Tribune Media,* CV 15-4259-VAP (SSx), 2016 WL 4062047 (C.D. Cal. July 25, 2016), are not particularly helpful to resolving the question of whether Plaintiffs merely have stated a claim.

[5] Defendant has directed the Court to an August 5, 2015 decision, a May 10, 2016 decision, and an October 5, 2016 decision rendered by a court in this District in a similar suit Plaintiffs brought, *National Association of African-American Owned Media v. Comcast Corporation*, CV 15-01239 TJH (MANx). *See* Request for Judicial Notice, Exhs. A-B (Docket No. 48-2, 48-3); Second Request for Judicial Notice, Exh. K (Docket No. 52-1). The August 5, 2015, decision contains no reasoned analysis or explanation as to why the pleading challenged failed the Rule 12(b)(6) standards. *See* Request for Judicial Notice, Exh. B, at pg. 4 of 4 (Docket No. 48-3). The May 10 and October 5, 2016, decisions concluded that the complaints in question failed to plead facts tending to exclude the possibility that an innocent explanation was true. *See* Request for Judicial Notice, Exh. A, at pgs. 3-4 of 4 (Docket No. 48-2); Second Request for Judicial Notice, Exh. K, at pgs. 2-3 of 3. However, the *Comcast* decisions are not controlling on this Court (an appeal has been filed with the Ninth Circuit, *see* Plaintiffs' Response to Defendant's Request for Judicial Notice (Docket No. 55), at 2:2-4), and here the Court has simply concluded otherwise based on the allegations in *this case*. In addition, none of the *Comcast* decisions made any reference whatsoever to any statements similar to those allegedly attributable to Singer and Rutledge here.

1259, 1262-63 (7th Cir. 1990); *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 914 (3d Cir. 1983). But the Ninth Circuit has specifically rejected the argument that a "mixed-motive" defense provides a complete defense to liability on a Section 1981 claim, including by dismissing the approach the Eleventh Circuit took in *Mabra*. *See Metoyer*, 504 F.3d at 932-34. *Metoyer* is still good law in this Circuit.[6]

Notwithstanding *Metoyer*, Defendant rejects the suggestion that a "mixed motive" or "motivating factor" analysis – where simply one of the motives behind the conduct in question was racially discriminatory – is sufficient to state a Section 1981 claim. While the Ninth Circuit has held that legal principles applicable in Title VII disparate treatment cases (where a "mixed motive" or "motivating factor" approach is sufficient) apply also to Section 1981 claims, *see Johnson*, 534 F.3d at 1122 n.3, Defendant responds that the Supreme Court decisions in *University of Texas Southwest Medical Center v. Nassar*, 133 S.Ct. 2517 (2013) and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009) demonstrate that Plaintiffs are simply wrong as a matter of law that a "mixed motive" or "motivating factor" approach applies here, as opposed to the "but for" requirement Defendant champions.

Unlike here, *Nassar* involved a Title VII retaliation claim,[7] and *Gross* concerned discrimination under the ADEA. Those claims are not present in this litigation, and Defendant has not established that – unlike Title VII – Section 1981 analysis takes any guidance from ADEA claims. Beyond even that, *Nassar* made clear that "[a]n employee who alleges status-based discrimination under Title VII need *not* show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is *not* the test." *Nassar*, 133 S.Ct. at 2522-23 (emphasis added). "Status-based discrimination," not retaliation, is what is (allegedly) involved in this case.

Beyond reliance on those decisions, Defendant acknowledges the Ninth Circuit's ruling in *Metoyer*, but just emphasizes that the ruling conflicts with the decision of every other Court of

---

[6] In addition, over 20 years before *Metoyer*, the Ninth Circuit had also held that a plaintiff did not have to show that discrimination was the sole factor behind the impact on the plaintiff. *See Mitchell v. Keith*, 752 F.2d 385, 391 (9th Cir. 1985).

[7] *Metoyer* is actually *consistent* with *Nassar* insofar as retaliation claims are concerned. *See Metoyer*, 504 F.3d at 934 ("[W]e must find that a mixed-motive defense to liability *is* available for a retaliation claim brought under § 1981…[s]ince a claim under § 1981 follows the same legal principles as those applicable in a Title VII case….") (emphasis added).

11

Appeals to address the issue. That may or may not be true, but *Metoyer* is a Ninth Circuit decision, and it therefore binds this Court in the absence of any intervening Supreme Court decision overruling it. Defendant argues that *Nassar* and *Gross* do just that. But as noted above, those cases involved claims and statutes not present or at issue here. Given that neither *Nassar* nor *Gross* dealt with Section 1981 and that neither case mentioned *Metoyer* (or, in *Gross*'s case, Section 1981) at all, if *Metoyer* is no longer good law on this point, this Court believes that it is the Ninth Circuit that should announce that conclusion.

### C. The First Amendment

Defendant also argues that imposing liability on it in this case for refusing to contract with ESN would violate its First Amendment rights, and Plaintiff therefore may not employ Section 1981 to that end.[8] This argument has no clear resolution, and the parties must resort to inferential reasoning from several decisions bearing some – but not total, or even necessarily controlling – similarities with this case.

At base, the argument is that Defendant's decision over which stations or programs to include in its distribution enjoys First Amendment protection in line with the Supreme Court's decisions in *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622 (1994) and *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995). That Section 1981 is (as was true in *Hurley*) a law of general applicability does not save it from this approach, a proposition that Defendant asserts – citing one district court decision, *Claybrooks v. American Broadcasting Companies*, 898 F.Supp.2d 986 (M.D. Tenn. 2012) – is "well settled."[9]

While Plaintiffs agree that Defendant is entitled to some First Amendment protection in deciding which channels to carry, they draw the line at Defendant being allowed "to decide which channels to carry based on the race of the owners." Docket No. 49, at 15:15-16. In part, they rely on *Turner Broadcasting*, asserting that Section 1981 "is a content neutral law that does not require Charter to carry any channels," *id.* at 16:5-6, but instead requires only equal treatment

---

[8] Plaintiffs do not contest that Defendant may present this First Amendment defense in connection with a Rule 12(b)(6) motion.

[9] Defendant also advances *Jian Zhang v. Baidu.com Inc.*, 10 F.Supp.3d 433 (S.D.N.Y. 2014), as a case supporting a First Amendment-focused outcome. Insofar as it is both non-controlling and does not involve television programming or carriage issues, the Court sees little reason to consider that case in detail here considering the more-immediate applicability and/or precedential considerations of *Turner Broadcasting*, *Hurley* and *Claybrooks*.

and merely prohibits Defendant from using different criteria for African American-owned networks. As such, Plaintiffs argue that Plaintiffs' claims trigger, at most, intermediate scrutiny. And because Defendant did not analyze the FAC under intermediate scrutiny, Plaintiffs argue that it has not met its burden on this motion with respect to this argument.[10]

Plaintiffs also reject Defendant's reliance on *Hurley* by arguing that, in that case, the Supreme Court explained that the forced association problems that existed with the parade at issue in that case were "absent in the cable context" and affirmed the notion that cable *distributors* like Defendant were not entitled to the same degree of First Amendment protection as cable *programmers*. They also distinguish *Claybrooks* from this case by noting that they are not challenging any decision by Defendant regarding the content of television programming.

*Turner Broadcasting* made clear that "[c]able programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." 512 U.S. at 636. That case specifically dealt with an analysis of certain sections of the Cable Television Consumer Protection and Competition Act of 1992 that "require[d] cable television systems to devote a portion of their channels to the transmission of local broadcast television stations," "so-called must-carry provisions." *Id.* at 626, 630. A similar message-forcing issue was present in *Hurley*, where the Supreme Court considered whether Massachusetts, by way of a state public accommodations law, could "require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey." *Hurley*, 515 U.S. at 559, 561, 566; *see also id.* at 572-73 ("Since every participating unit affects the message conveyed by the private organizers, the state courts' application of the statute produced an order essentially requiring petitioners to alter the expressive content of their parade."). Similarly, *Claybrooks* – a case which, unlike *Turner Broadcasting* and *Hurley*, *did* involve a Section 1981 claim – involved a lawsuit against a broadcaster and producers of the shows "The Bachelor" and "The Bachelorette," alleging racially discriminatory casting selections, seeking damages and injunctive relief prohibiting the defendants from engaging in the alleged discriminatory practices and requiring the defendants to consider non-whites as finalists for the role of the Bachelor and the Bachelorette. *See* 898 F.Supp.2d at 989-90. Though the Court acknowledges that these cases make clear that

---

[10] Plaintiffs assert that that their claim easily passes intermediate scrutiny because the government clearly has a legitimate interest in preventing racial discrimination and because their claim furthers this interest by seeking redress against Defendant's use of race as a criteria for contracting.

Defendant is entitled to First Amendment protection for its speech activities, several considerations give it some pause with respect to the notion that it can employ the First Amendment to avoid the reach of Section 1981 in the present context.

First, *Turner Broadcasting*, *Hurley* and *Claybrooks* all dealt, to some degree, with forced speech. The parties here battle over whether this case is more like *Turner Broadcasting* or *Hurley* in terms of Defendant's association with the message that it asserts would result should Plaintiffs prevail here.[11]

Commenting on *Turner Broadcasting*, in *Hurley* the Supreme Court explained that the forced "dissemination of a view" compromising "the speaker's right to autonomy over the message" was "absent in the cable context, because '[g]iven cable's long history of serving as a conduit for broadcast signals, there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator.'" 515 U.S. at 576. In contrast, "[u]nlike the programming offered on various channels by a cable network, [a] parade does not consist of individual, unrelated segments that happen to be transmitted together for individual selection by members of the audience," and is thus "not understood to be so neutrally presented or selectively viewed." *Id.* As *Hurley* itself could be taken to suggest by way of its summary of *Turner Broadcasting*, the Court finds any "forced message" issue in this case to be more similar to that involved in *Turner Broadcasting* than in *Hurley*. That is not to say that there is no forced-message issue here at all, but only one that is much more similar to what was involved in *Turner Broadcasting* (where there was "little risk" of association) than in *Hurley*.

Continuing with that issue in mind, although *Claybrooks* – which, of course, is not controlling on this Court in any sense – dealt with plaintiffs attempting to use Section 1981 to eliminate racial considerations in connection with a television broadcast, that case specifically dealt with the *casting decisions* for a *single program*. In that sense, there was – as compared to the situation at hand here – a much-more-direct impact on the content of the speech at issue and, simultaneously, a much more direct association between the defendants and that impacted

---

[11] It may be that Plaintiffs – and a jury and the Court – could not force Defendant to carry ESN's networks because of the First Amendment. But, at base, what this case appears to be about is Plaintiffs' attempt to get Defendant to stop (allegedly) discriminating against ESN based upon the race of its owner. Indeed, none of the relief requested in the FAC's Prayer asks that the Court force Defendant to carry Plaintiff's networks/channels. In *Hurley*, in contrast, the trial court had ruled that the plaintiff was "entitled to participate in the Parade on the same terms and conditions as other participants." *Hurley*, 515 U.S. at 563.

14

speech. *See Claybrooks*, 898 F.Supp.2d at 993 ("[T]he court finds that casting decisions are part and parcel of the creative process behind a television program – including the Shows at issue here – thereby meriting First Amendment protection against the application of anti-discrimination statutes to that process. Thus, as applied here, § 1981 would force the defendants to employ race-neutral criteria in the casting process, thereby regulating the creative content of the Shows. Accordingly, *as applied in this specific context*, § 1981 regulates speech based on its content – i.e., the race(s) of the Shows' respective cast members – which implicates strict scrutiny.") (emphasis added); *see also id.* at 996 ("[T]he Court in *Hurley* articulated a general principle that governs the court's analysis in this case: *under appropriate circumstances*, anti-discrimination statutes of general applicability must yield to the First Amendment.") (emphasis added).[12]

Next, under the approach laid out in *Turner Broadcasting*, the strength of Defendant's argument as to whether application of Section 1981 in the context of this case would be *content-based* would appear to depend on the activity focused upon. *See Turner Broad.*, 512 U.S. at 641-43. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Id.* at 643. Here, punishing Defendant for refusing to carry ESN's programming because that decision runs afoul of Section 1981 (assuming that it, in fact, does) would appear to be tied to the content of that decision not to contract, but *that decision* is not the speech activity in question here, according to Defendant's argument. The speech activity Defendant has identified is the actual programming it carries, not the behind-closed-doors contracting decisions (race-based or not) leading to that programming.[13] The Court is not convinced that Defendant could rely – even if it had chosen to do so – on reasoning analogous to *Claybrooks*, where the district court determined that the

---

[12] In the other similar lawsuits Plaintiffs have pursued against other similar defendants, only one court reached the First Amendment issue, tentatively ruling – following a single paragraph of analysis of the issue, based almost entirely on the analysis set forth in *Claybrooks* – in favor of the defense position before that litigation settled. *See* Request for Judicial Notice, Exh. C (Docket No. 48-4), at pg. 11 of 18. That tentative decision did not appear to contemplate the distinctions present between the casting issues of a single show presented in *Claybrooks* and the carriage decisions impacting a distributor's entire line of available programming, nor did it appear to recognize the steps the *Claybrooks* decision took to emphasize the limited context at issue in that case, as set forth in the quoted material reproduced above.

[13] The Court is somewhat further troubled by the fact that, in essence, what Defendant seeks here is a First Amendment-based exemption from racial discrimination laws for an entire industry. Were that the law, the Court might expect there to have been more decisions supporting or reflecting it than a single district court decision from Tennessee that dealt simply with a challenge to the casting decisions for one television show, a situation that – as set forth further above – appears to have a much more direct impact on speech activities than what is presented here.

casting decisions were "part and parcel of the creative process behind a television program," the more-obvious ultimate speech activity. Thus, whereas *Claybrooks* believed "strict scrutiny" was the proper analytical construct in that case, *see* 898 F.Supp.2d at 993, and *Hurley* may have reached that conclusion too (even *Claybrooks* was uncertain on that point, *see id.* at 995 n.11), it is not clear to this Court that the same should be true here.

In sum, the Court believes that, in terms of speech-impact, this case is more similar to *Turner Broadcasting* than it is to *Hurley* and *Claybrooks*, and that while Section 1981 might not be "content-neutral" with respect to the contracting decisions in question here, those decisions are not the speech activity Defendant attempts to rely upon here for First Amendment protection. As a result, while Defendant's ultimate carriage/programming activity is entitled to some measure of First Amendment protection, the Court does not believe that Defendant has identified and applied the proper method of analyzing the First Amendment impact of an application of Section 1981 to the contracting activity in question here. Having failed (to this point) to convince the Court of its position in that regard, the Court declines to rule in Defendant's favor on First Amendment grounds.[14]

### D. **NAAAOM's Standing**

Finally, Defendant asserts that NAAAOM lacks standing. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Defendant asserts that the individual plaintiff, ESN, is in the best position to litigate its own claims, meaning that prudential standing considerations support a determination that NAAAOM lacks standing. In addition, it argues that the FAC lacks any allegations about any other member of NAAAOM, meaning that there is no demonstration that any injunctive relief NAAAOM might pursue would benefit anyone other than ESN. Finally, Defendant contends that the form of injunction Plaintiffs request – amounting to a requirement that

---

[14] Before the case settled, the tentative ruling issued in Plaintiffs' similar lawsuit against AT&T Inc., AT&T Services, Inc., AT&T Mobility LLC, and DirecTV granted an interlocutory appeal of the First Amendment issues raised by the case. *See* Request for Judicial Notice, Exh. C (Docket No. 48-4), at pgs. 17-18 of 18. The Court will not consider whether a similar order is proper here in the absence of briefing directed to that issue.

Defendant obey the law – is not a proper form of injunction.[15]

Plaintiffs respond to this standing argument by asserting that NAAAOM has standing to seek injunctive relief on behalf of its members other than ESN and that such a claim does not require the participation of ESN. Their only wholly-separate contention with respect to this issue is that Defendant failed to meet and confer with respect to this issue/argument, meaning that the motion is the first time Plaintiffs were put on notice that Defendant would be challenging NAAAOM's standing. Defendant's response to this last point, in turn, is rather weak – it simply asserts that it "has consistently claimed that Plaintiffs' claims lack merit" (which does not address standing) and that Plaintiff has not identified any prejudice that it will suffer as a result of Defendant having raised the issue now. *See* Docket No. 52, at 25:1-4.

While the Court agrees with Plaintiffs that Defendant should have raised this issue, specifically, in connection with meet-and-confer efforts, "whether or not the parties raise the issue, '[f]ederal courts are required sua sponte to examine jurisdictional issues such as standing.'" *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008) (quoting *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2001)). That being said, while there may be problems with the injunctive relief requested as it is formulated in the FAC, if indeed NAAAOM has members other than ESN, the Court does not perceive a standing problem. If, however, ESN is NAAAOM's *only* member, then the individual member is already participating in the lawsuit and NAAAOM's participation is unnecessary, at least from the standpoint of prudential standing considerations. At this point in time, Plaintiffs' allegations are unclear with respect to whether NAAAOM has any members other than ESN (and Defendant has provided judicially-noticeable material at least calling into question whether ESN is NAAAOM's only member). *See* FAC ¶¶ 14-17; Docket No. 48, at 4:3-5.[16] As such, the Court would dismiss the FAC so as to allow Plaintiffs to provide further information supporting NAAAOM's standing, if they are able to do so.

### E. Conclusion

The Court will grant Defendant's Rule 12(b)(1) motion, with leave to amend, as to

---

[15] This last point seemingly has little to do with standing (or at least Defendant has not sufficiently explained the connection).

[16] In their Opposition brief, Plaintiffs assert that "NAAAOM has other members as well," citing paragraph 17 of the FAC. *See* Docket No. 49, at 2:16-17. But paragraph 17 of the FAC does not contain such an allegation. *See* FAC ¶ 17.

17

NAAAOM's standing.  Otherwise, it will deny Defendant's motion.