1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  DAVID W. SCHECTER (State Bar No. 296251)
   dschecter@millerbarondess.com
3  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
4  Los Angeles, California 90067
   Telephone:   (310) 552-4400
5  Facsimile:    (310) 552-8400

6  Attorneys for Plaintiffs

7

8

9              UNITED STATES DISTRICT COURT

10   CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12  NATIONAL ASSOCIATION OF          CASE NO. 2:16-cv-00609-GW-FFM
    AFRICAN AMERICAN-OWNED
13  MEDIA, a California limited liability   PLAINTIFFS' SECOND AMENDED
    company; and ENTERTAINMENT      COMPLAINT FOR CIVIL RIGHTS
14  STUDIOS NETWORKS, INC., a        VIOLATIONS
    California corporation,
15                                    DEMAND FOR JURY TRIAL
              Plaintiffs,
16                                   Action Filed:   January 27, 2016
       v.                            Trial Date:     Not Set
17
18  CHARTER COMMUNICATIONS,
    INC., a Delaware corporation; and
19  DOES 1 through 10, inclusive,

20            Defendants.

21

22

23

24

25

26

27

28

463356.1

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................ 3

PARTIES, JURISDICTION AND VENUE.............................................................. 7

    A.    Plaintiffs ............................................................................................ 7

    B.    Defendants.......................................................................................... 9

    C.    Jurisdiction And Venue..................................................................... 9

FACTS ...................................................................................................................... 10

    A.    Racial Discrimination In The Media................................................ 10

    B.    Charter's Racial Discrimination ..................................................... 10

    C.    Charter Makes Sham Commitments To Diversity............................ 19

    D.    Charter Enters Into An MOU.......................................................... 19

FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS (42 U.S.C.
    § 1981)............................................................................................................ 22

    A.    Section 1981 .................................................................................... 22

    B.    Damages .......................................................................................... 23

PRAYER FOR RELIEF .......................................................................................... 23

DEMAND FOR JURY TRIAL ............................................................................... 25

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Plaintiffs National Association of African American-Owned Media ("NAAAOM") and Entertainment Studios Networks, Inc. ("Entertainment Studios") (together "Plaintiffs") allege claims against Defendants Charter Communications, Inc. ("Charter") and DOES 1 through 10, inclusive, (together "Defendants") as follows:

## **INTRODUCTION**

1.     This case is about racial discrimination in contracting for television channel carriage.[1]  Plaintiff Entertainment Studios is an African American-owned media company.  For years, Entertainment Studios has been attempting to enter into a carriage agreement with Defendant Charter—now the third-largest television distributor in the United States—but Charter has refused to carry Entertainment Studios' channels because Entertainment Studios is owned by an African American.

2.     Entertainment Studios' channels are carried by more than 60 multi-channel video programming distributors ("MVPDs") throughout the United States, including DirecTV, AT&T U-Verse, AT&T TV Now, Verizon FIOS, DISH Network, Mediacom, Frontier Communications and RCN.  Through these MVPDs, Entertainment Studios' channels are distributed to over 80 million subscribers across the nation and in all 50 States.  The channels and their programming have also been nominated for, and have won, Emmy Awards.

3.     Entertainment Studios has spent years attempting to contract with Charter to obtain carriage for its channels, but Charter has not engaged in good faith negotiation.  Charter has completely shut the door to Entertainment Studios, and it has engaged in racial discrimination in the contracting process as alleged herein.  At the same time, Charter agreed to launch and/or renew similarly situated, white-

---

[1] A carriage agreement is a contract between a multi-channel video programming distributor, such as Charter, and a channel vendor/programmer, such as Entertainment Studios, granting the distributor the right to "carry" (that is, distribute) the programmer's channels.

owned channels while refusing to negotiate with Entertainment Studios.

4.     The United States Supreme Court recently held that a plaintiff asserting a claim under 42 U.S.C. § 1981 must allege and prove that racial discrimination was the but-for cause of the defendant's refusal to contract.  In a concurring opinion, Justice Ginsburg explained that a plaintiff can also state a claim under 42 U.S.C. § 1981 by alleging that the defendant subjected the plaintiff to a racially discriminatory contracting process.  In this case, Plaintiffs assert claims under both theories.  Charter engaged in racial discrimination against Entertainment Studios, and such racial discrimination was the but-for cause of Charter's refusal to contract. In addition, Charter subjected Entertainment Studios to a racially discriminatory contracting process, as alleged herein.

5.     Racial discrimination is the but-for cause of Charter's refusal to contract with Entertainment Studios because, as alleged herein, Entertainment Studios' channels are good enough for carriage and would have been carried by Charter if Entertainment Studios were white-owned.  Indeed, Charter's refusal to contract is not based on legitimate business reasons because Entertainment Studios' channels are carried by Charter's competitors and Entertainment Studios offered to license six of its networks to Charter for free and the seventh network for just ten cents per subscriber—which is the lowest offer Entertainment Studios can make, given the most favored nations clause in its other agreements.  Entertainment Studios' offer of ten cents per subscriber for a total of seven networks is far below the millions of dollars Charter pays to white-owned programmers to license their networks.  Still, Charter would not negotiate in good faith, let alone propose any terms on which it would carry some or all of Entertainment Studios' channels.

6.     Racial discrimination is an ongoing practice in the media industry with far-reaching adverse consequences.  The practice is so extensive that a top legal advisor to the Chairman of the Federal Communications Commission (the "FCC") told a representative of Entertainment Studios that the "cable system in America is

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400    Fax: (310) 552-8400

1  inherently racist."

2       7.     Plaintiffs have powerful evidence of Charter's racial bias against

3  Entertainment Studios.  Four African Americans who were protesting against

4  Charter's discriminatory practices outside of Charter's headquarters in Stamford,

5  Connecticut have come forward and will testify that Charter's Senior Vice President

6  of Programming, Allan Singer, approached them and made derogatory racist

7  comments about African Americans.

8       8.     Singer yelled at these African Americans and told them to get off

9  welfare and that they were typical African Americans looking for "handouts."

10  Singer stereotyped one of the people as an African American who was out of work,

11  saying he spent his money on frivolous things.  In his anger, Singer specifically

12  mentioned race.  These comments show Singer's racism—that African Americans

13  are financially irresponsible and can succeed only through government assistance or

14  "handouts."  Two days after Plaintiffs showed Charter their allegations about

15  Singer's racist statements to this African American group, Charter announced that

16  Singer was leaving the company.

17       9.     Singer's racism has roots in the racism that existed in this Country in

18  the mid-19th Century when African Americans were thought to be genetically

19  inferior to and lacking the intellectual capacity of whites.

20       10.    A person with such racial bias carries these prejudices into all aspects

21  of his life, including his work.  At Charter, Singer was the executive in charge of

22  dealing with Entertainment Studios and its African American owner until he left the

23  company.

24       11.    Plaintiffs also have evidence of racial animus harbored by Charter's

25  Chairman and CEO, Tom Rutledge.  Rutledge and the owner, founder and CEO of

26  Entertainment Studios, Byron Allen, who is African American, both attended the

27  Cable Hall of Fame Dinner on May 16, 2016.  At the dinner, Allen tried to talk with

28  Rutledge, but Rutledge refused.  Rutledge made a dismissive hand gesture and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

317504.2

SECOND AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   called Allen "Boy," a derogatory name for an African-American man.  Rutledge told

2   Allen that he needed to change his behavior.

3        12.    Rutledge's use of the derogatory, insulting term "Boy" was no

4   accident.  Rutledge was expressing his belief that Allen was different from the white

5   executives Rutledge is used to dealing with, echoing the days of Jim Crow when

6   whites routinely called African-American men "Boys" to demean them as inferior to

7   whites.

8        13.    The racism expressed by Rutledge and Singer is evidence that racial

9   animus is the but-for cause of Charter's refusal  to carry Entertainment Studios'

10   channels.  It also explains why Charter, until the approval of its merger with Time

11   Warner Cable, had an all-white, male board of directors, even though women and

12   racial minorities subscribe to Charter's services and are responsible for a significant

13   portion of Charter's revenue.  Rutledge and Singer would not do business with

14   Entertainment Studios because of their racial animosity and because, per their

15   statements, it would just be another "handout" for African Americans.

16        14.    In addition to the derogatory racist statements by Charter CEO, Tom

17   Rutledge, and Charter Senior Vice President of Programming, Allan Singer, as set

18   forth above, there is abundant evidence pleaded herein showing Charter's racism

19   including deceitful conduct, phony excuses for not contracting with Entertainment

20   Studios, and paying off non-media civil rights groups such as Al Sharpton's

21   organization to supposedly fulfill diversity requirements.

22        15.    Charter's discrimination is contrary to the law.  Racial discrimination in

23   contracting is prohibited by 42 U.S.C. § 1981, which ensures that all people have the

24   same right to make and enforce contracts "as is enjoyed by white citizens."  Section

25   1981 was enacted to eradicate racial discrimination in contracting and is derived

26   from the Civil Rights Act of 1866, and applies with full force today.

27        16.    Through this lawsuit, Plaintiffs seek to vindicate their rights under 42

28   U.S.C. § 1981.

317504.2

**6**

## PARTIES, JURISDICTION AND VENUE

**A.     Plaintiffs**

17.     Plaintiff NAAAOM is a California limited liability company, with its principal place of business in Los Angeles, California.

18.     NAAAOM was created for the purpose of and is working toward obtaining the same contracting opportunities for African American-owned media companies as their white counterparts for—among other things—distribution, channel carriage, channel positioning and advertising dollars.  At the heart of its mission is obtaining the economic inclusion of African American-owned media companies in the same manner as white-owned media companies.

19.     Historically, because of economic exclusion, African American-owned media companies have been forced either to: (i) give away significant equity in their enterprises; (ii) pay exorbitant sums for carriage, effectively bankrupting the business; or (iii) go out of business altogether, pushing African American-owned media to the edge of extinction.

20.     Entertainment Studios—a member of NAAAOM—is being discriminated against on account of race in violation of 42 U.S.C. § 1981. NAAAOM thus has standing to seek redress for such violations in its own right. The interests at stake in this litigation—namely, the right of African American-owned media companies to make and enforce contracts in the same manner as their white-owned counterparts—are consonant with NAAAOM's purpose.  NAAAOM does not seek money damages, so the individual participation of its members is not required.  NAAAOM's individual members include:  Akabueze Productions, Inc.; The Alvin James Group; HBCUX Network; NASA Studios; and The Yard.

21.     Plaintiff Entertainment Studios is a corporation, with its principal place of business in Los Angeles, California.  Entertainment Studios is a 100% African American-owned television production and distribution company, involved in all facets of the entertainment industry including television, film, digital publishing,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    advertising and multiple networks/channels featuring original content.

2       22.    Entertainment Studios is a bona fide Minority Business Enterprise as

3    defined by the National Minority Supplier Development Council, Inc. and as

4    adopted by the Southern California Minority Supplier Development Council.

5       23.    Entertainment Studios was founded in 1993 by Byron Allen, an

6    African-American actor, comedian and media entrepreneur.  Allen is the sole owner

7    of Entertainment Studios.  Allen first made his mark in the television world in 1979

8    as the youngest comedian ever to appear on "The Tonight Show Starring Johnny

9    Carson."  He thereafter served as the co-host of NBC's "Real People," one of the

10   first reality shows on television.  Alongside his "on-screen" career, Allen developed

11   a keen understanding of the "behind the scenes" television business.  For more than

12   22 years, Allen has built Entertainment Studios into an independent, global media

13   company competing with the likes of The Walt Disney Company, Warner Bros.,

14   Lionsgate, Sony, and Paramount (among others).

15      24.    Entertainment Studios has channel carriage contracts with more than 60

16   MVPDs, including the largest MVPDs in the nation such as AT&T U-Verse,

17   DirecTV, AT&T TV Now, DISH Network, VerizonFIOS, Mediacom, Frontier

18   Communications and RCN.  These MVPDs distribute Entertainment Studios'

19   networks to over 80 million cumulative subscribers in all 50 States.

20      25.    In 2009 Entertainment Studios launched six high-definition television

21   networks (channels) to the public, eventually launching a seventh in 2012.

22   Entertainment Studios produces, owns and distributes over 35 television series on

23   broadcast television, with thousands of hours of video programming in its library.

24   Entertainment Studios' shows have been nominated for, and have won, highly

25   coveted and internationally recognized awards such as the Emmy Award.

26   Entertainment Studios also acquires, produces and distributes motion pictures to

27   movie theatres, home video distributors, television networks, and other licenses

28   through its affiliate companies.  A copy of an Entertainment Studios promotional

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  presentation highlighting certain key aspects of the company and the programming

2  it produces is attached hereto as **Exhibit A**.

3         26.     In December 2012, Entertainment Studios launched

4  "JusticeCentral.TV," a 24-hour-per-day, high-definition court, news and

5  entertainment channel featuring several Emmy-Award-nominated and Emmy-

6  Award-winning television judges and legal/court shows.  JusticeCentral.TV has

7  already proved itself a successful channel, being now available to over 25 million

8  pay television subscribers in the United States.

9  **B.     Defendants**

10        27.     Charter Communications, Inc. is a Delaware corporation with its

11 principal place of business in Stamford, Connecticut.  Charter also has an office, is

12 registered to do business and operates in California.  Charter is now the third-largest

13 television distribution company in this country, with nearly 16 million subscribers.

14        28.     Charter became the third-largest television distribution company after

15 the FCC—the federal administrative agency tasked with regulating interstate and

16 international communications by radio, television, wire, satellite and cable—

17 approved the merger with Time Warner Cable.

18        29.     Plaintiffs are informed and believe, and on that basis allege, that

19 Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to

20 Plaintiffs for the wrongs alleged herein.  The true names and capacities, whether

21 individual, corporate, associate or otherwise, of Defendants DOES 1 through 10,

22 inclusive, are unknown to Plaintiffs at this time.  Accordingly, Plaintiffs sue

23 Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this

24 Complaint to allege their true names and capacities after they are ascertained.

25 **C.     Jurisdiction And Venue**

26        30.     This case is brought under a federal statute, 42 U.S.C. § 1981; as such,

27 there is federal question jurisdiction under 28 U.S.C. § 1331.  Venue of this action is

28 proper in Los Angeles because the parties reside in this district, as defined in 28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1   U.S.C. § 1391; and the acts in dispute were committed in this district.

2   <u>**FACTS**</u>

3   **A.   <u>Racial Discrimination In The Media</u>**

4       31.   Racial discrimination in this industry is so extensive that a top legal

5   advisor to the Chairman of the FCC, Gigi Sohn, candidly told an Entertainment

6   Studios representative that the "cable system in America is inherently racist."  Such

7   inherent racism prevents television audiences from viewing programming from

8   African American-owned media companies.

9       32.   Major television channel distributors such as Charter have unique

10   power to limit economic opportunity for channel owners.  To reach the television

11   audience, channel owners like Entertainment Studios are reliant upon the services of

12   television distributors, like Charter, to provide access to their distribution platforms.

13   Channel owners need distribution to realize subscriber and advertising revenue.

14       33.   Charter has refused to carry African American-owned channels on its

15   distribution platform, contributing to the near-extinction of African American

16   ownership in mainstream media.  There is a statistic that highlights the inequity

17   here:  Charter's President and CEO, Tom Rutledge—the main perpetrator of the

18   discrimination recounted herein and a blatant racist—was awarded a compensation

19   package in 2016 valued at $98.5 million according to a filing with the Securities and

20   Exchange Commission.  Meanwhile, 100% African American-owned media

21   companies received *nothing* by way of license fees from Charter.

22   **B.   <u>Charter's Racial Discrimination</u>**

23       34.   Charter's racial bias is evident even in its own moving papers.  In its

24   motion to dismiss filed on June 16, 2016, Charter refers to Plaintiffs as extortionists

25   and calls the lawsuit a "scam" brought with "cynical" motives—these are criminal

26   accusations.  When white-owned businesses file suit against Charter, they are called

27   litigants.  But when an African American-owned business files suit, Charter calls it

28   extortion.

Miller Barondess, llp
Attorneys at Law
1999 Avenue of The Stars, Suite 1000   Los Angeles, California 90067
Tel: (310) 552-4400    Fax: (310) 552-8400

317504.2

35.     Entertainment Studios is an African American-owned global media company with over 80 million cumulative television subscribers, seven television networks, a film studio and a robust production and distribution business.  Charter's competitors—including AT&T U-Verse, DirecTV, AT&T TV Now, DISH Network, VerizonFIOS, Mediacom, Frontier Communications and RCN—carry Entertainment Studios' channels.  In fact, VerizonFIOS has carried Entertainment Studios' networks since 2009, has repeatedly extended carriage agreements with Entertainment Studios and added JusticeCentral.TV in 2012.  Charter's competitors would not carry, let alone extend, carriage agreements with Entertainment Studios unless Entertainment Studios' channels had market demand and working with Entertainment Studios made sound business sense.

36.     Despite the fact that Charter's competitors carry Entertainment Studios' channels, Charter has never dealt in good faith with, nor provided a competitive proposal, offer or counter-offer to, Entertainment Studios.  Charter's top programming official, Senior Vice President Allan Singer, has refused, rescheduled and postponed meetings with Entertainment Studios, which prevented Charter and Entertainment Studios from engaging in meaningful discussions about a carriage deal.

37.     By virtue of his position, Singer had decision-making authority over which channels Charter carries.  Singer blocked Entertainment Studios' attempts to obtain a carriage contract with Charter because Entertainment Studios is owned by an African American.

38.     To hide their racial animus, Singer and other Charter executives, all at the direction of CEO Tom Rutledge, gave Entertainment Studios multiple phony excuses for why "now" was never the right time.

39.     In 2011, Entertainment Studios reached out to Charter to discuss a possible carriage deal.  Singer told Entertainment Studios they needed to "be a bit patient."  Singer insisted that Entertainment Studios try again "next year."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

40.    When the next year rolled around, Singer explained that, again, "now" was not the right time.  Speaking on behalf of Charter, Singer stated "we aren't launching" despite the fact that Charter was indeed launching new, white-owned channels throughout the entire time period in question.  As additional excuses, Singer told Entertainment Studios that Charter's "bandwidth and operational demands have increased," such that it did "not have any opportunities for the foreseeable future."  Just as he did in 2011, Singer told Entertainment Studios that a "meeting in 2012 doesn't make sense."

41.    Charter's made-up excuse that it was not launching any new networks on its system in 2012 and that it had bandwidth problems are provably false.  During this same period, Charter was in negotiations to launch several new white-owned networks on its system.  Indeed, in late 2012, Charter publicly announced that it had entered into carriage agreements with, among others, the Walt Disney Company (for the Longhorn Network, among others) and Time Warner Cable Sports.

42.    Charter's phony excuses and refusals to discuss a carriage deal with Entertainment Studios continued into 2013.  Charter again told Entertainment Studios that it would not launch its networks "for the foreseeable future," further stating that it would not even allow Entertainment Studios to make "another pitch."

43.    Charter's excuses for why Entertainment Studios would not be eligible for a carriage deal "in the foreseeable future" are patently false.  Charter publicly announced in 2013 that it had entered into a channel carriage agreement with white-owned/controlled RFD-TV, which provides programming focused on rural and Western lifestyle issues.

44.    Another phony excuse was that, according to Singer, Charter did not believe in Entertainment Studios' "tracking model" because Entertainment Studios' content appears on both Entertainment Studios' channels and on other broadcast stations and cable networks.  This is yet another made-up excuse because several white-owned media companies with carriage agreements with Charter have the same

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  business model—*i.e.*, their content not only appears on their channels but is also

2  sold to other networks.  Indeed, the vast majority of cable networks Charter carries

3  have programming that simultaneously runs on broadcast networks, local broadcast

4  television stations, other cable networks, and on digital platforms such as Netflix,

5  Hulu and Amazon.

6      45.    In 2013, Singer advised Entertainment Studios that Charter would be

7  willing to keep one of Entertainment Studios' channels, JusticeCentral.TV, in

8  consideration for "the next e basic launches"—*i.e.*, the "expanded basic" or second-

9  highest penetrated tier in the industry.  After several years of making no progress

10  with Charter, Entertainment Studios was surprised and excited by this potential

11  launch opportunity.

12      46.    Entertainment Studios thanked Charter for its consideration of

13  JusticeCentral.TV as part of its next e basic launches.  But this potential launch

14  opportunity was a Singer/Rutledge ruse.  Charter had no intention of ever doing

15  business with Entertainment Studios.  Shockingly, Singer told Entertainment

16  Studios:  "I was being facetious.  We are never doing e basic launches . . . ."

17      47.    In other words, Charter was only willing to consider Entertainment

18  Studios for a service that it never intended to launch or utilize.  Singer made it clear

19  that he would block any future efforts to obtain carriage, telling Entertainment

20  Studios:  "Even if you get support from management in the field, I will not approve

21  the launch of your networks."

22      48.    Sensing that Singer was discriminating against Entertainment Studios,

23  Entertainment Studios requested a meeting with Charter's President and CEO, Tom

24  Rutledge.  Singer tried to block this effort, telling Entertainment Studios that

25  Rutledge "does not meet with programmers."  This was a lie because Rutledge

26  regularly meets with white CEOs of white-owned programmers.  In fact,

27  Entertainment Studios witnessed Rutledge meet with Phillipe Daumann (who is

28  white), the then-CEO of Viacom—*i.e.*, a programmer.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

49.     Seeking the same treatment Charter offers to white-owned programmers, Entertainment Studios reached out to Charter's CEO, Tom Rutledge, in March 2013 to pitch its channels.  Rutledge never responded.  In fact, Rutledge has refused to take or return any of Entertainment Studios' calls or to meet with Byron Allen, the African-American founder, chairman and CEO of Entertainment Studios.

50.     Despite Charter and Rutledge's repeated refusals to negotiate for carriage with Entertainment Studios, Entertainment Studios persisted. Entertainment Studios reached out again in June 2015.  Despite several years of knocking on Charter's door and countless attempts to set in-person meetings and phone calls to discuss a carriage deal, Singer told Entertainment Studios that he thought Entertainment Studios was "no longer interested" in a Charter carriage deal—a wholly illogical, disingenuous statement.

51.     Condescendingly, Singer stated that the "practice in the industry" dictated that Entertainment Studios "provide a presentation about [its] channels as the first step to considering carriage."  Singer even said that he "looked forward to learning more about them."  But as Entertainment Studios had already provided information about its channels directly to Singer on multiple occasions over the past four years, Singer's comments were bizarre and fake.

52.     As Singer knew, at no time did Entertainment Studios stop seeking carriage on Charter's system.  Indeed, the suggestion that Entertainment Studios would not be interested is ludicrous; why would any television programmer decide to stop seeking carriage to reach Charter's nearly 16 million subscribers and all of the potential advertising and licensing revenue associated with a carriage deal? Singer always balked at Entertainment Studios' persistence, telling Entertainment Studios that he did not need "another pitch" from the company and that it did not make sense to "meet again" regarding Entertainment Studios' request for carriage. In reality, Singer was creating a record to cover up his past dealings with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Entertainment Studios.

53.     After Entertainment Studios called Singer out on his lies and excuses, Singer finally agreed to set a meeting with Entertainment Studios in July 2015.

54.     Entertainment Studios' team traveled from Los Angeles to Charter's headquarters in Stamford, Connecticut, with the understanding that the purpose of the meeting was to negotiate the terms of a carriage deal.  But when they arrived, they soon learned that was not the case.  Singer lured Entertainment Studios to Connecticut just so he could say "on the record" that he met with Entertainment Studios' team and considered offering a carriage deal.  Singer made clear that Charter would never do business with Byron Allen's company.

55.     Once more, Singer gave Entertainment Studios all the excuses in the book.  Singer told Entertainment Studios that Rutledge wanted to wait to "see what AT&T does."  But AT&T already carried one of Entertainment Studios' networks (JusticeCentral.TV) at the time, and AT&T has since launched Entertainment Studios' entire portfolio of channels on its television distribution system.  Despite this—and despite Charter's indication that it just wanted to wait to "see what AT&T does"—Charter still refuses to carry any of Entertainment Studios' channels.

56.     Charter also told Entertainment Studios that it would have to wait until after the Time Warner Cable merger was approved to be considered for a carriage deal.  According to Charter, until the merger is approved, there are "too many unknowns" to enter into a carriage deal with Entertainment Studios.  Singer told Entertainment Studios:  "You go back to the line"—*i.e.*, "Get to the back of the bus behind white-owned channels who have carriage."

57.     Using this ploy, Charter wanted to postpone the negotiations and deceive Entertainment Studios into believing that it had a chance to obtain carriage on its system so that Entertainment Studios would not publicly oppose the merger on the basis of Charter's racist refusal to do business with the African American-owned Entertainment Studios.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

58.     This phony meeting is evidence that Charter subjected Entertainment Studios to a racially discriminatory contracting process, which caused significant harm to Entertainment Studios, including, but not limited to, costs and expenses associated with preparing for the meeting and traveling to and from the meeting.

59.     At the meeting, Charter restated its phony excuse about limited bandwidth.  Charter had ample bandwidth available to carry Entertainment Studios' channels.  In fact, in 2015, Charter expanded the reach of its distribution of the white-owned, lesser-known channel RFD-TV across its entire television footprint—including in major urban cities such as Los Angeles and Atlanta where, presumably, the demand for rural networking is not nearly as high as the demand for the general audience lifestyle networks offered by Entertainment Studios.  Also in 2015, Charter expanded the reach of the white-owned, lesser-known channel CHILLER to its subscribers.

60.     Meanwhile, Singer ceased returning Entertainment Studios' calls altogether; and Rutledge refused to meet.

61.     During the relevant period when Entertainment Studios sought a carriage contract from Charter, Charter granted preferential treatment to similarly situated, white-owned channels.  In addition to launching and expanding the distribution of RFD-TV and CHILLER, Charter continued to carry, and on information and belief renewed, carriage contracts for the following channels with similar content to Entertainment Studios' channels:  Comedy Central (similar to Comedy.TV); Cooking Channel and Food Network (similar to Recipe.TV); Destination America (similar to MyDestination.TV); E! (similar to ES.TV); Justice Network (similar to JusticeCentral.TV); and Velocity (similar to Cars.TV). Entertainment Studios' channels are similarly situated with these and other channels and contain high-quality content with significant viewer demand.  Entertainment Studios reserves the right to alter and/or expand its list of similarly situated channels based on information learned during the discovery phase of this case.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

62.     There is no sound business justification for Charter's unwavering refusal to meet in good faith with Entertainment Studios and negotiate a carriage deal.  There is also no sound business justification for Charter's refusal to provide a competitive proposal, offer or counter-offer to Entertainment Studios, especially since Charter's competitors carry Entertainment Studios' channels.  Rather than engage in good faith discussions, Singer and his boss Rutledge simply do not want to do business with Entertainment Studios' owner Byron Allen because he is African American.

63.     Entertainment Studios has powerful direct evidence confirming Singer and Rutledge's racial bias.  In mid-March 2016, as summarized above, Singer approached an African-American group in front of Charter headquarters and made derogatory racist comments to them.  Singer racially profiled these people, telling them to get off of welfare and that they were typical African Americans looking for a "handout."

64.     These people were peacefully and lawfully protesting the merger that made Charter the third-largest television distributor in the United States, giving it even more power to discriminate against African American-owned media.  Given Singer and Rutledge's racial bias, it is not surprising that Charter has refused to treat Entertainment Studios as a legitimate media company.

65.     And more, the Chairman and CEO of Charter, Tom Rutledge, condescendingly dismissed Allen at the Cable Hall of Fame dinner, calling him "Boy" and telling him to change his behavior.  This is powerful, direct evidence of racial bias.

66.     And there is still more evidence of Charter's racism.  In or about late July or early August 2016, Charter subscribers received a horrific, white supremacist message through their cable box.  The message is shown below:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400



67.     The message reads:  "F*** Black Lives Matter!  1488 Brought to you by Phreak of Nature Baby J and King Benji!  All N****** Must Die!"  The term 1488 is a combination of two white supremacist symbols.  14 refers to 14 words: "We must secure the existence of our people and a future for white children."  88 refers to HH or "Heil Hitler" (H is the eighth letter of the alphabet).

68.     Charter has not identified the source of this message.  On information and belief, this message came from within Charter.

69.     In addition, Charter's upper management has referred to Byron Allen— the African American owner of Entertainment Studios—as a terrorist.  This is yet another example of Charter treating African Americans differently because of race, as Charter upper management would not refer, and has not referred, to a white channel owner using similar language.

70.     Entertainment Studios is merely the most recent victim of Charter's racism towards African Americans.  For years, prominent African American media executives and entrepreneurs have tried and failed to launch a cable television network on Charter's platform.  Charter's refusals have led to the near extinction of 100% African American-owned media.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**C.     Charter Makes Sham Commitments To Diversity**

71.     Charter's racially discriminatory conduct is evidenced by its song-and-dance routine with the FCC, where Charter makes diversity commitments that appear genuine so that both Charter and the FCC can present themselves as champions of diversity—but in reality, these commitments are a sham that Charter knows the FCC will not enforce.

72.     Diversity is a core concern for FCC merger approval.  Indeed, a driving purpose of the Federal Communications Act and the First Amendment is to ensure the widest possible dissemination of information from diverse sources.  Yet the FCC has not done enough to protect African American-owned media companies in the face of increased media consolidation.  The FCC routinely encourages, and then accepts as reliable, empty diversity promises in order to ostensibly satisfy the law's diversity requirements.

73.     It has become an all-too-common practice for merger applicants to satisfy diversity commitments by using "token fronts"—African-American shills posing as "fronts" or "owners" of so-called "Black cable channels" that are actually majority-owned and controlled by white-owned businesses.  The FCC gives merger applicants significant credit for making "voluntary" diversity commitments that are truly empty and illusory.  The result provides the merging parties with a "win-win" situation:  The FCC can claim that it has secured voluntary diversity concessions (and, thus, can posture itself as a champion of diversity), while the applicants get what they want—*i.e.*, agency approval.

74.     That is exactly what was done with the Charter/Time Warner Cable merger.

**D.     Charter Enters Into An MOU**

75.     To receive regulatory approval from the FCC for its merger with Time Warner Cable, Charter entered into a memorandum of understanding ("MOU") with a dozen "multicultural leadership organizations," including Al Sharpton's National

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

Action Network, among other non-media civil rights groups.  Through the MOU, Charter made symbolic commitments, including appointing minority members to its all-male, all-white Board of Directors, appointing a so-called "Chief Diversity Officer," and enhancing its "involvement and investment" in organizations serving communities of color—*i.e.*, making monetary "contributions"—pay offs—to non-media civil rights groups that support the merger.

76.     Charter apparently thought that Al Sharpton spoke for all African Americans, and thus if Charter entered into an MOU with Sharpton, Charter must be making a *bona fide* commitment to African American-owned media.  But Sharpton does not speak for all African Americans, and certainly not for African American-owned media companies.  Sharpton acts merely as racial cover, and it is far less expensive for Charter to pay him than to do business with African American-owned media companies like Entertainment Studios.

77.     In fact, Sharpton has a well-documented business model and track record of obtaining payments from corporate entities in exchange for his support on "racial issues."  Sharpton can be bought on the cheap, and allows businesses to avoid doing business with real African American-owned companies that would lead to true economic inclusion for African Americans—something that is unacceptable to Rutledge and Charter.

78.     Even worse, the implementation of Charter's illusory MOU was contingent upon the approval of Charter's merger application by the FCC.  Rutledge's motive in entering into the MOU is thus transparent:  The pledges made by Charter were designed to facilitate approval of the merger; Charter otherwise had no intention of increasing diversity or inclusion in its business practices, including with respect to contracting for channel carriage.  If the merger were to have fallen through, it would have been business as usual at Charter—*i.e.*, diversity is not on the agenda.

79.     Charter's press release regarding the MOU stated that the MOU

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

includes "specific steps" that Charter will take post-merger, including the following:

- ▪ Appointing one African American, one Asian American/Pacific Islander and one Latino American to its board of directors within two years of the close of the transaction;

- ▪ Appointing a so-called "Chief Diversity Officer"; and

- ▪ Expanding "programming targeting diverse audiences."

80.     These first two commitments—to add minority members to its board of directors and appoint a "Chief Diversity Officer"—are only symbolic.  They do nothing to enhance diversity of the entities contracting with Charter or advance economic inclusion of African American-owned media companies.  The fact that, in 2016, Charter did not already have a Diversity Officer indicates that Charter had no interest in diversity.

81.     Nor did Charter's vague commitment to expanding "programming targeting diverse audiences" promote diversity in ownership or economic inclusion of African American-owned media companies in any real way.  Through this pledge, Charter committed only to distributing more programming "targeting" diverse audiences.  Charter made no commitment to actually do business with minority-owned media companies.

82.     Without a commitment to do business with minority-owned media companies, there can be no true economic inclusion for such companies in the media industry.  Charter's symbolic commitments to add minority members to its board and appoint a "Chief Diversity Officer" do nothing to protect African American-owned media companies like Entertainment Studios from continued economic exclusion by Charter.  Post-merger and post-implementation of the MOU, the television content available to Charter's nearly 16 million subscribers will continue to be limited by Charter's racial discrimination in contracting.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

## FIRST CAUSE OF ACTION: VIOLATION OF CIVIL RIGHTS
## (42 U.S.C. § 1981)
## (By Plaintiffs NAAAOM and Entertainment Studios Against
## Defendant Charter)

**A.     Section 1981**

83.     Plaintiffs refer to and incorporate by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

84.     Charter has engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting, which is illegal under § 1981.  Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

85.     African Americans are a protected class under § 1981.  Entertainment Studios is a member of that class because it is a 100% African American-owned media company.

86.     As alleged herein, Entertainment Studios attempted many times over many years to contract with Charter to carry its channels, but Charter has refused, providing a series of phony excuses.  Yet, Charter has continued to contract with— and make itself available to contract with—similarly situated white-owned television channels.

87.     Charter has refused to contract with Entertainment Studios for channel carriage.  Charter has a pattern and practice of refusing to do business, or offering unequal contracting terms to, African American-owned media companies.

88.     Racial discrimination is the but-for cause of Charter's refusal to contract.  If Entertainment Studios were a white-owned company, Charter would have offered Entertainment Studios a carriage contract for some or all of its lifestyle channels.

89.     Charter also subjected Entertainment Studios to a racially

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   discriminatory contracting process that caused Entertainment Studios to incur

2   significant costs and expenses.

3   **B.   Damages**

4        90.    But for Charter's refusal to contract with Entertainment Studios,

5   Entertainment Studios would receive millions of dollars in annual license fees and

6   advertising revenue.  Moreover, with distribution on one of the largest television

7   platforms in the nation, the demand for Entertainment Studios' channels both

8   domestically and internationally would increase, leading to additional growth and

9   revenue for Entertainment Studios' channels.

10        91.    Based on the revenue Entertainment Studios would generate if Charter

11   contracted with them in good faith, Entertainment Studios would be valued at

12   approximately $10 billion.

13        92.    Similarly situated lifestyle and entertainment media companies are

14   valued at higher amounts.  But for Charter's refusal to contract with Entertainment

15   Studios, Entertainment Studios would have a higher valuation.

16        93.    Accordingly, Charter's unlawful discrimination has caused

17   Entertainment Studios in excess of $10 billion in damages, according to proof at

18   trial; plus punitive damages for intentional, oppressive and malicious racial

19   discrimination.

20                   **PRAYER FOR RELIEF**

21       **WHEREFORE**, Plaintiffs pray for judgment, as follows:

22       1.    Plaintiff Entertainment Studios prays for compensatory, general and

23              special damages from Charter in excess of $10 billion according to

24              proof at trial;

25       2.    Plaintiffs NAAAOM and Entertainment Studios pray for injunctive

26              relief prohibiting Charter from discriminating against African

27              American-owned media companies, including Entertainment Studios,

28              based on race in connection with contracting for channel carriage;

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

3.      Plaintiff Entertainment Studios prays for punitive damages, based on oppression and malice, according to Charter's net worth;

4.      Plaintiff Entertainment Studios prays for attorneys' fees, costs and interest; and

5.      Plaintiffs NAAAOM and Entertainment Studios pray for such other and further relief as the court deems just and proper.

DATED:  June 4, 2020                    MILLER BARONDESS, LLP


By: _____
        */s/ Louis R. Miller*
        LOUIS R. MILLER
        Attorneys for Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

317504.2

24

SECOND AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiff Entertainment Studios hereby demands trial by jury pursuant to the
3 Seventh Amendment of the United States Constitution on the 42 U.S.C. § 1981
4 claim for damages.

5

6 DATED:  June 4, 2020                    MILLER BARONDESS, LLP

7

8

9                                    By: _____*/s/ Louis R. Miller*_____
10                                         LOUIS R. MILLER
                                          Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

317504.2

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400